# DC  CINGS

*Phyllis Copy*

## DISTRICT OF COLUMBIA
## CHILDREN INSPIRED NOW GAIN STRENGTH

APPLICATION FOR

COOPERATIVE AGREEMENTS FOR THE COMPREHENSIVE
COMMUNITY MENTAL HEALTH SERVICES FOR CHILDREN
AND THEIR FAMILIES PROGRAM

GFA NO. SM-02-002

April 26, 2002

| APPLICATION FOR<br>FEDERAL ASSISTANCE | 2. DATE SUBMITTED<br>April 23, 2002 | | Applicant Identifier<br>N/A |
|---|---|---|---|
| 1. TYPE OF<br>SUBMISSION:<br>Application ☒<br>☐ Construction | ☐ Preapplication<br>☐ Construction<br>☐ Non-Construction | 3. DATE RECEIVED BY STATE<br>N/A | State Application Identifier<br>N/A |
| | | 4. DATE RECEIVED BY FEDERAL AGENCY | Federal Identifier |

**5. APPLICANT INFORMATION**

| Legal Name:<br>DC Children Inspired Now Gain Strength | Organizational Unit:<br>DC Department of Mental Health |
|---|---|
| Address (give city, county, state, and zip code):<br>77 P St, NE<br>Suite 400<br>Washington, DC 20002 | Name and telephone number of the person to be contacted on matters involving this application (give area code)<br>Nicholas Geleta, Ph.D.<br>202-631-3157 |

| 6. EMPLOYER IDENTIFICATION NUMBER (EIN):<br>5 3 - 6 0 0 1 1 3 1 | 7. TYPE OF APPLICANT: (enter appropriate letter in box) [A] |
|---|---|
| **8. TYPE OF APPLICATION:**<br>☒ New   ☐ Continuation     ☐ Revision<br><br>If Revision, enter appropriate letter(s) in box(es): ☐ ☐<br><br>A. Increase Award    B. Decrease Award    C. Increase Duration<br>D. Decrease Duration    Other (specify): | A. State                      H. Independent School Dist.<br>B. County                    I. State Controlled Institution of Higher Learning<br>C. Municipal                J. Private University<br>D. Township                K. Indian Tribe<br>E. Interstate                L. Individual<br>F. Intermunicipal        M. Profit Organization<br>G. Special District        N. Other (Specify): |
| | 9. NAME OF FEDERAL AGENCY:<br>SAMHSA, CMHS |

| 10. CATALOG OF FEDERAL DOMESTIC<br>ASSISTANCE NUMBER:   9 3 - 1 0 4<br><br>TITLE: SM-02-002    city set-aside | 11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT:<br>INTERAGENCY/FAMLY COOPERATIVE AGREEMENT<br>establishing A COMPREHENSIVE COMMUNITY<br>BASED SYSTEM OF CARE FOR CHILDREN WITH<br>SERIOUS EMOTIONAL DISTURBANCE AND THEIR<br>FAMILIES |
|---|---|
| 12. AREAS AFFECTED BY PROJECT (cities, counties, states, etc.):<br>Washington, DC | |

**13. PROPOSED PROJECT:**

| Start Date<br>10/1/02 | Ending Date<br>9/30/08 | 14. CONGRESSIONAL DISTRICTS OF: | |
|---|---|---|---|
| | | a. Applicant<br>Washington, DC | b. Project<br>Washington, DC |

| 15. ESTIMATED FUNDING: | | 16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS? |
|---|---|---|
| a. Federal | $ 999,564.00 | a. YES. THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE    ORDER 12372 PROCESS FOR REVIEW ON: |
| b. Applicant | $ 13,104,151.00 | DATE  April 23, 2002 |
| c. State | $ .00 | |
| d. Local | $ .00 | b. NO ☐   PROGRAM IS NOT COVERED BY E.O. 12372 |
| e. Other | $ 40,000.00 | ☐ OR PROGRAM HAS NOT BEEN SELECTED STATE FOR REVIEW |
| f. Program Income | $ .00 | 17. IS APPLICATION DELINQUENT ON ANY FEDERAL DEBT? |
| g. TOTAL | $ 14,143,715.00 | ☐ YES   If "Yes," attach an explanation.   ☒ No |

| 18. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT, THE DOCUMENT HAS BEEN DULY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES IF THE ASSISTANCE IS AWARDED. | | |
|---|---|---|
| a. Typed Name of Authorized Representative<br>Martha B. Knisley | b. Title<br>Director, DMH | c. Telephone number<br>202-673-2200 |
| d. Signature of Authorized Representative | | e. Date Signed<br>April 24, 2002 |

Previous Editions Not Usable<br>Authorized for Local Reproduction

Standard Form 424   (Rev. 7-97)<br>Prescribed by OMB Circular A-102

Nicholas Geleta, Ph.D., Project Director

## PROJECT ABSTRACT

The District of Columbia Department of Mental Health (DMH) is applying for funding to establish a comprehensive system of care for children and youth challenged with serious emotional disturbances (SED) and their families. The *D.C. Children Inspired Now Gain Strength (D.C. CINGS)* project's major goal is to reduce reliance on out-of-home and out-of-state residential treatment centers for care of D.C. youth with SED through the creation of a comprehensive array of community-based services and supports to that are accessible, available, culturally appropriate and of high quality with families. The project will be governed by the Mental Health System of Care Sub-Council of the District Intergovernmental Youth Investment Collaborative which includes the directors of all key child-serving agencies, the Presiding Judge of the newly mandated District Family Court, the Superintendent of the D.C. Public Schools, the director of the Protection and Advocacy agency and four family members. Through a public/university partnership, professors from Howard University School of Social Work will head the local evaluation team for the project.

Following an interagency strategic planning process during year one, the project management team will be responsible for providing comprehensive services to over 800 youth and their families during the six-year grant period. The target population will be youth meeting criteria for SED between the ages of birth and 22. The District will begin with youth who are currently in costly out-of-state placements, eventually addressing the needs of youth who are also at-risk of such placements. Particular strategies will include the development of intensive home-based services, wraparound case management, an array of crisis responses for youth, and the development of a cadre of family liaisons to support families as they move through the system and identify/develop needed community supports. In addition, the grant funding will be used to strengthen and build the capacity of the Family Advocacy and Support Association (FASA) and increase access to services for currently underserved Latino and immigrant children and families in the District. All aspects of the project will apply cultural competency principles and strategies.

The re-organized DMH, with its Medicaid Rehabilitation Services Option, and increased interagency collaboration, presents a unique and significant opportunity to move system of care development forward. A plethora of local reform initiatives and developments have produced a focus on youth and interagency collaboration that has been missing in the District. D.C. is now poised to make real system reform for children with SED and their families. The cooperative agreement presents a major opportunity to make a difference.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | FACE PAGE................................................................................ | 2 |
| 2 | ABSTRACT................................................................................. | 3 |
| 3. | TABLE OF CONTENTS................................................................ | 4 |
| 4. | BUDGET FORMS........................................................................ | 6 |
| | Letter Certifying 10% Indirect Cost........................................... | 9 |
| 5. | PROJECT NARRATIVE AND SUPPORT DOCUMENTATION........... | 10 |

SECTION A:   UNDERSTANDING THE PROPOSED PROJECT.................10

| | | |
|---|---|---|
| A1. | History of System of Care Development:  Progress and Challenges........... | 10 |
| A2. | Need for System of Care Reform in the District.......................... | 11 |
| A3. | The District's Target Population................................................ | 13 |
| A4. | Current Service Capacity.......................................................... | 14 |
| A5. | Gaps, Inadequacies and Barriers in Current Service Structures.......... | 15 |
| A6. | Local Developments and Initiatives Creating Opportunities.............. | 16 |

SECTION B:  IMPLEMENTATION PLAN:  DEVELOPMENT OF THE
SYSTEM OF CARE............................................18

| | | | |
|---|---|---|---|
| B1. | Developing the System of Care............................................... | | 18 |
| | B1.1. | Systems Integration.................................................. | 18 |
| | B1.2. | Interagency Collaboration......................................... | 20 |
| | B1.3. | Services Integration.................................................. | 20 |
| | B1.4. | Wraparound Process.................................................. | 22 |
| | B1.5. | Case Review............................................................. | 23 |
| | B1.6. | Access...................................................................... | 23 |
| | B1.7. | Fiscal Sustainability................................................. | 23 |
| | B1.8. | Community Leader Support........................................ | 24 |
| B2. | Infrastructure....................................................................... | | 24 |
| | B2.1. | Governance Body...................................................... | 25 |
| | B2.2. | Administrative Team.................................................. | 25 |
| | B2.3. | Office in the Community............................................ | 26 |
| | B2.4. | Management Information System.................................. | 26 |
| | B2.5. | Service Provision...................................................... | 26 |
| B3. | Key Activities for Providing Services...................................... | | 29 |
| | B3.1. | Delivery of Clinical Interventions............................... | 29 |
| | B3.2. | Case Management Services......................................... | 29 |
| | B3.3. | Individualized Service Plans....................................... | 30 |
| B4. | Family Involvement.............................................................. | | 30 |
| B5. | Youth Involvement............................................................... | | 31 |
| B6. | Cultural Competence............................................................. | | 31 |
| B7. | Training and Technical Assistance........................................... | | 31 |
| B8. | Social Marketing.................................................................. | | 32 |
| B9. | Increased Capacity and Quality of Services............................... | | 32 |
| B10. | Eligibility Criteria, Referral Sources, Enrollment Procedures............ | | 32 |
| B11. | Application Development........................................................ | | 33 |
| B12. | Non-Federal Match............................................................... | | 33 |
| B13. | Project Sustainability............................................................ | | 33 |

SECTION C:     PROJECT MANAGEMENT AND STAFFING PLAN.................33
   C1.     Agency Description.................................................................33
   C2.     Qualifications and Experience of Key Personnel..............34
   C3.     Task Chart and Timeline.......................................................37
   C4.     Facilities, Equipment, Resources.........................................38
   C5.     Service Locations.....................................................................38

SECTION D:  EVALUATION PLAN.....................................................38
   D1.     Successful and Inclusive Implementation Plan.................38
   D2.     National Evaluation.................................................................39
   D3.     Data Measurement...................................................................41
   D4.     Local Evaluation.......................................................................43

SECTION E:     REFERENCES TO LITERATURE CITATIONS.........45

SECTION F:     BUDGET JUSTIFICATION, EXISTING RESOURCES,
                      OTHER SUPPORT..................................................................48
   F.1.    Line Item Justification............................................................48
           F.1.1.   Year 1......................................................................48
           F.1.2.   Year 2......................................................................49
           F.1.3.   Year 3......................................................................51
           F.1.4.   Year 4......................................................................52
           F.1.5.   Year 5......................................................................54
           F.1.6.   Year 6......................................................................55
   F.2.    Existing Resources...................................................................56
   F.3.    Other Support............................................................................57

SECTION G:     BIOGRAPHICAL SKETCHES AND JOB DESCRIPTIONS...........61

SECTION H:  CONFIDENTIALITY AND SAMHSA PARTICIPANT
                      PROTECTION.........................................................................89
   H1.     Protection for Potential Risks..............................................89
   H2.     Data Collection.........................................................................89
   H3.     Privacy and Confidentiality..................................................90
   H4.     Adequate Consent Procedures.............................................91

6.     Appendices...............................................................................................92
       Appendix 1:   Memoranda of Understanding for Services Coordination
                          and Evaluation...............................................................93
       Appendix 2:   Health Coverage Modifications Plans/Governor's Assurance..........112
       Appendix 3:   Data Collection Procedures.....................................114
       Appendix 4:   Sample Consent Forms.............................................117
       Appendix 5:   Non-Federal Match Certification.............................121
       Appendix 6:   Organizational Chart, Staffing Pattern, Timeline and
                          Management Chart.......................................................123
7.     Assurances...............................................................................................137
8.     Certifications...........................................................................................139
9.     Disclosure of Lobbying Activities......................................................142
10.    Checklist....................................................................................................143

5

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

OMB Approval No. 0348-0044

# BUDGET INFORMATION - Non-Construction Programs

## SECTION A - BUDGET SUMMARY

| Grant Program Function or Activity (a) | Catalog of Federal Domestic Assistance Number (b) | Estimated Unobligated Funds | | New or Revised Budget | | |
|---|---|---|---|---|---|---|
| | | Federal (c) | Non-Federal (d) | Federal (e) | Non-Federal (f) | Total (g) |
| 1. | | $ | $ | $ | $ | $ 0 |
| 2. | | | | | | 0 |
| 3. | | | | | | 0 |
| 4. | | | | | | 0 |
| 5. TOTALS | | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |

## SECTION B - BUDGET CATEGORIES

| 6. Object Class Categories | GRANT PROGRAM, FUNCTION OR ACTIVITY | | | | Total (5) |
|---|---|---|---|---|---|
| | (1) Child MH Init. | (2) | (3) | (4) | |
| a. Personnel | $ 238,890 | $ | $ | $ | $ 238,890 |
| b. Fringe Benefits | 40,611 | | | | 40,611 |
| c. Travel | 55,000 | | | | 55,000 |
| d. Equipment | 38,290 | | | | 38,290 |
| e. Supplies | 26,500 | | | | 26,500 |
| f. Contractual | 474,524 | | | | 474,524 |
| g. Construction | 0 | | | | 0 |
| h. Other | 34,880 | | | | 34,880 |
| i. Total Direct Charges (sum of 6a - 6h) | 908,695 | | 0 | 0 | 908,695 |
| j. Indirect Charges | 90,869 | | | | 90,869 |
| k. TOTALS (sum of 6i and 6j) | $ 999,564 | $ | $ 0 | $ 0 | $ 999,564 |
| 7. Program Income | $ | $ | $ | $ | $ 0 |

Standard Form 424A   (7-97)

XFT   Created by: PSC Media Arts (301) 443-2454

6

## SECTION C - NON-FEDERAL RESOURCES

| (a) Grant Program | (b) Applicant | (c) State | (d) Other Sources | (e) TOTALS |
|---|---|---|---|---|
| 8. CHILD MENTAL HEALTH INITIATIVE | | | | |
| 9. | $ 13,104,151 | $ 0 | $ 40,000 | $ 13,144,151 |
| 10. | | | | |
| 11. | | | | |
| 12. TOTALS (sum of lines 8 and 11) | $ 13,104,151    0 | $    0 | $ 40,000    0 | $ 13,144,151    0 |

## SECTION D - FORECASTED CASH NEEDS

| | Total for 1st Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|---|
| 13. Federal | $    0 | $ | $ | $ | $ |
| 14. Non-Federal | | | | | |
| 15. TOTAL (sum of lines 13 and 14) | $    0 | $    0 | $    0 | $    0 | $    0 |

## SECTION E - BUDGET ESTIMATES OF FEDERAL FUNDS NEEDED FOR BALANCE OF THE PROJECT

| (a) Grant Program | FUTURE FUNDING PERIODS (Years) | | | |
|---|---|---|---|---|
| | (b) First | (c) Second | (d) Third | (e) Fourth |
| 16. CHILD MENTAL HEALTH INITIATIVE, BUDGET YEARS 2-5 | $ 1,260,074 | $ 1,919,973 | $ 1,454,592 | $ 1,442,355 |
| 17. | 1,260,074 | 1,919,973 | 1,454,592 | 1,442,355 |
| 18. | | | | |
| 19. | | | | |
| 20. TOTALS (sum of lines 16 - 19) | $ 1,260,074 | $ 1,919,973 | $ 1,454,592 | $ 1,442,355 |

## SECTION F - OTHER BUDGET INFORMATION

21. Direct Charges:

22. Indirect Charges:

23. Remarks
    See continuation sheet for budget year 6.

SF 424A (Rev. 7-97)

District of Columbia GFA Sgt-01-002                                      Nicholas Geletz, Ph.D., Project Director

## SECTION C - NON-FEDERAL RESOURCES

| | (a) Grant Program | (b) Applicant | (c) State | (d) Other Sources | (e) TOTALS |
|---|---|---|---|---|---|
| 8. | | $ | $ | $ | $ |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | TOTALS (sum of lines 8 and 11) | $ 0 | $ 0 | $ 0 | $ 0 |

## SECTION D - FORECASTED CASH NEEDS

| | | Total for 1st Year | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|---|---|
| 13. | Federal | $ | $ | $ | $ | $ |
| 14. | Non-Federal | | | | | |
| 15. | TOTAL (sum of lines 13 and 14) | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |

## SECTION E - BUDGET ESTIMATES OF FEDERAL FUNDS NEEDED FOR BALANCE OF THE PROJECT

| | (a) Grant Program | FUTURE FUNDING PERIODS (Years) | | | |
|---|---|---|---|---|---|
| | | (b) First | (c) Second | (d) Third | (e) Fourth |
| 16. | CHILD MENTAL HEALTH INITIATIVE, BUDGET YEAR 6 | $ 996,826 | $ | $ | $ |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | TOTALS (sum of lines 16 - 19) | $996,826 | $ 0 | $ 0 | $ 0 |

## SECTION F - OTHER BUDGET INFORMATION

| 21. Direct Charges: | 22. Indirect Charges: |
|---|---|
| 23. Remarks | |

SF 424A  (I    .07)  Page 2

## DC CINGS BUDGET YEAR 1

| PERSONNEL | Grant Cost | Per Year | Per Hr | Hours* | Months | FTE | IN KIND |
|---|---|---|---|---|---|---|---|
| Principal Investigator | $0.00 | $140,000.00 | 67.30769231 | 2080 | 12 | 0.1 | |
| Project Director | $0 | $0 | 0 | 2080 | 12 | | $14,000 |
| Evaluation Assistant (parent) | $14,150 | $33,961 | 16.32740385 | 1733.3333 | 10 | 1 | $84,658 |
| MIS/Evaluation Liasion | $50,202 | $60,242 | 28.9625 | 1733.3333 | 10 | 0.5 | $0 |
| Liasion to Fiscal Officer | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
| Training & T/A Liasion | $25,101 | $60,242 | 28.9625 | 1733.3333 | 10 | 1 | $60,242 |
| Social Marketing/Communications Mgr. | $25,101 | $60,242 | 28.9625 | 1733.3333 | 10 | 0.5 | $0 |
| Clinical Director | $0 | $84,658 | 40.70096154 | 2080 | 12 | 0.5 | $0 |
| Admin Asst (X2) | $49,943 | $29,966 | 14.40673077 | 1733.3333 | 10 | 2 | $84,658 |
| Family Coordinator | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
| Youth Coordinator | $0 | $61,565 | 29.59855769 | 2080 | 12 | 0.5 | $71,642 |
| Family Liaison | $0.00 | $33,961 | 16.32740385 | 1906.6667 | 11 | 4 | $30,783 |
| Key Family Contact | $14,150 | $33,961 | 16.32740385 | 1733.3333 | 10 | 0.5 | $0 |
| State/ Local Liaison (Senior Project Adv.) | $0 | $99,580 | 0 | 2080 | 12 | 0.33 | $0 |
| Interagency Coordinator | $60,242 | $60,242 | 34.755 | 1733.3333 | 10 | 1 | $32,861 |
| | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
| | | | | | | | |
| TOTAL | $238,890 | | | | | | $364,844 |
| FRINGE (17.0%) | $40,611 | | | | | | $65,307 |

| | | |
|---|---|---|
| **TRAVEL** | | |
| Project staff, familiies, governance | $55,000 | |
| | | |
| **EQUIPMENT** | | |
| 14 Computers | $14,000 | |
| 6 laptopS w/ docking stations | $12,000 | |
| printers (2 network) | $4,000 | |
| 3 fax machines | $1,200 | |
| 20 phones (install & monthly chg) | $2,040 | |
| 6 cellular phones (purchase) | $1,050 | |
| a/v equipment for trainer/community pro. | $4,000 | o/h proj, vcr/monitor |
| | | |
| **SUPPLIES** | | |
| software | $10,000 | |
| office supplies | $12,000 | |
| training materials | $4,500 | |
| | | |
| **CONTRACTUAL** | | |
| Annie E Casey | $0 | |
| Training and TA | $150,000 | $40,000 |
| FASA | $15,000 | |
| Bilingual translators for writing | $10,000 | marketing/training/evaluation materials, brochures |
| Oral bilingual ppl ($15/hr, 200 hrs) | $3,000 | evaluation, needs assessment meetings |
| Sign-language interpreters ($20/hr, 100 h | $2,000 | Family advocates, CBC for hearing impaired parents |
| TA (marketing, PR) | $20,000 | |
| Provider Services(DMH non-federal) | $0 | |
| Evaluation | $150,000 | $12,500,000 |
| Family LiaisonS (4) | $124,524 | |
| | | |
| **RENT** | | |
| Office Space | $0 | $174,000 |
| | | |
| **OTHER** | | |
| cell phones ($40/mo each) | $2,880 | starting mo 2 |
| Printing evaluation materials | $7,500 | |
| Printing-marketing/training lit | $7,500 | for consumers, providers, community |
| child care ($10/hr, 300 hrs) | $3,000 | for mtgs, trainings, eval (incl 2 ppl caring at times) |
| food ($5/pers, 1,000 ppl) | $5,000 | for mtgs, trainings |
| evaluation stipends ($20/eval, 200 eval.) | $4,000 | for interview/questionnaire completion |
| travel vouchers ($10/voucher, 200 vchrs) | $2,000 | to get to mtgs, trainings, eval |
| room rental | $3,000 | for community meetings |
| SUBTOTAL | $908,694 | |
| INDIRECT RATE (10%) | $90,869 | $13,144,151 |
| TOTAL | $999,564 | $1,000,000.00 |

*According to month hired    $13,144,151

8a

DISTRICT OF COLUMBIA  SM-02-002                                    NICHOLAS GELETA, Ph.D., PROJECT DIRECTOR

DC CINGS BUDGET- YEAR 2                                                                      1.04

| | Grant Cost | Per Year | Per Hr | Hours* | Months | FTE | IN KIND |
|---|---|---|---|---|---|---|---|
| **PERSONNEL** | | | | | | | |
| Principal Investigator | $0.00 | $145,600 | 70.00 | 2080 | 12 | 0.1 | $14,560 |
|   Project Director | $0 | $0 | 0 | 2080 | 12 | 1 | $88,044 |
|   Evaluation Assistant (parent) | $17,660 | $35,319 | 16.9805 | 2080 | 12 | 0.5 | $0 |
| MIS Evaluaton Liasion | $62,652 | $62,652 | 30.121 | 2080 | 12 | 1 | $0 |
| Liasion to Fiscal Officer | $0 | $0 | 0 | 2080 | 12 | 1 | $62,652 |
| Training & TA Liasion | $31,326 | $62,652 | 30.121 | 2080 | 12 | 0.5 | $0 |
| Social Marketing/ Communication Mgr. | $31,326 | $62,652 | 30.121 | 2080 | 12 | 0.5 | $0 |
|   Clinical Director | $0 | $88,044 | 42.329 | 2080 | 12 | 1 | $88,044 |
|   Admin Asst (X2) | $62,329 | $31,165 | 14.983 | 2080 | 12 | 2 | $0 |
|   Family Coordinator | $0 | $0 | 0 | 2080 | 12 | 1 | $74,508 |
| Youth Coordinator | $0 | $64,028 | 30.7825 | 2080 | 12 | 0.5 | $32,014 |
| Family Liaison | $0.00 | $35,319 | 16.9805 | 2080 | 12 | 8 | $0 |
| Key Family Contact | $17,660 | $35,319 | 16.9805 | 2080 | 12 | 0.5 | $0 |
| State/Local Liaison (Senior Project Adv.) | $0 | $103,563 | 49.79 | 2080 | 12 | 0.33 | $34,176 |
|   Interagency  Coordinator | $62,652 | $62,652 | 30.121 | 2080 | 12 | 1 | $0 |
| | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
|     **TOTAL** | $285,604 | | | | | | $379,438 |
| | | | | | | | |
| **FRINGE (17.0%)** | $48,553 | | | | | | $67,919 |
| | | | | | | | |
| **TRAVEL** | | | | | | | |
| Project staff, familiies, governance | $65,000 | | | | | | |
| | | | | | | | |
| **EQUIPMENT** | | | | | | | |
|   4 Computers | $4,000 | | | | | | |
|     1 laptop w/docking station | $2,000 | | | | | | |
|   2 network printers | $4,000 | | | | | | |
| 2 fax machines | $1,800 | | | | | | |
|   20 phones (monthly charge) | $700 | | | | | | |
|   6 cellular phones (purchase) | $1,050 | | | | | | |
| a/v equipment for communiry pro. | $1,000 | o/h proj, vcr/monitor | | | | | |
| | | | | | | | |
| **SUPPLIES** | | | | | | | |
|   software | $10,000 | | | | | | |
|   office supplies | $6,000 | | | | | | |
|   training materials | $5,000 | | | | | | |
| | | | | | | | |
| **CONTRACTUAL** | | | | | | | |
| | | | | | | | |
|   Annie E Casey | $0 | | | | | | $40,000 |
| Training & TA | $200,000 | | | | | | |
| FASA | $12,000 | | | | | | |
|   Bilingual translators for writing | $5,000 | marketing/training/evaluation materials, brochures | | | | | |
|   Oral bilingual ppl ($15/hr, 200 hrs) | $3,000 | evaluation, needs assessment meetings | | | | | |
|   Sign-language interpreters ($20/hr, 100 hrs) | $2,000 | family advocates, CBC for hearing impaired parents | | | | | |
|   TA (marketing, PR) | $10,000 | family awareness 4 mats | | | | | |
| Provider servicesDMH non-federal) | $0 | | | | | | $13,750,000 |
| Grant Evaluation | $153,000 | | | | | | |
| Family Liaisons (8) | $282,556 | | | | | | |
| | | | | | | | |
| **RENT** | | | | | | | |
| office space | $0 | | | | | | $177,480 |
| | | | | | | | |
| **OTHER** | | | | | | | |
| cell phones ($40/mo each) | $5,760 | | | | | | |
| printing evaluation materials | $7,500 | | | | | | |
| printing marketing/training kit | $5,000 | for consumers, providers, community | | | | | |
|   child care ($10/hr, 300 hrs) | $3,000 | for mtgs, trainings, eval (incl 2 ppl caring at times) | | | | | |
|   food ($5/pers, 1,500 ppl) | $7,500 | for mtgs, trainings | | | | | |
| evaluation stipends ($20/eval, 250 eval.) | $5,000 | for interview/questionnaire completion | | | | | |
|   travel vouchers ($10/voucher, 200 vchrs) | $2,000 | to get to mtgs, trainings, eval | | | | | |
| room rental | $7,500 | for community meetings | | | | | |
| | | | | | | | |
| **SUBTOTAL** | $1,145,522 | | | | | | $14,035,399 |
| **INDIRECT RATE (10%)** | $114,552 | | | | | | |
| **TOTAL** | $1,260,074 | $1,500,000.00 | | | | | $14,035,399 |

8b

DISTRICT OF COLUMBIA  SM-02-002

NICHOLAS GELETA, Ph.D., PROJECT DIRECTOR

## DC CINGS BUDGET YEAR 3

1.04

| PERSONNEL | Grant Cost | Per Year | Per Hr | Hours* | Months | FTE | IN KIND |
|---|---|---|---|---|---|---|---|
| Principal Investigator | $0.00 | $151,424 | 72.80 | 2080 | 12 | 0.1 | $15,142 |
| Project Director | $0 | $0 | | 2080 | 12 | 1 | $91,566 |
| Evaluation Assistant (parent) | $18,366 | $36,732 | 17.65972 | 2080 | 12 | 1 | $0 |
| MIS/Evaluation Liason | $65,158 | $65,158 | 31.32584 | 2080 | 12 | 0.5 | $0 |
| Liasion to Fiscal Officer | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
| training & TA Liasion | $32,579 | $65,158 | 31.32584 | 2080 | 12 | 1 | $65,158 |
| Social Marketing/ Communication Mgr. | $32,579 | $65,158 | 31.32584 | 2080 | 12 | 0.5 | $0 |
| Clinical Director | $0 | $91,566 | 44.02216 | 2080 | 12 | 0.5 | $0 |
| Admin Asst (X2) | $64,822 | $32,411 | 15.58232 | 2080 | 12 | 1 | $91,566 |
| Family Coordinator | $0 | $0 | 0 | 2080 | 12 | 2 | $0 |
| Youth Coordinator | $0.00 | $66,589 | 0 | 2080 | 12 | 1 | $77,488 |
| Family Liaisons | $0.00 | $36,732 | 17.65972 | 2080 | 12 | 0.5 | $33,294 |
| Key Family Contact | $18,366 | $36,732 | 17.65972 | 2080 | 12 | 0.5 | $0 |
| State/Local Liaison (Senior Project Adv.) | $0 | $107,706 | 0 | 2080 | 12 | 8 | $35,543 |
| Interagency  Coordinator | $65,158 | $65,158 | 31.32584 | 2080 | 12 | 0.33 | $0 |
| TOTAL | $297,028 | $0 | 0 | 2080 | 12 | 1 | $0 |
| | | | | | | | $394,615 |
| FRINGE (17.0%) | $50,495 | | | | | | |
| | | | | | | | $70,636 |

**TRAVEL**

| | | |
|---|---|---|
| Project staff, families, governance | $75,000 | |

**EQUIPMENT**

| | | |
|---|---|---|
| 15 Computers | $15,000 | |
| 2 laptop w/docking stations | $5,500 | |
| 2 network printers | $5,000 | |
| 4 fax machines | $3,600 | |
| 20 phones (monthly charge) | $700 | |
| 6 cellular phones (purchase) | $1,050 | |
| a/v equipment for community pro. | $10,000 | o/h proj, vcr/monitor |
| 'Operational Start-up/Family Resource Ctr. | $200,000 | |
| 5 Seven-passenger vans | $120,000 | |

**SUPPLIES**

| | |
|---|---|
| software | $15,000 |
| office supplies | $15,000 |
| training  materials | $7,500 |
| Therapeutic/recreational supplies | $150,000 |

**CONTRACTUAL**

| | | | |
|---|---|---|---|
| Annie E Casey | $0 | | |
| Training & TA | $200,000 | | $40,000 |
| FASA | $50,000 | | |
| Bilingual translators for writing | $10,000 | marketing/training/evaluation materials, brochures | |
| Oral bilingual ppl ($15/hr, 200 hrs) | $3,000 | evaluation,needs assessment meetings | |
| Sign-language interpreters ($20/hr, 100 hrs) | $2,000 | family advocates, CBC for hearing impaired parents | |
| TA (marketing, PR) | $20,000 | family awareness 4 mats | |
| Provider services | $0 | | |
| Grant Evaluation | $156,060 | | $15,125,000 |
| Family Liaisons (8) | $293,858 | | |

**RENT**

| | | | |
|---|---|---|---|
| office space | $0 | | $181,030 |

**OTHER**

| | | | |
|---|---|---|---|
| cell phones ($40/mo each) | $8,640 | | |
| printing evaluation materials | $7,500 | | |
| printing marketing/training lit | $5,000 | for consumers, providers, community | |
| child care ($10/hr, 300 hrs) | $3,000 | for mtgs, trainings, eval (incl 2 ppl caring at times) | |
| food ($5/pers, 1,000 ppl) | $5,000 | for mtgs, trainings | |
| evaluation stipends ($20/eval, 250 eval.) | $5,000 | for interview/questionnaire completion | |
| travel vouchers ($10/voucher, 250 vchrs) | $2,500 | to get to mtgs, trainings, eval | |
| room rental | $3,000 | for community meetings | |
| SUBTOTAL | $1,745,430 | | |
| INDIRECT RATE (10%) | $174,543 | | $15,811,281 |
| TOTAL | $1,919,973 | $2,500,000.00 | $15,811,281 |

DISTRICT OF COLUMBIA  SM-02-002                                                NICHOLAS GELETA, Ph.D., PROJECT DIRECTOR

DC CINGS BUDGET- YEAR 4                                                                                    1.04

| | Grant Cost | Per Year | Per Hr | Hours* | Months | FTE | IN KIND |
|---|---|---|---|---|---|---|---|
| **PERSONNEL** | | | | | | | |
| Principal Investigator | $0.00 | $157,481 | 75.71 | 2080 | 12 | 0.1 | $15,748 |
| Project Director | $0 | $0 | 0 | 2080 | 12 | 1 | $95,229 |
| Evaluation Assistant (parent) | $19,101 | $38,202 | 18.3661088 | 2080 | 12 | 0.5 | $0 |
| MIS/Evaluation Liasion | $67,764 | $67,764 | 32.5788736 | 2080 | 12 | 1 | $0 |
| Liasion to Fiscal Officer | $0 | $0 | 0 | 2080 | 12 | 1 | $67,764 |
| Training & TA Liasion | $33,882 | $67,764 | 32.5788736 | 2080 | 12 | 0.5 | $0, |
| Social Marketing/ Communications Mgr. | $33,882 | $67,764 | 32.5788736 | 2080 | 12 | 0.5 | $0 |
| Clinical Director | $0 | $95,229 | 45.7830464 | 2080 | 12 | 1 | $95,229 |
| Admin Asst (X2) | $67,415 | $33,708 | 16.2056128 | 2080 | 12 | 2 | $0 |
| Family Coordinator | $0 | $0 | 0 | 2080 | 12 | 1 | $80,588 |
| Youth Coordinator | $0 | $69,252 | 33.294352 | 2080 | 12 | 0.5 | $34,626 |
| Family Liaisons | $0 | $38,202 | 18.3661088 | 2080 | 12 | 8 | $0 |
| Key Family Contact | $19,101 | $38,202 | 18.3661088 | 2080 | 12 | 0.5 | .$0 |
| State/Local Liaison (Senior Project Advisor) | $0 | $112,014 | 53.852864 | 2080 | 12 | 0.33 | $36,965 |
| Interagency Coordinator | $67,764 | $67,764 | 32.5788736 | 2080 | 12 | 1 | $0 |
| | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
| **TOTAL** | $308,909 | | | | | | $410,400 |
| | | | | | | | |
| **FRINGE (17.0%)** | $52,515 | | | | | | $73,462 |
| | | | | | | | |
| **TRAVEL** | | | | | | | |
| Project staff, familiies, governance | $75,000 | | | | | | |
| | | | | | | | |
| **EQUIPMENT** | | | | | | | |
| 12 Computers | $12,000 | | | | | | |
| 2 laptops w/docking stations | $5,500 | | | | | | |
| 2 network printers | $4,000 | | | | | | |
| 2 fax machine | $1,800 | | | | | | |
| 20 phones (monthly charge) | $700 | | | | | | |
| a/v equipment for community pro. | $10,000 | o/h proj, vcr/monitor | | | | | |
| | | | | | | | |
| **SUPPLIES** | | | | | | | |
| software | $15,000 | | | | | | |
| office supplies | $15,000 | | | | | | |
| training materials | $7,500 | | | | | | |
| | | | | | | | |
| **CONTRACTUAL** | | | | | | | |
| Annie E Casey, DC Agenda | $0 | | | | | | $40,000 |
| Training & TA | $200,000 | | | | | | |
| FASA | $75,000 | | | | | | |
| Bilingual translators for writing | $10,000 | marketing/training/evaluation materials, brochures | | | | | |
| Oral bilingual ppl ($15/hr, 200 hrs) | $3,000 | evaluation, needs assessment meetings | | | | | |
| Sign-language interpreters ($20/hr, 100 hrs) | $2,000 | family advocates, CBC for hearing impaired parents | | | | | |
| TA (marketing, PR) | $20,000 | family awareness 4 mats | | | | | |
| Provider services | $0 | | | | | | $16,637,500 |
| Grant Evaluation | $159,181 | | | | | | |
| Family Liaisons (8) | $305,612 | | | | | | |
| | | | | | | | |
| **RENT** | | | | | | | |
| office space | $0 | | | | | | $184,650 |
| | | | | | | | |
| **OTHER DIRECT** | | | | | | | |
| cell phones ($40/mo each) | $8,640 | | | | | | |
| print evaluation materials | $7,500 | | | | | | |
| print marketing/training lit | $5,000 | for consumers, providers, community | | | | | |
| child care ($10/hr, 300 hrs) | $3,000 | for mtgs, trainings, eval (incl 2 ppl caring at times) | | | | | |
| food ($5/pers, 1,000 ppl) | $5,000 | for mtgs, trainings | | | | | |
| evaluation stipends ($20/eval, 250 eval.) | $5,000 | for interview/questionnaire completion | | | | | |
| travel vouchers ($10/voucher, 250 vchrs) | $2,500 | to get to mtgs, trainings, eval | | | | | |
| room rental | $3,000 | for community meetings | | | | | |
| | | | | | | | |
| **SUBTOTAL** | $1,322,357 | | | | | | $17,346,012 |
| **INDIRECT RATE (10%)** | $132,236 | | | | | | |
| **TOTAL** | $1,454,592 | $2,000,000.00 | | | | | $17,346,012 |

8d

## DC CINGS BUDGET- YEAR 5

| PERSONNEL | Grant Cost | Per Year | Per Hr | Hours* | Months | FTE | IN KIND |
|---|---|---|---|---|---|---|---|
| Principal Investigator | $0.00 | $163,780 | 78.74 | 2080 | 12 | 0.1 | $16,378 |
| Project Director | $0 | $0 | 0 | 2080 | 12 | 1 | $99,038 |
| Evaluation Assistant (parent) | $19,865 | $39,730 | 19.10075315 | 2080 | 12 | 1 | $0 |
| MIS/Evaluation Liasion | $70,475 | $70,475 | 33.88202854 | 2080 | 12 | 0.5 | $0 |
| Liasion to Fiscal Officer | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
| Training & TA Liasion | $35,237 | $70,475 | 33.88202854 | 2080 | 12 | 1 | $70,475 |
| Social Marketing/ Communications Mgr. | $35,237 | $70,475 | 33.88202854 | 2080 | 12 | 0.5 | $0 |
| Clinical Director | $0 | $99,038 | 47.61436826 | 2080 | 12 | 0.5 | $0 |
| Admin Asst (X2) | $70,112 | $35,056 | 16.85383731 | 2080 | 12 | 1 | $99,038 |
| Family Coordinator | $0 | $0 | 0 | 2080 | 12 | 2 | $0 |
| Youth Coordinator | $0 | $72,022 | 34.62612608 | 2080 | 12 | 1 | $83,811 |
| Family Liaisons | $0.00 | $39,730 | 19.10075315 | 2080 | 12 | 0.5 | $36,011 |
| Key Family Contact | $19,865 | $39,730 | 19.10075315 | 2080 | 12 | 8 | $0 |
| State/Local Liaison (Senior Project Advisor) | $0 | $116,495 | 56.00697856 | 2080 | 12 | 0.5 | $0 |
| Interagency Coordinator | $70,475 | $70,475 | 33.88202854 | 2080 | 12 | 0.33 | $38,443 |
| | $0 | $0 | 0 | 2080 | 12 | 1 | $0 |
| TOTAL | $321,265 | | | | | | $426,816 |

| FRINGE (17.0%) | $54,615 | | | | | | $76,400 |

**TRAVEL**

| Project staff, families, governance | $75,000 |
|---|---|

**EQUIPMENT**

| | | |
|---|---|---|
| 6 Computers | $6,000 | |
| 2 laptops w/docking stations | $5,500 | |
| 2 network printers | $5,000 | |
| 20 phones (monthly charge) | $700 | |
| 2 cellular phones (purchase) | $350 | |
| a/v equipment for community pro. | $5,000 | o/h proj, vcr/monitor |

**SUPPLIES**

| | |
|---|---|
| software | $15,000 |
| office supplies | $10,000 |
| training materials | $7,500 |

**CONTRACTUAL**

| | | |
|---|---|---|
| Annie E Casey | $0 | |
| Training & TA | $175,000 | $40,000 |
| FASA | $75,000 | |
| Bilingual translators for writing | $5,000 | marketing/training/evaluation materials, brochures |
| Oral bilingual ppl ($15/hr, 200 hrs) | $3,000 | evaluation, needs assessment meetings |
| Sign-language interpreters ($20/hr, 100 hrs) | $2,000 | amily advocates, CBC for hearing impaired parents |
| TA (marketing, PR) | $20,000 | family awareness 4 mats |
| Provider services | $0 | |
| Grant Evaluation | $162,365 | $18,301,250 |
| Family Liaisons (8) | $317,837 | |

**RENT**

| | | |
|---|---|---|
| office space | $0 | $188,343 |

**OTHER**

| | | |
|---|---|---|
| cell phones ($40/mo each) | $9,600 | |
| evaluation materials | $7,500 | |
| marketing/training lit | $5,000 | for consumers, providers, community |
| child care ($10/hr, 300 hrs) | $3,000 | for mtgs, trainings, eval (incl 2 ppl caring at times) |
| food ($5/pers, 1,000 ppl) | $5,000 | for mtgs, trainings |
| evaluation stipends ($20/eval, 250 eval.) | $5,000 | for interview/questionnaire completion |
| travel vouchers ($10/voucher, 250 vchrs) | $2,500 | to get to mtgs, trainings, eval |
| room rental | $7,500 | for community meetings |

| | | | |
|---|---|---|---|
| SUBTOTAL | $1,311,232 | | $19,032,809 |
| INDIRECT RATE (10%) | $131,123 | | |
| TOTAL | $1,442,355 | $1,500,000.00 | $19,032,809 |

8e

DISTRICT OF COLUMBIA  SM-02-002                                          NICHOLAS GELETA, Ph.D., PROJECT [

## DC CINGS BUDGET- YEAR 6

| PERSONNEL | Grant Cost | Per Year | Per Hr | Hours* | Months | FTE | IN KIND |
|---|---|---|---|---|---|---|---|
| Principal Investigator | $0.00 | $170,331 | 81.89 | 2080 | 12 | 0.1 | $17,033 |
| Project Director | $0 | $0 | 0 | 2080 | 12 | 1 | $102,999 |
| Evaluation Assistant (parent) | $20,659 | $41,319 | 19.86478328 | 2080 | 12 | 0.5 | $0 |
| MIS/Evaluation Liasion | $73,294 | $73,294 | 35.23730969 | 2080 | 12 | 1 | $0 |
| Liasion to Fiscal Officer | $0 | $0 | 0 | 2080 | 12 | 1 | $73,294 |
| Training & TA Liasion | $36,647 | $73,294 | 35.23730969 | 2080 | 12 | 0.5 | $0 |
| Social Marketing/ Communications Mgr. | $36,647 | $73,294 | 35.23730969 | 2080 | 12 | 0.5 | $0 |
| Clinical Director | $0 | $102,999 | 49.51894299 | 2080 | 12 | 1 | $102,999 |
| Admin Asst (X2) | $72,916 | $36,458 | 17.5279908 | 2080 | 12 | 2 | $0 |
| Family Coordinator | $0 | $0 | 0 | 2080 | 12 | 1 | $87,163 |
| Youth Coordinator | $0 | $74,903 | 36.01117112 | 2080 | 12 | 0.5 | $37,452 |
| Family Liaison | $0.00 | $41,319 | 19.86478328 | 2080 | 12 | 8 | $0 |
| Key Family Contact | $0 | $41,319 | 19.86478328 | 2080 | 12 | 0.5 | $20,659 |
| State/Local Liaison (Senior Project Advisor) | $0 | $121,154 | 58.2472577 | 2080 | 12 | 0.33 | $39,981 |
| Interagency Coordinator | $0 | $73,294 | 35.23730969 | 2080 | 12 | 1 | $73,294 |
| | | $0 | 0 | 2080 | 12 | 1 | $0 |
| **TOTAL** | $240,163 | | | | | | $537,841 |
| | | | | | | | |
| FRINGE (17.0%) | $40,828 | | | | | | $96,274 |
| | | | | | | | |
| TRAVEL | | | | | | | |
| Project staff, families, governance | $32,000 | | | | | | |
| | | | | | | | |
| EQUIPMENT | | | | | | | |
| 20 phones (monthly charge) | $700 | | | | | | |
| | | | | | | | |
| SUPPLIES | | | | | | | |
| office supplies | $10,000 | | | | | | |
| training materials | $4,000 | | | | | | |
| | | | | | | | |
| CONTRACTUAL | | | | | | | |
| Annie E Casey | $0 | | | | | | $40,000 |
| Training & TA | $20,000 | | | | | | |
| FASA | $5,000 | | | | | | |
| Bilingual translators for writing | $5,000 | marketing/training/evaluation materials, brochures | | | | | |
| Oral bilingual ppl ($15/hr, 200 hrs) | $3,000 | evaluation, needs assessment meetings | | | | | |
| Sign-language interpreters ($20/hr, 100 hrs) | $2,000 | amily advocates, CBC for hearing impaired parents | | | | | |
| TA (marketing, PR) | $10,000 | family awareness | | | | | |
| Provider services | $0 | | | | | | |
| Grant Evaluation | $162,365 | | | | | | $20,131,375 |
| Family Liaisons (8) | $330,550 | | | | | | |
| | | | | | | | |
| RENT | | | | | | | |
| office space | $0 | | | | | | $192,110 |
| | | | | | | | |
| OTHER | | | | | | | |
| cell phones ($40/mo each) | $9,600 | | | | | | |
| printing evaluation materials | $7,500 | | | | | | |
| printing marketing/training lit | $5,000 | for consumers, providers, community | | | | | |
| child care ($10/hr, 300 hrs) | $3,000 | for mtgs, trainings, eval (incl 2 ppl caring at times) | | | | | |
| food ($5/pers, 1,000 ppl) | $5,000 | for mtgs, trainings | | | | | |
| evaluation stipends ($20/eval, 250 eval.) | $5,000 | for interview/questionnaire completion | | | | | |
| travel vouchers ($10/voucher, 250 vchrs) | $2,500 | to get to mtgs, trainings, eval | | | | | |
| room rental | $3,000 | for community meetings | | | | | |
| | | | | | | | |
| **SUBTOTAL** | **$906,206** | | | | | | **$20,997,600** |
| **INDIRECT RATE (10%)** | **$90,621** | | | | | | |
| **TOTAL** | **$996,826** | $1,000,000.00 | | | | | **$20,997,600** |

8f

District of Columbia, GFA SM-02-002                                    Nicholas Gadelo, Ph.D., Project Director

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF MENTAL HEALTH



April 23, 2002

Bernard S. Arons, MD
Director Center for Mental Health Services Administration
5600 Fisher Lane
Rockville, MD  20857

Dear Dr. Arons:

Re:  Indirect Cost Rate
        Grant: Children Inspired Now Gain Strength (C.I.N.G.S)

The District of Columbia, Department of Mental Health has implemented a 10%
"Provisional" Indirect Cost Rate in submission of its System of Care Grant pending the
establishment of a "Final" rate based on actual allowable cost of the period as outlined in
OMB Circular A87.

Sincerely,

Winford Dearing
Acting Senior Deputy Director
Fiscal and Administration

9

## SECTION A: UNDERSTANDING THE PROPOSED PROJECT

**A1. History of System of Care Development: Progress and Challenges.** For the past two decades, the goal of most child mental health systems has been the development of "systems of care". Stroul and Friedman (1996) note that the system of care movement represents a *philosophy* about the way in which services should be delivered to children and their families. Systems of care differ from state to state and between local communities, but there are three core values and ten principles that provide the underlying framework for all system of care models for children and youth with severe emotional disturbances (SED) and their families. The core values suggest that systems of care should be: (1) child-centered and family-focused, i.e. the needs of the child and the family dictate the types and mix of services and supports provided; (2) community-based, with the locus of services, as well as management and decision-making resting at the community level; and (3) culturally competent, i.e. agencies, programs and services are responsive to the cultural, racial, and ethnic differences of the populations served.

The guiding principles stress the need for a system of care to: (1) create a comprehensive array of services; (2) develop individualized service plans; (3) deliver services in the least restrictive settings; (4) ensure families as full participants in all aspects of planning and delivery of services for their children; (5) integrate and coordinate services across child-serving agencies and programs; (6) provide case management or other coordination mechanisms to ensure that multiple services are delivered in a coordinated and therapeutic manner; (7) promote prevention and early identification; (8) ensure smooth transitions from one level of care to another or from one system to another, especially transitions from child to adult services; (9) protect the rights of children and create effective advocacy efforts; and (10) provide services without regard to race, religion, nationality, sex, physical disability, or other characteristics (Stroul and Friedman, 1996).

Many of these values and principles have been used to build service systems for children and adolescents in public mental health systems throughout the country, in Indian nations, and U.S. territories. Some of the challenges of system of care development have also been recognized. States and locales have found great difficulty in implementing true interagency collaboration, developing sufficient cultural competency in services, and focusing attention on prevention and early identification. Since child mental health services are so dependent on the financing strategies used, the advent of managed care models for public sector mental health services have also had an impact on the effective development of systems of care for children and adolescents with SED and their families (Stroul, Pires & Armstrong, 2001). For example, managed care is credited with improving access to outpatient services and increasing family involvement for children in the Massachusetts' mental health system. But it was also evaluated as decreasing access to inpatient care, decreasing coverage for behavioral-based diagnoses, limiting lengths-of-stay in services and neglecting important psychosocial factors through use of 'medical necessity' criteria (Rochefort, 1999). These same concerns have been expressed for managed care systems in other states as well (Bazelon Center, 2001).

In addition to the impact of funding structures, urban communities and those with large numbers of poor families of color, like the District of Columbia (the District), seem to face additional challenges to effective system of care development:

10

- **Urban areas:** Few system of care efforts have specifically addressed development in poor, urban neighborhoods and such settings present unique opportunities and challenges (Joseph et. al, 2001). Research clearly indicates that neighborhood characteristics, such as poverty, residential instability, poor public services, limited social networks, and exposure to violence, tend to undermine positive parental behaviors and healthy child development (Pinderhughes, Foster & Jones, 2001; Leventhal & Brooks-Gunn, 2000; Sampson, Raudenbush & Earls, 1997). Accumulation of adverse risk factors is also associated with poor, urban communities and these play a critical role in the development of emotional problems in children residing in such neighborhoods (U.S. DHHS, 2001; National Institute of Mental Health, 2001).

- **Access to mental health services:** In *Mental Health: A Report of the Surgeon General* (U.S. DHHS, 1999) and its' supplement, *Mental Health: Culture, Race and Ethnicity* (U.S., DHHS, 2001), the Surgeon General found striking disparities in access to, and availability of, quality mental health services for racial and ethnic minorities. Many barriers to access operate for all Americans: cost, fragmentation of services, lack of availability of services and societal stigma towards mental health. But the Surgeon General also found additional access and quality barriers for racial and ethnic minorities including: 1) mistrust and fear of treatment, 2) racism and discrimination, 3) differences in help-seeking behaviors, and 4) differences in language and communication. Thus, the need for culturally competent practices and policies is critical.

- **Over-representation in non-treatment settings:** A corollary to the lack of access to mental health services is subsequent overrepresentation in non-treatment settings that often remove children from their families and communities. We now know conclusively that treatment works better than no treatment (NIMH, 2001; Burns, Hoagwood & Mrazek, 1999) and we are beginning to sort out effective clinical practices, i.e. evidence-based practice models (Burns & Hoagwood, 2002). However, poor youth of color are over-represented in child welfare, juvenile justice, and special education programs, which remove children from their homes, communities and more normalized school experiences, yet tend not to address their significant mental health needs (Roberts, 2001; Hoytt et. al, 2001); Poe-Yamagata & Jones, 2000; Morton, 1999. Estimates suggest that 85% of the youth in foster care have an emotional and/or substance abuse disorder (AACAP/CWLA, 2001) and that 50 to 75% of youth detained or incarcerated in juvenile justice facilities have serious mental health problems, with nine to 13% of these youth suffering with SED (Coalition for Juvenile Justice, 2000; National Mental Health Association, 2000). These systems also tend to minimize the roles of natural families in the rehabilitative process.

**A2. Need for System of Care Reform in the District.** The need for system of care development for children and youth[*] with SED and their families in the District is immense and challenging. Years of consent decrees and receiverships of core child-serving agencies and the District's mental health system hindered the ability to establish a specific direction and consistent infrastructure. Although system of care development for children and youth with SED has been a primary goal of the District's child mental health system for more than a decade, the lack of funding, trained staff, meaningful family involvement, political will, focused attention,

---

[*] References to children and/or youth in this document include the population ages 0-22 years.

interagency collaboration, and community resistance to return/diversion projects effectively derailed prior efforts. Consequently, the prevailing D.C. infrastructure forced children with SED into one or more agency-defined categories that do not usually meet the multiple and complex needs of these youth and their families. Thus, children currently receive uncoordinated and inadequate services – and many of the issues discussed above are inherent in the District's present system of serving youth with SED. Specifically:

- There is limited access to a comprehensive array of mental health services in the District for children and youth with SED and their families. Subsequently, most youth with SED are placed in residential treatment programs (RTCs) located within and outside the District at great financial costs.
- District public sector agencies have tended to respond to the needs of youth of color through child welfare or juvenile justice placements rather than mental health programs.
- Access to quality mental health services has been inadequate, under-developed, and not culturally sensitive to the needs of children and youth.
- There has been limited advocacy and demand from families and community leaders for mental health services, possibly due to stigma, lack of familiarity with the types of services available, mistrust, and the lack of programs based outside of traditional mental health settings.
- There has been a lack of community infrastructure to support and build the informal networks and services necessary to support families and youth in their homes and neighborhoods.
- There has been a lack of solid interagency relationships and mechanisms to promote coordination, close gaps, and eliminate duplicative processes and services.
- The early identification of youth with SED has primarily been through the schools – a system that has historically worked in isolation from the other child-serving agencies; and,
- Judges who have lost confidence in the District agencies serving children have spearheaded placement of youth with SED through the court system.

These structural and organizational issues have plagued and doomed many attempts to serve District children and youth with SED and their families.

In 2000, a group of key District staff was privileged to participate as a delegation in the System of Care Policy Academy sponsored by the National Technical Assistance Center for Children's Mental Health at Georgetown University. Through this experience, we were able to begin to address the deficits in our system and create a vision of how to implement a system of care. This group has had early success in gaining legislation and other mandates that provide statutory support for systems of care development and provide the opportunities for the District to really utilize the CMHS cooperative agreement to build on substantive momentum that have developed over the last two years.

Therefore, the District of Columbia, through the Mental Health System of Care Sub-Council of the District Intergovernmental Youth Investment Collaborative (Sub-Council) under the direction of the Department of Mental Health (DMH), seeks to enter into a cooperative agreement with the Center for Mental Health Services (CMHS), SAMHSA, to develop the *D.C.*

***Children Inspired Now Gain Strength (D.C. CINGS)*** project for children and adolescents with SED and their families. This project will attempt to overcome many of the existing structural barriers and create a system of care for District children and families that will have the following goals:

- Reduce the current reliance on out-of-home and out-of-state RTC placements for children and youth with SED;
- Focus on strengthening and supporting families and providing mental health treatment as an alternative to child welfare and juvenile justice placements;
- Create a comprehensive array of community-based services that are accessible, available and culturally appropriate and which offer opportunities for earlier identification and intervention of youth at-risk of out-of-home placements;
- Ensure that families are involved in system of care development at all levels;
- Implement evidence-based practice models, care coordination, and individualized service planning embedded in strengths-based foci that build resiliency and take into account the cultural strengths of the District's youth and families;
- Enhance interagency collaboration and shared decision-making processes to bridge gaps, decrease duplication, and improve outcomes for children and youth with SED and their families;
- Maximize the use and blending of Medicaid and other federal funding programs, District funding, and private sector funding to meet the multiple needs of youth with SED and their families, as well as develop strategies to re-invest funds from out-of-home and out-of-state placements to address long-term sustainability of the system of care; and,
- Develop and enhance management information systems (MIS) and evaluation activities to track outcomes and share data across agencies and programs.

**A3. The District's Target Population.** The District of Columbia is a city of contrasts. It is home to the federal government, international agencies, embassies, corporate headquarters, and a population of prosperous and influential professionals. It is also home to a majority African American population, segments of which are very low on the socioeconomic scale and whose only political influence is expressed through the election of a city government that lacks states' rights and is closely regulated by Congress. The city is also home to an increasing population of immigrants from Latin America, Asia and Africa – many of whom are poor and not well-versed in the American culture and English language. Although many of these immigrants could and should use public sector services, agencies in the District report very low utilization from these communities, despite their increasing numbers in the population.

According to the 2000 Census, the youth population in the District of Columbia between the ages of birth and 17 is approximately 114,992 -- a decline of more than 30,000 since 1994. Another 72,637 are between the ages of 18 and 24. Although the 2000 Census shows that the District **continues** to lose population, it also indicates that there has been significant growth in the Hispanic/Latino and Asian/Pacific Islanders groups. The child population under age 18 is 75% Black, 14% White, 10% Hispanic/Latino and over 5% other race. The Census data also indicate that there is not equal distribution of the youth population throughout the eight (8) wards of the District. Six of the eight (8) wards account for almost 90% of the youth. Racial and ethnic

composition for youth varies from 63% White in Ward 3 to 98% Black in Ward 7. The largest numbers of Hispanic/Latino youth reside in Wards 1 and 2.

According to the child well-being indicators tracked by the Annie E. Casey Foundation's KIDS COUNT data book (2001), there have been some major improvements in the District – reductions in the percent of low birthweight babies, the infant mortality rate, the child death rate, the teen birth rate and the percent of teens who are high school dropouts. However, the percent of children in poverty has worsened (42%), as have the percent of families with children headed by a single parent and the percent of teens not attending school and not working. The KIDS COUNT data indicates that in 2000, 28% of children living in the District live in high-risk families, which indicates a worsening situation since 1990 (Annie E. Casey Foundation, 2000).

The *D.C. CINGS* project will target all children and adolescents under 22 years of age, and their families, who require services from two or more D.C. child-serving agencies, and who have been diagnosed under DSM-IV or ICD-9-CM with a serious emotional disturbance that is expected to last for a year or more (with the exception of DSM IV "V" Codes, substance use disorders, developmental disorders, and conduct disorder, unless they co-occur with another diagnosable serious emotional disturbance). The emotional disturbance must be manifested such that it limits the youth's ability to function in the family, school, peer group and/or local community. This limitation is defined as the inability to function within the range of therapy, evaluation, medication management, and advocacy services available in a mental health outpatient clinic or within the supportive interventions of a special education placement within the D.C. Public Schools and/or documented attempts of at least one or more of the following interventions which have not succeeded and/or are at imminent risk for not succeeding:  acute psychiatric inpatient hospitalization; psycho-education placement;  placement in a therapeutic foster home; placement in a special education setting; and, placement in a juvenile detention or correctional facility.

The District's mental health plan estimates, conservatively, that 15% of youth (17,250) would benefit from mental health services; 6.5% of youth (7,475) actually require mental health services; 5.5% of youth (6,325) experience SED and up to 2,300 youth (2%) are at-risk for residential placement or acute hospitalization. The *D.C. CINGS* project will begin with the population of 425 youth who are currently in out-of-home or out-of state placement due to SED, expanding this population to include up to 20% (460) of the youth most at-risk for residential placement or acute hospitalization over the six years of the cooperative agreement with CMHS. Currently four agencies and the courts have authorization to place youth with SED in various levels of placement:  the Child and Family Services Agency (CFSA), the DMH, the Youth Services Administration in the Department of Human Services (YSA) and the D.C. Public Schools (DCPS). Medicaid covers many of the youth in out-of-home and out-of-state placements – at an estimated $122,000 per placement annually.

**A4. Current Service Capacity.** As noted, the current service system for children with SED operates under five separate spheres:  DMH, CFSA, DCPS, YSA and the Superior Court of DC (SCDC). In some instances, the Health Services for Children with Special Health Needs (HSCSHN) and Addiction, Prevention and Recovery Administration (APRA) within the Department of Health may intersect with these children. Although there have been efforts to coordinate mental health services for youth in the District, for the most part, each system still

operates or contracts for its' own set of mental health service providers. Although DCPS and Medicaid often play a role for each child for whom RTC placement is requested, YSA, CFSA and DMH each operate separate residential placement units and processes for youth with SED in their systems. This fragmentation leads to far more out-of-home placements than necessary. About 4% of the District's child population and over 10% of the youth served in DMH receive such placements (425), as compared to a national average of two percent of those youth receiving care in mental health systems (Pottick, et. al.2001).

DMH currently operates a 24-bed facility for latency-age children with SED in the District (the Hurt Home). Through the current system of care for children, DMH can also provide comprehensive mental health services for approximately 200 detained/committed youth. For children and youth requiring less intensive and restrictive intervention, DMH, through its public Community Service Agency (CSA), offers limited crisis and outpatient services, a small psycho education program, psychiatric adolescent day treatment services, therapeutic nurseries, and court-ordered psychiatric and psychological evaluations. In 2000, DMH registered encounters for 950 children across these programs.

The DC Public Schools (DCPS) currently has 11,529 pupils enrolled in some type of special education program – 1,987 of these children have an emotional disturbance that interferes with their learning – 479 females and 1,500 males. Over 1,900 students are in non-public day programs, including DMH psycho education programs. The schools are also responsible for the education of 90% of the youth in residential placement.

YSA provides a wide array of placements for youth involved with the courts and juvenile justice including home detention, intensive home supervision, and shelter homes for detained youth and probation court social services. For committed youths, services can be delivered at the Oak Hill Youth Center (84 beds); YSA-contracted group homes (62 beds); and out-of-state RTCs (113 youth). In 2001, YSA served 614 committed youth and 60 detained youth.

CFSA provides child welfare and child protective services to over 3,000 children annually. Under receivership for the last several years, in 2001, the federal court moved to return the child welfare system to the city's direct administrative and programmatic control. CFSA provides a host of services to children and families at-risk of placement (family preservation) and those in placement – including foster care, therapeutic foster care, adoption services and independent living programs. Currently, 168 youth are receiving services in out-of-state RTCs. The agency has recently begun a number of initiatives to improve outcomes for youth in child welfare and to strengthen the ability to care for these youngsters more effectively (see A.6). The success of some of their recent initiatives will be used to enhance service outcomes for children included in *D.C. CINGS*.

**A5. Gaps, Inadequacies and Barriers in Current Service Structures.** In section A2. many of the structural and systemic barriers in current service structures were noted. However, there are critical gaps, inadequacies and barriers in the current service capacity that need to be enhanced or created through the *D.C. CINGS* project. Some of these gaps and needs include the following:

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

- Better coordination and possible merger of residential placement units within DMH, CFSA and YSA.
- Multiple private sector contracts for mental health services and underutilization of the DMH services by other public-sector child-serving agencies.
- Lack of intensive, community-based programs.
- Lack of substantive and intensive home-based services.
- Lack of alternatives to acute psychiatric hospitalization (need for in-home and community-based crisis care responses for youth).
- Lower caseloads and longer lengths of case management for youth with SED and their families.
- Lack of common assessment instruments and tracking systems across child-serving agencies.
- Lack of integration between school-based programs and community services for youth identified as "special education.

Almost all child-serving agencies in the District have been laboring in a landscape of public system failure and inadequacy. The fact that these systems are now winding their way out of receiverships and other court-ordered commitments provides the first opportunity to take advantage of new opportunities. For too long, funding has driven policies and services in the District. For the first time, there is a real commitment to having the needs of families and children drive services that will work for them.

The CMHS cooperative agreement will provide an opportunity to address many of the gaps and inadequacies in the service system. Specific services will be enhanced, evidence-based models that address the development of intensive home and community-based services that provide an opportunity to return and divert District youth with SED from out-of-state residential placements. The CMHS grant will also solidify interagency and resource development mechanisms that must be in place to support the smooth transitions of youth through a service continuum. The grant will also provide an opportunity to enhance services to families in their greater involvement in all aspects of the system of care and strengthen the community networks needed to support youth and their families coping with mental health problems.

**A6. Local Developments and Initiatives Creating Opportunities.** For over 20 years, mental health services were under the Dixon consent decree – a process that did not always acknowledge or support the development of mental health services for children and youth. Over the past two years, there have been a number of positive developments in the District, which provide major opportunities for creating and maintaining an effective infrastructure and framework for the delivery of community-based, coordinated, mental health services and supports to children and youth with SED and their families. Standing alone, none of these events is sufficient to signal a dramatic shift in policy and action; however, if the events are viewed as tied together, they indicate the District's readiness to leap forward with the creation of a system of care. The following developments and initiatives are representative of developments that have occurred in the District child-serving systems over the last several years:

- In 1996, The Child and Family Services Agency (CFSA) began implementation of a network of seven Healthy Families Thriving Communities Collaboratives (The Collaboratives) in those areas of the city with the highest rates of foster care placements. Six years later, these

entities have developed into critical community infrastructures for planning and delivery of a whole host of formal and informal services to residents and families. Thus, The Collaboratives offer a strong foundation for the development and delivery of mental health services and supports – a direct connection to high-risk communities that has never been in place in the District before.

- In 2000, Mayor Anthony Williams established a Deputy Mayor for Children, Youth and Families to bring increased attention to children through stronger interagency collaboration.
- The Office of the Deputy Mayor for Children, Youth and Families created *Safe Passages*—a program designed to improve child and youth well-being through tracking critical indicators such as children being ready for school or living in healthy, stable and supportive families and environments. *Safety Net* targets the most vulnerable children and families and establishes a policy of coordinated case planning with a system of escalation of high-risk cases to a senior-level review panel to provide additional assistance and oversight.
- DMH, YSA, CFSA and the DCPS are engaged in the Multi-Agency Collaborative Task Force – a senior-level group involved in reviewing the cases of five youth who are currently in out-of-state RTC care. This work will be an important forerunner for full implementation under the cooperative agreement.
- In collaboration with Casey Family Programs and For Love of Children (FLOC), a non-profit organization in the District, CFSA began implementation of The Family Intervention Program (FIP)--a comprehensive therapeutic program integrating family preservation, foster care and adoptive services capable of promoting child well-being and permanency, with a focus on youth in foster care with serious emotional needs. To meet these goals, these investments are leveraging flexible forms of respite care, parent coaching, family group conferencing (an evidence-based practice model), flexible funds and wrap-around services, and functional assessments – all of which can enhance and inform services within the *D.C. CINGS* project.
- In 2001, the City Council enacted the Mental Health Service Delivery Reform Act, which established, for the first time, an independent Department of Mental Health (DMH) as a cabinet-level agency reporting directly to the Mayor. The new Department is specifically mandated to create a system of care for children, youth and their families, which is defined as " a community support system for children or youth with mental health problems and their families, which is developed through collaboration in the administration, financing, resource allocation, training, and delivery of services across all appropriate public systems". (Chapter 11A, Title 7, 1131.03).
- Section 111 of the Mental Health Service Delivery Reform Act directs the Director of DMH to convene a meeting of the System of Mental Health Sub-Council, consisting of child-service agency directors and key leaders including the Presiding Judge of the Family Division of the Superior Court, the Director of the District's Protection and Advocacy agency, four family members and the Superintendent of the Public Schools, to develop the system of care for children, youth and families. The Sub-Council began meeting earlier this year.
- In 2001 the CFSA came out of receivership with new leaders and new energy to serve the District's most vulnerable youth at-risk for child abuse and neglect.
- In 2001, Mayor Williams appointed a Blue Ribbon Commission to study and make recommendations to improve the juvenile justice system by focusing on creating viable alternatives to youth being institutionalized at Oak Hill. The District's Juvenile Justice

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

Advisory Committee (JJAG) has approached the DMH to utilize the Multi-Agency Collaborative Task Force to develop and implement an initiative for wrapping services around youth to divert up to 75 youth from Oak Hill and other juvenile institutions over the next two years. The JJAG and its partners will incorporate this initiative into the overall *D.C. CINGS* project as appropriate.

■ In 2002, Congress enacted P.L. 107-114 to establish the Family Court of the District of Columbia to have jurisdiction over all issues involving children and families and mandating that judges be qualified and appointed to serve in the court for a period of time. The Chief Judge of this new court is an active member of the Sub-Council and the Director of DMH sits on the Executive Advisory Committee for the creation of the Court, as does the CFSA Director. The Court is supportive of the *D.C. CINGS* project and other interagency initiatives in the District.

## SECTION B: IMPLEMENTATION PLAN: DEVELOPMENT OF THE SYSTEM OF CARE

**B1. Developing the System of Care.** The *D.C. Children Inspired Now Gain Strength (D.C CINGS)* project will develop a community-based system of care that successfully provides early intervention, treatment, support, resources and other related services in a manner that inspires confidence and hope, and is respectful, accessible and culturally competent for children with SED and their families. The current child-serving delivery system, which is primarily provider- and agency-focused, will shift to one that measures outcomes and concentrates on the needs and choices of families. *Services will work for families—not the systems that operate them.*

Utilizing a set of core characteristics present in effective interventions for children and youth with mental health needs as suggested by the National Mental Health Association (2000), we will develop a system of care that includes: 1) an integrated array of community-based services and supports; 2) families in all aspects of the decision-making and governance, evaluation, planning and treatment processes; treatment models that place the "whole family" at the center of the therapeutic process rather than just the identified child or youth; 3) fidelity to the program design through well-qualified and well-trained staff, good supervision and program monitoring and evaluation; use of professionals, families, community and other key stakeholders working together in partnership to address the needs of the family throughout the care process; 4) use of case management as a tool for coordinating the work with the family and as a structure for linking services and systems; 5) delivery of an appropriate, sufficient treatment that utilizes the family's cultural values and activities as a critical affirming support of the treatment process; and 6) creation of collaborative relationships/partnerships between juvenile justice, mental health, child welfare, education, law enforcement and other systems in which a child and his/her family might be involved. We view our participation in this cooperative agreement as a critical opportunity to work with the Federal government to use these resources as the "glue" needed to connect and ultimately, "cement" agency/community efforts to deliver effective services in the District.

**B1.1. Systems Integration.** Under the leadership and guidance of the Mental Health Sub-Council, *D.C. CINGS* will dedicate much of its time and resources beginning in the first year to strengthen current collaborative efforts and policy improvements to create the permanent

linkages, processes and incentives needed to transform the current fragmented and duplicative collection of policies, practices, and services into a responsive and coordinated system of care. The Sub-Council will also establish a System of Care Team* (SOC Team) to conduct planning, project and budget oversight, data collection, and monitoring of the system of care. These governance bodies provide a forum for agencies, family and community to create a full range of effective services and funding for children with SED and their families.

During year one, the membership of the SOC Team will be temporarily expanded to include agency representatives who have specific planning and policy knowledge and skills. The Team will develop a comprehensive strategic plan to identify key systems integration opportunities and strategies needed to support a quality system of care. This plan will serve as a "roadmap" for guiding the work over the six-year life of the cooperative agreement and beyond. At a minimum, the planning process is expected to:

- Evaluate current gaps and strategies for developing infrastructure and make modifications to expand and enhance the existing system of care;
- Review current policies and practices to assess the need for agreements, regulatory and legislative changes required to facilitate interagency collaboration, family-centered, culturally competent practice and service delivery, and support sustainability;
- Build on the work of an existing Medicaid Policy workgroup to develop effective financial strategies such as pooled funding, utilization of Federal entitlements such as Medicaid, Title IV-A, Title IV-B, Title VI, and the Early, Periodic, Screening, Diagnosis and Treatment programs, and management information systems;
- Identify and develop universal tools, practices and staffing arrangements;
- Establish a Quality Improvement Process to monitor project operations, processes, and outcomes;
- Develop a specific evaluation, training and technical assistance, and social marketing plan;
- Utilize a "trans-agency"* case study planning approach to identify more accurately the specific service needs of the target population and their families, and assess the capacity of the current infrastructure to effectively meet those needs;
- Use the experience of returning youth to examine effective strategies and inform the process for diverting youth from placement in out-of home/out-of-state placements; develop a family-reintegration strategy to support these families during placement and upon return;
- Select the appropriate evidence-based practice(s) to effectively address the service needs of the target population; and
- Develop community-based, age appropriate services needed to enhance the current system's capacity to address the needs of children with SED and their families.

---

* System of Care Team membership: project management, staff, agency representatives appointed by the Sub-Council, family members, youth, community providers and leaders.
* The term "trans-agency" is becoming the preferred term to describe a change in culture that focuses on the needs of the "whole" family, not on the child in isolation. This philosophy requires interagency coordination at the policy and service levels across the systems that serve children and families.

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

Existing interagency/community work groups (to include families), such as the Medicaid work group mentioned above, along with other new ones (e.g., fiscal, policy, service delivery/practice, confidentiality, etc.) will be formed to develop and implement recommendations noted in the plan. We anticipate that the these landmark reforms will result in the availability of a well-organized, responsive system of care that greatly improves outcomes for hundreds of D.C.'s most vulnerable children and families.

**B1.2. Interagency Collaboration.** Interagency collaboration and community partnerships are the foundation upon which *D.C. CINGS* rests. Our project design encompasses a broader definition of this concept to include not only public agencies, but families and community as well. Recent passage of key legislation calling for the establishment of a system of care, along with implementation of a number of other efforts to forge the kind of relations needed to support effective policy and practice, signals the District's solid commitment to developing a strong infrastructure to address the needs of our children and families. Significant restructuring of how the system is organized, supported with changed functions and responsibilities at the department level, provides the context for the development of a coordinated, structured network of service delivery focused on the needs of the *whole* family.

 *D.C. CINGS* will build on the momentum of these and other existing collaborative efforts beginning with the signing of an interagency memorandum of understanding by the Mayor, Deputy Mayor, directors of all child-serving agencies, the Court, and the Family Advocacy and Support Association, Inc. (FASA), the key family organization, in support of this application. All administrative and implementation efforts such as governance, strategic planning, policy development and service delivery will involve interagency/community partnerships working along with family members and youth. These individuals will receive training and compensation to support their participation.

**B1.3. Services Integration.** The *D.C. CINGS* model focuses on strengthening families and providing community-based treatment as an alternative to placement of youth in costly, deep-end residential placements. It further seeks to create a comprehensive array of community-based, age-appropriate services that are accessible, available and culturally appropriate for the increasingly diverse groups that inhabit the city, and that offers opportunities for earlier identification and intervention for children and youth with SED who are at-risk for out-of-home placements. Each child or youth's mental health services and supports will be based on a single child and youth-centered, and family-focused Individualized Plan of Care (IPC) that is strengths-based and encompasses all the necessary and appropriate services and supports families need. Family and community members, working in partnership with caregivers, will be directly involved in the planning, treatment and service delivery process. Consumer choice, continuity of care and reliance on community supports are key components of the new system. All services will be delivered in natural, nurturing and integrated environments by both public and private entities.

Multiple portals of entry, including the child-serving agencies, law enforcement, courts, The Collaboratives, and community leaders and providers offer families universal access to the *D.C. CINGS* target population. Specifically, children with SED who are returning from out of home or out of state placements, those who are at-risk for disruption from a current placement (e.g.,

therapeutic foster care, psych- education programs, acute hospitalization, etc.), and chronic repeat offenders who receive services from the juvenile justice system will participate in *D.C. CINGS*.

Assessment, crisis intervention and triage will be available 24 hours a day; 7 days a week through the DMH care coordination process. Screenings will occur in a variety of settings including those where providers who have arrangements with ACCESS. Families will also be able to walk in to a Core Service Agency (CSA) and be connected to services during regular business hours. An automated MIS that is transparent to families will facilitate coordination between community providers and ACCESS.

A Child and Youth Risk and Resiliency Scale currently being used will serve as a model for the development of a strengths-based, culturally competent screening tool. Over time, a "universal" risk and resiliency tool will be developed and adopted for use by agencies and providers community-wide, thereby eliminating the need for multiple assessments for the child and family. We will also develop mechanisms to allow agencies and providers to share this information electronically, directly with the DMH ACCESS Helpline.

 Two existing community-based efforts, The Collaboratives and FASA will be contracted to hire and train a cadre of family liaisons to support parents as they navigate the care system. Liaisons must be family members of children and youth with or at-risk for SED. This support will be offered at the point of access (ACCESS Helpline), as well as anytime during the planning and treatment processes. They will also be available to assist the family in selecting a CSA and with the evaluation consent process.

Children who require crisis/emergency services will receive them immediately if necessary through the MHRS Crisis Emergency Services coordinated by the DMH ACCESS Helpline. The Department will contract with a network of providers who are trained to respond to emergency/crisis situations. Initially, access to these services will occur through the ACCESS Helpline or CSA. The Risk and Resiliency Scale will be used to determine whether the situation is urgent, emergent or routine. Children in need of urgent care will receive services within a 1-hour time frame. If the need is more emergent (experiencing distress that will develop into a crisis without intervention, and there is not yet imminent threat of harm to self or others), services will commence within 24 hours.

Children and youth who do not require emergency services will be linked to a Core Services Agency*—a community-based, public or private provider that will serve as a provider "home" for the family. Families will receive information to help them choose a CSA of their choice to receive care. The selected CSA will become the lead agency for coordination and service planning with the family. It is conceivable that the lead agency will also be one of the public agencies in which the family is involved. A child and family-focused CSA clinical manager will establish a *core service team** to facilitate the care planning process. The *Core Services Team*

---

* Currently, DMH operates on public Community Service Agency that operates according to MHRS system. Three-five additional core services agencies will developed over the next 3 years.
* *Core Services Team*" CSA clinical manager child, family, family liaison, presenting agency representative, and other key stakeholders and helpers identified by the family and team.

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

will conduct strengths-based needs assessments, manage implementation of the IPC, and facilitate the wraparound process and coordination efforts with all agencies involved with the child and family. Service planning will involve an interactive process in which the team will develop a collective vision and related goals, along with a crisis and safety plan for the child and family.

The Sub-Council will appoint agency representatives to a formal Multi-Agency Planning Team (MAPT) (formerly Multi-Agency Collaborative Task Force). This group will address the complex service needs of children and their families who are involved with multiple agencies, and whose needs cannot be readily addressed through the CSA treatment planning process. It is anticipated that the MAPT will review IPCs for a significant number of the children with SED returning from lengthy out-of-home placements, as well as those who are at risk for out-of-home placement. Family Group Decision-Making, an evidence-based practice, will be used to develop plans of care for these children and their families. All members of the MAPT will be trained to participate in this process to ensure fidelity of practice.

A unique feature of this component will be the introduction of an intensive family leadership training model adopted from the Family Intervention Program (FIP) currently being implemented by The Collaboratives and CFSA. Family liaisons and agency case managers will engage in a training process in which they work together on issues of family resilience and strengthening. Structured as a "live" practicum, each family liaison/ case manager team will conduct a family care planning session during the training. These teams will gain hands-on experience on how to identify and build on family strengths. Learnings from this training will support effective IPC team meetings and will position family liaisons to more effectively serve as coaches to other families.

**B1.4. Wraparound Process.** The core principles of wraparound involve a set of interventions that are developed and/or approved by a service planning team; are community–based and unconditional; centered on the strengths of the child and family; and, include the delivery of coordinated, highly individualized services in three or more life domain areas of a child and family (Cole and Poe, 1993). Emphasis is placed on long-term planning in order to maximize the entire family's quality of life instead of compartmentalizing services by an agency or categorizing them as mental or physical health. These principles serve as the foundation for all service planning and implementation for children and families served by *D.C. CINGS*.

Until recently, the capacity of the District to utilize a wraparound approach to the services delivered to families was limited by a fragmented system and limited service capacity. For example, DMH contracted with a local community-based organization to provide a limited range of wraparound services to approximately 40 families per year. Implementation of *D.C. CINGS* provides a model that is designed to expand the capacity of the current system to utilize a wraparound approach to care. Specifically, DMH added Community-Based Intervention (CBI) to its Medicaid Rehabilitation Option. This set of intensive home-based services incorporates the core functions of wraparound.

The ACCESS Helpline will also serve as the connecting point for children and youth identified through the newly developed EPSDT provisions in Medicaid and the Medicaid 1115 and /or

1915(b) waivers. DMH serves as the mental health point of contact through a recently developed Memorandum of Agreement between the Medical Assistance Administration and DMH for joint oversight of the mental health services provisions in these Waivers. It is expected that utilizing the EPSDT model initially will allow more providers to participate in building the broader base of wraparound services. In addition, more children will be eligible for Medicaid under the Children Health Insurance Program (CHIP) program.

**B1.5. Case Review.** The MAPT will also be responsible for overseeing the system of care to determine how well services are being delivered to individual children and their families. This interagency group of representatives appointed by the Mental Health Sub-Council (section A-6), along with a family coordinator, will periodically review a small number IPCs that present particular challenges to the delivery of the system of care and develop recommendations regarding implementation policies and practices needed to improve the quality and effectiveness of the service delivery process. This process will support and encourage broader systems change strategies, as well as help to break down barriers, build and sustain service for children and their families, and create supports for service expansion, funding and evaluation. It is conceivable that some of these families will appear within the cohort of complex cases for which the MAPT will conduct additional planning. In these cases, Family Group Decision Making, an evidence-based practice, will be used as a framework for planning.

**B1.6. Access.** The *D.C. CINGS* project design offers a system of care that is consistently accessible, available and approachable. Multiple portals of entry including child-serving agencies, service providers, family organizations and traditional and non-traditional community-based organizations facilitate opportunities for families to enter the system of care. Access to care coordination and emergency services will be available 24 hours per day, 7-days per week. A consumer-run telephone information service, known as the "Warmline", will also be available to provide general information for families and the community. Services are expected to be delivered in a variety of settings including the family's CSA, in the home, at community-based organizations, or if the family chooses, at another accessible location. CSAs will be located throughout the community. We expect to expand the availability of these entities from three (3) to five (5) during the life of this project.

Services will be provided to families regardless of their race, religion, national origin, gender, disability, sexual orientation or age. Non-discriminatory provision of services calls for service delivery that is sensitive to the family's culture, lifestyle and language. Although a significant portion of the target population is African American, *D.C. CINGS* will utilize the resources of the DMH Cultural Competence Task Force, along with the Collaboratives and family-run Organizations, to reach out to families from other ethnic groups.

**B1.7. Fiscal Sustainability.** In FY 2002, an Interagency Medicaid Policy Workgroup was established to analyze policies across a wide range of Medicaid reimbursed and non-reimbursed services funded through multiple arrangements and agreements across at least five different DC agencies. Part of the genesis for this effort has been the historical reliance on expensive out of District residential treatment costs partly attributable to the fact that this service is reimbursed when other services including in-home services have not been reimbursable until March of this year (02). This problem is also compounded by the fact that some out-of-District providers have

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

been unwilling to accept Medicaid due to historical problems with timely payment. The upshot of this has been that while out-of-state placements have been the cost drivers for the District's mental health services for children, local funds have also been overly utilized. Given the District's match ratio (70 federal and 30 cents on a dollar) and the number of local only days being funded, the District expects to redirect approximately $15 million to the community-based system of care over the next two to three years.

The Medicaid Policy Workgroup recently developed a three-stage process for their work: 1) identification of conflicting service, eligibility, enrollment, service coverage, access, provider standards, and business processes including duplicate information systems, billing rules and claims processes. The workgroup has begun collecting these data and will conducting a cross sectional analysis of each agency's requirements; 2) identification of problems and barriers with recommendations for policy and business development, etc. The group has already made some decisions with infrastructure issues (see later section on infrastructure); 3) implementation of a single approach to Medicaid policy development, decision making, business approach and other functions associated with supporting a single approach. One key outcome of this work to-date, and going forward is that partners involved in this effort will identify funds to implement the goals of *D.C. CINGS* and reinvest those dollars as a part of an interagency agreement.

We also expect to expand the number of children served by this community-based system of mental healthcare from approximately 1,000 to 5,000-6,000 over three years. Finally, these dollars will be used to support expansion of school based, early intervention, family support and other services not reimbursable by Medicaid. Development of these resources, reforms, along with other learnings gleaned through *D.C. CINGS* will assist the District in identifying untapped efficiencies and resources to support a system of care long-term. Finally, the District has committed to reinvest $149,000 of its Mental Health Block Grant resources to return children from out-of-home placements.

**B1.8. Community Leader Support.** We have clearly demonstrated numerous existing and ongoing efforts to work together in this application. We have received endorsement from the highest level of government including the Mayor, Deputy Mayor for Children, Youth and Families, Superintendent of Schools, and the Chief Judge of the Family Division of the Superior Court, along with individual family members whose children are currently involved with the various child-serving agencies and other community groups. Strategies to expand our reach to ensure diversity and representation will be implemented throughout the life of the cooperative agreement.

**B2. Infrastructure.** Currently, children with SED presenting to the public schools, the juvenile justice system, mental health and child welfare receive services through a number of primarily public systems that contract with community providers for a limited array of services. Each child receives services through the agency that initially identifies his/her needs. A number of community-based organizations offer services to the target population, but what is provided is too often not adequate to address its needs. *D.C. CINGS* provides opportunities that allow us to "push the envelope" on behalf of children with SED and their families. While a number of efforts to fortify the District's infrastructure have already been discussed, it is important to note the commitment by our leadership and partners to ensure that these reforms result in a

comprehensive system of care that works for children and families. This requires that we work with agencies to train their staffs to adapt to the shift in culture from a child-focused system to one that addresses the needs of the entire family, along with specific interventions to network the service system at the community level by developing services and supports.

DMH has organized itself into three entities-the Authority, St. Elizabeth Hospital and the Public Community Services Agency (PCSA) with the passage of the Mental Health Establishment Act of 2001. DMH funds and manages the delivery of care to consumers of mental health services within the Authority. The Office of Delivery Systems Management implements service delivery functions across the mental health system of care. This office conducts planning and arranges for the delivery of services through human care service agreements and other contract vehicles. Implementation and management of *D.C. CINGS* will occur under the aegis of this office.

This function is a dramatic step forward for this new organization—the former Commission on Mental Health Services did not contract with community-based child serving organizations. This void is being filled with new contract arrangements being established at time of this Cooperative Agreement submission. Direct community services are currently provided only through the public Community Services Agency.

Under the new mental health system of care, DMH will certify providers to deliver nine (9) Mental Health Rehabilitation Services that are Medicaid reimbursable, along with additional services not covered by Medicaid. DMH will reimburse claims for the provision of medically necessary services for children and families who are eligible Medicaid. Those not eligible for Medicaid will be supported with local funds. In addition, DMH will purchase a number of other formal and informal services and supports to ensure the availability of a comprehensive array of services to address the needs of children and their families. DMH certification standards require each contract agency to assure culturally competent service delivery, immediate and 24-hour access to services and supports, consumer and family education and specified staff to consumer ratios that will promote an effective approach to service delivery and the IPC process described previously.

**B2.1. Governance Body.** The governance structure planned for *D.C. CINGS* will involve a community partnership that is reflective of the District's ongoing effort to share responsibility for its children and families with the end users of services. Family members, youth and other community leaders will be totally integrated through all aspects of the system of care. Under the Mental Health Sub-Council, an interagency group comprised of directors of the agencies that have responsibility for serving children and their families within the District of Columbia and consumer/family members will serve as the primary governance body for *D.C. CINGS.* As mentioned earlier, this group will oversee planning and implementation of the system of care including approval of the strategic plan and the steps for implementation, ensuring that the interagency agreements are in place to satisfy policy issues, and other reforms needed to support effective implementation of the system of care.

**B2.2. Administrative Team.** The *D.C. CINGS'* operational staff will consist of a Principal Investigator, a Senior State-Local Liaison, a Project Director, a Clinical Director; a Family Coordinator; a Key Family Contact, a Youth Coordinator; an Interagency Coordinator, an

MIS/Evaluation Liaison, a Fiscal Officer Liaison; a Training and Technical Assistance Liaison, and, a Social Marketing/Communications Manager. The Evaluation Team will be obtained through a subcontract/university partnership with Howard University School of Social Work. Each member of the project is highly qualified administratively and has substantial experience working with children and adolescents with SED and their families. They will each be responsible for a major aspect of the *D.C. CINGS* project implementation. Since most of the first year of the CMHS cooperative agreement will be used for more extensive strategic planning, this management team will play a major role in that process. We also expect to seek training and technical assistance support from a variety of consultants including the Annie E. Casey Foundation, National Latino Behavioral Health Association, Family Institute at the Medical Center of South Carolina University, as well as organizations that specialize in providing culturally appropriate services to African American youth, to ensure a consistent focus on and attention to cultural competence.

**B2.3. Office in the Community.** Project management staff will be housed at the Department of Mental Health, which is centrally located within the target area. Services offered by the CSAs, as well as other community-based services (e.g. The Collaboratives), will be located throughout the community. For example, the service capacity of the network of seven Collaboratives currently operating in each of the eight (8) wards within the District will be supported by enhanced dollars realized through the reinvestment strategy to be developed during the project.

**2.4. Management Information System.** Currently, throughout the child-serving agencies and providers within the District of Columbia, standard instruments, procedures, or training methods are typically non-existent, though many of the socio-demographic, behavioral and functional issues presented by the families they serve are common. Furthermore, information on particular children and youth is not routinely shared among different child-serving agencies. Consequently, each agency collects and maintains its own data set causing a significant burden on families seeking care, as well as problems with accountability.

*D.C. CINGS* will be supported by the DMH MIS system known as eCURA. This application was developed to support processes associated with managing services and reimbursement to providers that deliver those services on behalf of DMH. The application supports the DMH Business Model, particularly in three critical areas; 1) Medicaid Eligibility determination and all enrollment processes associated with accessing the DMH system of care; 2) Development of a child and family-centered "service package" which could encompass a variety of treatment services to support the specific needs of that child and family, as well as manage the Authorization and Referral process, and; 3) Enable DMH to collect, adjudicate, and pay off claims received from service providers in a timely manner in order to ensure continuity of care for children and families regardless of their eligibility status. These innovations are expected to play an integral part in normalizing transactions across the child-serving systems. *D.C. CINGS* will develop the kind of sound business practices needed to maximize the effectiveness of this application.

**B2.5. Service Provision.** The DMH system of care certifies three types of providers to deliver MHRS to children with SED and their families. They include: 1) Core Services Agencies (CSA); 2) Sub-Providers; and 3) a Specialty Providers. CSAs are certified community-based

MHRS provider agencies that deliver at least one core service directly. These organizations may provide up to three core services via contract with a sub-provider. Specialty services will be provided through referral arrangements with Specialty Providers.

Each CSA will develop affiliation agreements with a broad network of service providers who provide an array of more "formal" services such as counseling, community-based intervention, day treatment and acute inpatient services to "informal" supports such as transportation, day camps, respite, mentors, supported employment and work related programs, music, arts programs, and peer supports. Limited assortments of these services currently exist within the community and will continue to be developed during the six-year period. Beginning in year one and beyond, we will also explore strategies and resources to expand the array of services, especially those needed to address the needs of special populations such as children and youth who are victims of sexual abuse, fire setters, sex offenders, and others.

**During years 2-6 we enhance our current core service array which includes the following:**

**Diagnostic and assessment (evaluation) services.** Clinical staff located within the Core Services Agency will conduct diagnostic assessments and evaluations no later than 30 days following initial contact with the CSA. Each child involved with *D.C. CINGS* will be eligible to receive one (1) evaluation every six months. Services will occur within the CSA, the child's home, or community settings within the District.

**Case management.** Case management teams, led by clinical managers who have appropriate experience to serve children with SED, will support families to ensure that they receive the services and supports they need to meet the goals identified in the IPC. Services will occur within the CSA, home, or other residential or community settings.

**Individualized Plan of Care.** Each child will receive a child and family-centered IPC. Utilizing a wraparound approach, development of these plans will involve a coordinated, interagency process designed to address the needs of the "whole" family.

**Outpatient services.** Outpatient services will include individual and family psychotherapy, professional consultation, and or/review and management of medication, specialty therapy groups that focus on abuse and exposure to violence. These services will be offered in existing clinics, school-based mental health clinics, and other community-based settings.

**Crisis/emergency services.** Face-to-face or telephone crisis/emergency services to ensure an immediate response to a child with SED who has an emergency mental health situation will be available twenty-four (24) hours per day, seven (7) days per week. Services may be delivered in natural settings. A network of crisis/emergency providers such as Children's Hospital and other private providers in the community will be available to provide site-based assessment and evaluation of the presenting situation, assist in immediate stabilization and resolution, and ensure access to care for the child and family. We also hope to increase the number of crisis beds such as a short-term therapeutic arrangement that provides 72-hour care outside an acute hospital setting.

**Intensive home-based services.** Community-based interventions (CBI)-- intensive services designed to prevent utilization of more restrictive out-of home treatments will be provided. They will be multifaceted in nature and include situation management, environmental assessment, and interventions to improve child and family interaction. In-home services will include support and consultation to the Consumer's families and/or their support system.

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

**Intensive day treatment and psycho education program.** Clinical services designed to develop skills and foster social role integration through a range of social, psycho educational, behavioral and cognitive mental health interventions will be provided. These services must be curriculum driven and assist the child in the retention and restoration of community living, socialization or adaptive skills. Services will be provided in a DMH certified organization.

**Respite care.** The spectrum of respite care services to be provided through *D.C. CINGS* range from short-term emergency care to 30-day placements. Community providers, who include "natural helpers" like The Collaboratives, will be asked to help build the system's capacity to develop these services.

**School-based mental health services.** The school-based mental health programs serve children and families in 15 charter schools and are expanding into 17 additional schools. Services provided include an array of early intervention and treatment services, along with consultation for teachers, psychiatric services and case management. Special education students receive services from providers identified through their Individual Education Plans supported by resources from DCPS, which creates a bifurcated system of care for children and families. DMH and DCPS will explore opportunities to develop policy and funding reforms needed to coordinate this process. DMH will also expand these services by one or two clusters every year to facilitate the availability of school-based mental health services in all public schools within 5-10 years.

**Therapeutic foster care.** CFSA operates a system of therapeutic foster care homes in the community to address the needs of children with SED, and allows them to live successfully in a community-based family setting. The District has a limited number of these homes available. *D.C CINGS* will collaborate with community providers and agencies to expand the capacity of these services in years one (1) through year six (6).

**Transition services.** The DMH coordinated system of care on which *D.C. CINGS* is built provides opportunities for a seamless transition for youth with SED and their families as they transition through many levels of care , as well as to the adult care system. The Core Services Agency provides a "clinical home" for the child and family; consequently, these families will receive adult services through the same "door" they initially enter for care. All CSAs must provide adult services directly or through affiliation agreements. *D.C. CINGS* will also work with the Vocational Rehabilitation Administration and other agencies to develop strategies to meet the needs of these youth. The Rhode Island Community-Based Transition* program will be explored as a model.

**Optional Services.** In addition to the standard mental health services mentioned above, we will develop a universal risk and resiliency tool, recreation services, along with the necessary training to support standard assessment practice across agencies, an assortment of cross-agency/community training to enhance practice and support for planning to develop system capacity. Finally, considerable resources, (includes in-kind) will be devoted to the enhancement of the infrastructure of our key family organization, FASA. Over time, we will provide training and support for this organization, along with other key family-run entities, to assume responsibility for the hiring and implementation of all family-related activities within the system of care.

---

\* Rhode Island Community-Based Transition -Targets students eligible for SSI ages 18-21 years in a school to work program The program, operated by a partnership between the Franklin County education Services Center (FCESC) and the Ohio State University Medical Center, involves work-site experiences supported by a curriculum that emphasizes self-determination, choice, employability, and job search skills along with other supports. Students receive services through age 21.

District of Columbia GFA SM-02-002                        Nicholas Geleta, Ph.D., Project Director

**Non-Mental Health Services.** We also expect to make available a range of "non-mental health services"(as defined in the GFA) or family supportive services including, but not limited to, substance abuse services (Administration for Prevention and Recovery), mentoring, vocational training, transportation for parents, housing (DC Housing Authority), benefits support, protection and advocacy services and others.

## B3. Key Activities for Providing Services

**B3.1. Delivery of Clinical Interventions.** During year one, the *D.C. CINGS* planning group plans to review and select one or more evidence-based interventions based on specific diagnosable emotional, behavioral or mental disorders. The CFSA has already begun implementation of the evidence-based Family Group Conferencing process. They are in the process of developing trainers in the District that can implement and train others in this process over the next three years. When appropriate, this method will be used to engage families in a more empowering decision-making process to prevent further deterioration of the family unit. It is believed that this type of process might be very helpful in working with families whose children are returning from out-of-home and out-of-state placements.

The planning group will also explore the possibility of implementing Multi-Systemic Therapy (MST) as an evidence-based model for youth with SED that manifests as severe emotional and antisocial behavior. The model provides an intensive, in-home intervention that intervenes at the family, school, peer group and community levels. Clinical trials over the year have shown it to be effective, especially with adolescents, and their families, who are often involved with the courts and juvenile justice facilities, although it has also been successful with certain child welfare populations and other "stuck" kids. It works best with adolescents with behavioral disorders (i.e. oppositional disorders, disruptive behavior disorders, conduct disorders) than those with psychotic and affective disorders. Since the majority of District youth receive behavioral disorder diagnoses, this clinical intervention may prove to be effective in reducing family and community disruption and engaging youth before they become too connected to the juvenile justice and corrections systems. The planning group will work with Scott Henggeler[*] and his staff to determine whether the model needs to be modified to account for gender or cultural differences. MST provides intensive training and supervision for staff involved in the delivery of the intervention.

During the planning year, the group will also try to deepen the assessment of needs of Hispanic/Latino youth and their families, as well as other immigrant populations in the District. Once the assessment is completed, the planners will identify culturally appropriate clinical interventions that can be used to ensure greater participation, cultural appropriateness for these currently underserved groups.

**B3.2. Case Management Services.** As noted earlier, DMH has in place a case management mechanism that ensures all children enrolled in *D.C. CINGS* and their families will receive case management support. DMH has adopted a "community support" model of case management. The primary intervention involves a focus on building resiliencies for the child to meet his or her life goals. Assistance also includes supports for the child and family in crisis situations, as well

---

[*] Scott Henggeler, Ph.D., Director of the Family Institute, Medical Center University of South Carolina.

as education and consultation to the family and support system, individual developmental interventions and those necessary to avoid out-of-home placement. Under the new MHRS standards, this process must be completed within 24 hours for children and youth with "urgent needs" and within five (5) days for children and youth with routine needs. At the time that youths and their families are assigned to a CSA for diagnostic assessment and evaluation, a determination will be made about the appropriate level of case management. The IPC that guides this work will be updated every 90 days.

**B3.3. Individualized Service Plans.** Each child involved in the *D.C. CINGS* project will receive an Individual plan of Care (IPC) within 30 days of being assigned to a CSA. Services will be designed and delivered around the unique strengths and needs of each child and family, with maximum involvement from the youth (when appropriate), the family and all other service providers and agency staff, as necessary. The IPC will be multi-dimensional and comprehensive. It will include a clinical and family profile that will be developed for each child and family, taking into account age, developmental stage, level of functioning, culture, special needs, housing, etc. The IPC will delineate the services to be provided, as well as their expected duration and intensity. These plans will be developed by a team (based on the child and family) within the CSA of Consumer choice and forwarded to the Multi-Agency Planning Team for funding and interagency coordination (when needed). When multiple services are required or multiple agencies involved, a care coordinator and family liaison will be assigned to ensure that the child and family receive coordinated services. The IPC will be reviewed, and revised as needed, or at least quarterly.

**B4. Family Involvement.** The Department of Mental Health, along with its partner agencies, recognizes "parents as professionals" and acknowledges the important roles they play in the care of their children. Including family members at all levels affords the system the benefit of their individual and collective wisdom about "what works" for their children. Parents and family members of children and youth with SED have been involved in the District's efforts to develop a system of care since 1987 when the Commission on Mental Health Services supported the creation of FASA--the only incorporated family run-organization and current Center for Mental Health Services-funded Statewide Family Network grantee in the community.

Existing family-run organizations like FASA, Family Consultant Network, Parent Watch, Friend's and Families of children with Special Needs, The Collaboratives, and Family Alliance for Community Service will facilitate family involvement in the *D.C. CINGS* project. To ensure participation that is representative of the rich ethnic and racial diversity among families living in the District, *D.C CINGS* will enlist the assistance of community-based efforts like the Collaboratives and others to identify additional family-led groups. The Family Coordinator, Key Family Contact and Family Evaluation Assistant will work with these groups to encourage and prepare family members to participate in various components of the project including governance, service delivery, evaluation and others.

*D.C. CINGS* will develop a cadre of family members to serve as parent partners who support families, as well as the system to provide effective services. Modeled after the Houston-based "Friends of the Family" program, we will create a professional development curriculum designed to "credential" or certify family members to participate in the system of care. Implementation of

these strategies can only serve to prepare family members and the agencies that serve them to work together more effectively, resulting in a system of care that offers services that are available, accessible, approachable, and culturally competent for all families.

**B5. Youth Involvement.** The Department of Mental Health's School Based Mental Health program recently established a citywide Youth Council to prepare youth leaders to support the development of effective policy and practice, particularly within the mental health arena.   The individual currently responsible for coordinating the work of the Council will also serve as the *D.C. CINGS* Youth Coordinator.  He will be a member of the SOC Team and ensure the participation of youth in all aspects of the *D.C. CINGS* project.  The Youth Council comprised of youth consumers of mental health services and others will identify strategies to support the system of care.

**B6. Cultural Competence.**  Given the District's population, cultural competence is a critical component of the system of care. The majority of youth in the District's current system are African American.  A growing number of Hispanic/Latino, Asian and African immigrant children remain unserved/underserved by current systems.  This suggests that more time needs to be spent in outreach to these families.  Linguistic competence is critical if we are to meet the needs of these populations over the next six years.

In February 2001, the DMH Cultural Competency Initiative was established to provide leadership and direction to our efforts to assure that all services and programs are culturally competent.  This Committee has developed an Action Plan by which the Department's efforts to achieve such competence will be measured.  The Plan is comprehensive and includes interventions across all policy-making, infrastructure building, program administration and evaluation; service delivery and supports; and, the individual consumer/family member/youth experience within the system.  It is also designed to ensure that DMH and core service provider staff at all levels: 1) value diversity and recognize similarities among all peoples; 2) understand and respond effectively to cultural differences; 3) engage in cultural self-assessment both individually and organizationally; 4) make adaptations as needed to service delivery and supports; and 5) institutionalize cultural knowledge.  The plan further recommends that all DMH and CSA employees be required to participate in eight (8) hours of approved cultural competence training annually.   All staff and programs participating in the *D.C. CINGS* project will adhere to the cultural competence requirements outlined by the Committee.

**B7. Training and Technical Assistance.**  During year one, the SOC Team and staff will develop a targeted training and technical assistance plan to support implementation of *D.C. CINGS*.  The training and technical assistance coordinator will coordinate efforts among the project, the DMH training department, CMHS, and the national training and technical assistance center supporting this cooperative agreement to identify appropriate training and technical assistance to enhance project effectiveness and ensure implementation of best practice.  At a minimum, we will seek training and technical assistance support to: implement a strategic planning process, develop a logic model, conduct a targeted assessment of need among children in out-of-home, out-of-state placements, and undertake other strategies identified in the planning phase.  Our efforts will be coordinated with the DMH Training Institute.

31

**B8. Social Marketing.** The planning team responsible for the development of *D.C. CINGS* views a sound social marketing strategy as a critical component of our system of care. As previously noted, attitudes about mental health, as well as care seeking behaviors vary across the community. The one constant that remains, however, is the stigma that is often associated with these mental health issues. *D.C. CINGS* will develop a variety of strategies to increase awareness and affect attitudes about the mental health needs of children and youth with SED. Outcomes associated with these efforts will result in an increased understanding that the needs of these children and their families are best met through the used of comprehensive, community-based systems of care.

During year one, we will hire a social marketing/communications liaison to work with the Sub-Council, staff and DMH Office of Public Affairs to develop and implement a community-based social marketing plan. This plan will focus on the development of written, electronic, audio-visual, materials, specific communications strategies, technical assistance and support for the project and along with other communications mediums. All activities and documents will be culturally and linguistically competent and appropriate to address the literacy needs of D.C.'s diverse communities.

**B9. Increased Capacity and Quality of Services.** The *D.C. CINGS* project will not initially increase the capacity to serve youth with SED, but will definitely improve the quality of services delivered to these youth and their families, as well as reverse the flow of children in the District to out-of-state RTCs. Through the provision of a comprehensive array of community-based services, it is anticipated that lengths of stay in treatment will be reduced. Certainly, it is anticipated that 75 youth will be served through the system of care in Year 2, with 150 youth being served in subsequent years for a total of at least 500 unduplicated cases by the end of the project. It is anticipated that at least 125 youth will participate in the MST clinical intervention during the six-year period and another 100 will be included in Family Group Conferencing processes. All of the youth are expected to receive some level of care coordination. We also expect more Hispanic/Latino and immigrant families will be served, with a goal of at least five percent of the 500 youth and families served being from these cultural groups.

**B10. Eligibility Criteria, Referral Sources, Enrollment Procedures.** *D.C. CINGS* will serve children and their families who are at risk for out of home, out of state placement those who are currently in these residential placements. These individuals will be eligible for enrollment in the DMH MHRS system based on the following criteria: 1) resident of the District of Columbia; 2) they meet the definition of the *D.C. CINGS* target population; and 3) services are medically necessary as determined by a MHRS qualified practitioner.

Children and youth receiving care through *D.C. CINGS* will be enrolled in the DMH automated tracking system known as eCURA. Minimum data elements required for enrollment include first and last name, date of birth, address, social security number, one contact number and the enrollment event documenting the family's choice. A tracking number will be assigned to each "member". Enrollment will occur at the point of contact with the DMH ACCESS Helpline or at a CSA. eCURA will facilitate sharing of information between the ACCESS Helpline, CSA and eventually, community providers.

**B11. Application Development.** The collective effort and enthusiasm among the diverse group who participated in the planning and design of this application is reflective of the changing tide in the District of Columbia when it comes to serving our children and families. Representatives from the Mayor's office, the Deputy Mayor for Children, Youth and Families, directors and deputy directors of child-serving agencies, Medicaid, representatives from family-run organizations, family members of children with SED and community providers participated in numerous planning meetings and design review sessions to develop the application (Appendix 6). Each individual contributed valuable information, data and insights, and demonstrated a strong commitment to the development of a system of care for our children whether funded or not. We feel that this process clearly represents our intentions to build a system of care that works for children and their families—not the systems that provide services to them.

**B12. Non-Federal Match.** Interagency collaborative arrangements that support *D.C. CINGS* will utilize a variety of non-federal dollars and/or in kind services to meet the match requirements. With mental health as the lead, agencies participating in the effort will implement the following strategies for identifying resources to meet the match requirements: 1) Savings realized from opportunities for maximization of Medicaid thereby freeing up local dollars currently being used to pay for services; 2) reinvestment of dollars realized from reducing the costs associated with the high rate of out-of-home and out-of-state placements across child-serving agencies; and 3) redirection of dollars realized through increased efficiencies at DMH such as shifts in resources previously required to support infrastructure to service delivery. We will also conduct an analysis that allows us to project the amount of local funds needed from the District budget in the out years.

**B13. Project Sustainability.** Changing entrenched systems is a monumental task that requires the collective vision and cooperation of those responsible for managing them, as well as those who implement the services they provide. As we have demonstrated, the District of Columbia is at the genesis of establishing a "new way of doing business" on behalf of the children and families who reside here. Several examples of interagency collaboration, and plans to improve the infrastructure, along with policies and legislation to support these reforms have already been mentioned. Implementation of *D.C.CINGS* will add strength to the District's efforts to utilize system of care principles to realize good outcomes for its children and families. More focus on a system that supports interagency collaboration, family and community involvement, as well as informal supports, are expected to reduce the current high costs of services to youth with SED and their families. Over time, we expect this system of care, along with the changes in policy and practice that result from this project, to be institutionalized and become the manner in which the District of Columbia cares for its children and families.

## SECTION C: PROJECT MANAGEMENT

**C1. Agency Description.** The Department of Mental Health's mission is to "develop, support and oversee a comprehensive, community-based, consumer-driven, culturally competent, quality mental health system that is responsive and accessible to children/youth, adults, and their families; that leverages continuous positive change through its ability to learn and to partners; and that ensures that all providers supported through this system implement services that are

District of Columbia GFA SM-02-002

Nicholas Geleta, Ph.D., Project Director

accountable to Consumers and include active recovery models." As previously noted, the Mental Health Establishment Act of 2001 established the DMH as a cabinet-level agency that reports directly to the Mayor of the District of Columbia. The agency operates as an authority responsible for development, implementation and monitoring of a system of mental health care for residents of the District.

## C2. Qualifications and Experience of Key Personnel.

**Principal Investigator.** The *D.C. CINGS* project will have the oversight of the Director of DMH – Martha Knisley. Ms. Knisley, the first Director of the D.C. Department of Mental Health[*], is also the chair of the Mental Health System of Care Sub-Council. Her mandate is to create a new mental health system that regulates services and emphasizes community-based care. During Ms. Knisley's three decades as a mental health clinician and administrator, she directed two state Departments of Mental Health – Pennsylvania and Ohio – before becoming a Senior Consultant with the Technical Assistance Collaborative located in Boston, Massachusetts. She has been actively involved and enthusiastic about the possibilities inherent in the CMHS cooperative agreement and the opportunity to take advantage of a national network of experts in systems of care development. As Principal Investigator, she will be responsible for the fiscal and administrative oversight of the cooperative agreement and accountable to the funded community for the proper conduct of the agreement. She will provide 10% of her time as an in-kind contribution to this project.

**Senior State-Local Liaison.** Velva Taylor Spriggs, currently Director of the Child and Youth Services DMH, will serve as liaison to other District agencies and *D.C. CINGS*. In this role, she will have responsibility for receiving and providing action on barriers, opportunities or other policy changes identified during the planning and implementation of the cooperative agreement. She will also act as the primary liaison for the project with the Sub-Council, the Deputy Mayor's office, and key administrators in other child-serving agencies and will have primary responsibility for sustaining interagency collaboration in the project's structure. Ms. Spriggs has occupied several federal positions related to children's mental health. Her "grassroots" experience in children's mental health began over 15 years ago when her child was diagnosed with depression. One-third of her time will be dedicated to this project as an in-kind contribution.

**Project Director.** Nicholas Geleta, Ph.D. has over 25 years of experience in children's mental health in the District. In the Project Director role, Dr. Geleta will be responsible for the day-to-day oversight and implementation of the *D.C. CINGS* project and supervision of its' staff. He will also be responsible for all sub-contracts to be implemented as a part of this cooperative agreement. Dr. Geleta has been employed in the District since 1977, beginning his career as a school psychologist providing direct services to children and families for 11 years. He began working in child mental health as a Mental Health Systems Specialist where he played a direct role in the development of case management, home-based crisis intervention and wrap-around services. He also served as the Acting Chief of the Residential Placement Unit in mental health, supervising a staff of 16 professionals and gaining a critical up-close understanding of the

---

[*] Ms. Knisley was nominated by Mayor Anthony A. Williams and confirmed by the D.C. Council on November 6. 2001.

children placed out-of-state and the needs of families and local service structures available to support children returning home. This position is an in-kind contribution at 100%.

**Clinical Director.** Dr. Andrea Weisman will serve as clinical director for *D.C. CINGS*. Currently a senior analyst and special projects director at DMH, she has extensive experience in both civil and forensic mental health issues. Her previous appointments include director of mental health services at the Washington, D.C. juvenile detention facility, the Oak Hill Youth Center in Laurel, Md. During this time she initiated development of the District's jail diversion efforts.  This full-time position, an in-kind contribution to the project, will have primary responsible for ensuring that children with SED and their families receive timely assessments and comprehensive treatment plans, thus acting as the primary liaison to the CSAs in the District. Another role will be to select and oversee the implementation of and training for all evidence-based treatment models utilized in the project.

**Family Coordinator.** Harriet Crawley, LICSW, will assume this full-time position as an in-kind contribution. Ms. Crawley is Treasurer FASA and Director of the Paul Robeson Psycho Education/Day Treatment Program for latency age youth. She has worked with families and youth with SED for over 25 years. In the role as Family Coordinator, Ms. Crawley will assume primary responsibility for working closely with the family organization (FASA) and the outreach efforts in the Neighborhood Collaboratives. In addition, she will have primary responsibility and oversight for the Key Family Contact and the Family Liaisons.

**Key Family Contact.  TBA.** A parent, family member or other member involved with the District's key family organization, FASA, will fill this half-time position. This position will work closely with FASA and with the *D.C. CINGS* project staff in all aspects of implementation of the system of care and provide support services for families receiving services through the cooperative agreement.

**Youth Coordinator.** Mr. Jendayo Grady will assume this half-time position as an in-kind contribution. In this position, he will have responsibility for managing and expanding the current Youth Council and other activities that will bring the voice of youth who have SED to the project and to the highest levels of District government. Youth will have an opportunity to participate in planning, implementing and providing feedback to evaluators and staff. Mr. Grady has worked within a number youth-serving organizations in D.C. He is currently a Doctoral candidate at Howard University and is providing prevention and early interventions services within the DMH school-based mental health program.

**Interagency Coordinator.  TBA.** This full-time position, to be funded under the cooperative agreement, will have direct responsibility for coordinating interagency activities on a day-to-day basis and responsibility for ensuring effectiveness at the supervisory and direct services interactions. The position will work directly with designated *D.C. CINGS* liaisons in each of the District's child-serving systems with developed MOUs. The position will keep the agencies and governance entities liaisons abreast of developments in the project and help them identify and resolve any issues or concerns they might have in various levels of implementation. This position will also be responsible for securing interagency agreements with other agencies and

organizations identified during implementation, as well as maintaining relationships with The Collaboratives.

**MIS/Evaluation Liaison. TBA.** This will be a full-time position, funded by the cooperative agreement, to work closely with the Management Decision Support Unit within the MIS Department at DMH. This individual will coordinate efforts with the evaluation team at Howard University to ensure that the necessary data is being collected, analyzed and shared. He/she will also oversee the ongoing efforts and timeliness of implementation of the evaluation plan, as well as ensure that issues are resolved in a timely fashion.

**Fiscal Officer Liaison. TBA.** Given the critical need to sustain the services and structures implemented under the cooperative agreement, the DMH will support this position to work with its' fiscal office, along with the Medical Assistance Administration and other federal funding offices within the District's agencies. This position will also be responsible for the analysis of funding strategies such as interagency funding in the District. The position will also track costs and have responsibility for exploring various models for re-investment of resources saved through decreasing utilization of RTCs. This liaison will also ensure that the services developed under the auspices of the project will be reimbursed through the Mental Health Rehabilitation Option or some other ongoing mechanism. The position will also assist in the development of subsequent budgets developed for this project.

**Training and Technical Assistance Liaison. TBA.** This half-time position, to be supported under the cooperative agreement, will serve as the central point within the project for strategizing and assessing the technical assistance needs of the stakeholders participating in the initiative and linking these needs with ongoing technical assistance or creating new opportunities for training to meet them. This liaison will develop an orientation training packet for all those involved with the project and the fidelity to any evidence-based models implemented. The liaison will work closely with other technical assistance providers within the child-serving agencies to avoid unnecessary duplication.

**Social Marketing/Communications Manager. TBA.** This half-time position, to be supported by the cooperative agreement, will have responsibility for developing a comprehensive social marketing/communications strategy including: a social marketing strategic plan, public education activities, and overall outreach efforts. The position will also coordinate activities with the national communications campaign.

**Evaluation Team. Howard University School of Social Work.** The evaluation team for the project will be provided through a subcontract with Howard University. Drs. Lawrence Gary and Maxwell Manning will act as Co- Evaluators for the project and be responsible for all local evaluation efforts and liaison with the national evaluation team. They will also work closely with the MIS/Evaluation Liaison to be hired for the project. The evaluators hire a half-time Evaluation Assistant who is a parent or family member of a child with SED. This person will be trained to co-conduct focus groups, develop and administer satisfaction surveys, and other critical components of the proposed evaluation. Both Dr. Gary and Dr. Manning have extensive experiences in evaluation and the university partnership will ensure that additional resources become available, as needed, to the project.

36

Dr. Lawrence Gary is a mental health researcher and Professor in the Howard University School of Social Work with numerous years of experience working with and studying diverse populations. He has over ninety publications in mental health and has been the principal investigator on several national mental health funded grants. During the first year and throughout the project, Dr. Gary will have leadership responsibility for the implementation of the evaluation plan. Years 02 through 05, he will guide the interpretation of feedback from data and direct how this feedback can be utilized for system and policy implications. Most importantly, he will direct the implementation of the longitudinal evaluation.

Dr. Maxwell Manning is an evaluator, consultant and Assistant Professor in the Howard University School of Social Work. He has been involved with the national child mental health initiative since 1986. He began his involvement by providing leadership for the Brooklyn Child and Adolescent Program where he led the implementation of a large scale needs assessment of three community districts with a total population of approximately 350,000 people. The needs assessment led to the development of a single entry point system, a community based psychiatric hospital and other community oriented services among other successful developments. He has continued to write on children's mental health issues with a particular focus on the importance of cultural competence training. Most recently, Dr. Manning has participated as an evaluator for studies in the District of Columbia on children transitioning into the adult mental health system, HIV prevention, and substance abuse. During the first year, Dr. Manning will assist in the implementation of focus groups and with community engagement. Year 03 through 05, he will assist with the coordinating of evaluation activities, supervising evaluation implementation, overseeing logistical matters and assisting with report writing and data interpretation.

A chart describing staffing pattern is included in Appendix 6, along with a brief description of key sub-contracts to be utilized in the planning year of the cooperative agreement. It should also be noted that the District will be diligent in attempting to ensure that positions are filled with families and professionals who reflect the diversity within its' population.

## C3. Management Chart and Timeline.

A management chart, staffing pattern and timeline are included Appendix 6. The first year is essentially viewed as a strategic planning year that will provide an opportunity to develop, enhance and coordinate important components of the infrastructure of *D.C. CINGS* so that delivery of services to children and youth with SED and their families can begin in Year 2. The tasks in the first year, in addition to development of a strategic plan and development of a logic model will also include several special studies that will be used to inform and refine the strategic plan. One special study will focus on creating a better understanding of access to and use of mental health services for children among the growing population of Latino children and their families in the District. Another special study will be used to identify the service needs of the first cohort of 25-30 youth to be returned from out-of-state RTCs and their families or living situations upon return to the District. This in-depth study of the cohort will provide an opportunity to ensure that all of the community-based services and supports are in place for successful community re-integration in the second year. The project staff will also work closely with the Medicaid working group and provide needed expert consultants to develop a strategy for re-investment of cost savings and fiscal resources that follow children back into the District as they move from residential placement settings.

**C4. Facilities, Equipment, Resources.** Project management will be housed at the Department of Mental Health headquarters, which is centrally located within the District of Columbia. Although office space will be provided as an in-kind contribution, a budget item is included to purchase necessary hardware and computer software programs that will connect all project staff into a network system and facilitate daily communication between all the project staff and stakeholders. Additional equipment will include computers; fax and copying equipment, a scanner, and cell phones for those project staff that will be working in various locations throughout the District. As needed, project staff will be reimbursed for local travel and for the costs of meetings (rooms, refreshments, materials). The project will also provide resources to ensure that families can be actively involved in all the planning and implementation efforts in the project (child-care costs, transportation, food, stipends for all-day meetings and training-events, etc.). The project will also set-aside resources for interpreter and translation services for groups and families that do not speak English as their primary language or who have physical disabilities (i.e. deafness) that demand special accommodations to ensure their full participation.

**C5. Service Locations.** The project will be implemented through CSAs, Neighborhood Collaboratives, and other community-based organizations throughout the District to ensure easy accessibility and availability of services to the targeted population and their families. This will include the addition of evidence-based treatment models that include the home as the primary place of intervention. This decentralization of services throughout core areas of the city and in multiple settings will provide choice for District families and culturally appropriate places to deliver these services. All of the District-operated locations will be compliant with the American Disabilities Act and other regulatory requirements.

## SECTION D: EVALUATION PLAN

**D.1 Successful and Inclusive Implementation Plan.** The D.C. CINGS evaluation plan is a multi-level comprehensive approach that is consistent and compatible with the national evaluation's mission to improve the lives of children and families challenged with SED. Like the national evaluation, the study focuses on evaluating multiple components of a system of care utilizing both quantitative and qualitative methods. Its goals are to assess the impact of the system of care on the functioning of children and families over time, describe the characteristics of children and families who receive services, and study the service components and their cost. The local evaluation will be particularly concerned with the distinctive factors that impact children and families in the District of Columbia, i.e., racial composition, efforts to change the system and its unique governance. Other system components that will be evaluated are access, service and systems integration, interagency collaboration, cultural competence, family and youth involvement, infrastructure development and fiscal sustainability. Most importantly, the study emphasizes the impact of the system of care on children at-risk for residential care and those District of Columbia children placed in residential settings in other jurisdictions. The evaluation team will work closely with the national evaluation team to ensure that the local evaluation meets both the needs of the children and families in the District of Columbia and the national evaluation agenda.

To ensure that the system of care mirrors the needs of children and families challenged with serious emotional disturbance in the District of Columbia, a formative evaluation process will be conducted that will obtain input from a variety of key stakeholders, i.e., community residents, policy makers, system implementers, through community panels, forums and focus groups. Established integration and feedback mechanisms like The Collaboratives and the Mental Health Sub-Council will work with the SOC Team to ensure citywide representation and creation of a feedback system that informs evaluators, the community at large, policymakers and system implementers about critical changes necessary to improve the system of care.

Dr. Gary and Dr. Manning have engaged in substantial applied research and evaluation focused on social issues related to children and families, particularly those from communities of color. Combined, they have more than 40 years of experience studying and working with these populations, and their work is published in numerous professional and academic publications.

**D2. National Evaluation.** Because of this unprecedented time in the development of strategies to reform our care system and this grant opportunity, the District of Columbia can optimally use data from the national evaluation. Since the national evaluation focuses on core values and guidelines that are important for an effective system of care, it can provide critical support to effective systems development. Equivalent evaluation components provide a synergy of information and feedback that supports a family driven, culturally competent, and community based system of care. The local and national evaluation will provide data collection about the progress of systems development, service delivery, service cost, child and family descriptive and outcome data, and longitudinal comparative data.

The local evaluation complements the national evaluation because together they utilize four common outcome measures including a quality care of living measure: Child Behavior Checklist, Youth Self Report, Child and Adolescent Functional Assessment Scale, Children's Global Assessment of functioning, and Residential Living Environment and Placement Stability. The local evaluation team will work with the national evaluators to guard against any biases by using these measures. Tests will be conducted to ensure reliability and validity.

**Child Behavior Checklist - Achenbach (1991):** a behavior checklist designed to assess the behavior of problems and social competency of children and adolescents (4-18 years) as reported by parents and other caregivers. The instrument has been widely used but may prove inappropriate and difficult to read for the DC population because of its complex format and social competency items.

**Youth Self Report – Achenbach (1991):** a behavior checklist that measures behavior problems and social competencies like the CBCL but for ages 11-18 years. It has been widely used and has similar reliability/validity as the CBCL. It also has similar reading limitations.

**Child and Adolescent Functional Assessment Scale (Hodges and Wong, 1996):** a measure of functioning in different areas of a child's life, i.e., role performance, thinking, moods, and substance abuse. The advantages of this instrument are its case management utility, but it focuses primarily of weakness not strengths. The instrument could possibly be modified to focus more on strengths with assistance of the national evaluation team.

**Children's Global Assessment of Functioning (Shaffer, Gould, Brasic, Ambrosini, Fisher, Bird, Alawahlia, 1983):** the GAF is widely used for children ages 4-16 years and has established reliability for African American and Hispanics but has not been used in applied settings. More assessments need to conducted on its reliability for the DC population.

**Residential Living Environment and Placement Stability (Cross and McDonald, 1995):** the ROLES measures levels of restrictiveness in the different living environments of children challenged with SED. It has not been tested for reliability or validity. Again with the cooperation of the national evaluation team, the local team will assess its usefulness for the DC population.

As stated previously, the local evaluation team will spend considerable time during the first year testing these instruments and making the needed modifications. This modification will include input from a representative body of stakeholders. Other instruments that will, but seem to be used but seem to be more appropriate because they're strength-based characteristics: Family Empowerment (DeChillo and Friesen, 1992) and Family Crisis Oriented Personal Evaluation Scale (McCubbin, Olsen and Larsen, 1991).

The design is a multiple cohort, cross-sectional, comparison evaluation with a formative component. Evaluators will conduct pre-test and post-test (before and after services) comparisons and a longitudinal assessment of changes in service use, cost and outcome. Data will be collected from multiple sites, key stakeholders and system components. These individuals will participate in focus groups, panels, conferences and trainings. The District of Columbia is divided into seven (7) collaboratives for the purposes of delivery services to children in custody with CFSA. Each collaborative will have one focus group per year with approximately 8-10 people in each group, for a total of approximately 250 persons by the end of the study (accounts for a 10% loss). Each agency will participate in one focus group per year. It is estimated that a total of ten agencies will participate for a total of 100 participants per year.

The evaluation plan consists of five (5) measurement intervals, one every six months beginning in the second year. Each participant will be assessed, i.e., demographics, socio-economic and diagnostic status and mental health history, using in-person interviews (Appendix 3, Table 1). The pilot project will consist of 60 family/child pairs and over the project years, we will conduct an assessment of their needs. Specifically, we will assess the family/child and the system of care. The family/child will be assessed to determine levels of functioning, symptoms; satisfaction and system of care will be assessed to ascertain its cultural competence level, service coordination and level of service integration. Outcome data (child and family impairment, indicators and satisfaction) will be generated monthly, six months, and annual intervals. During years 02-05, 400 children will be evaluated appropriately, 100 per year. Evaluators will plot and graph

impairments of children based findings from the Achenbach Behavior Checklist. The strength based, empowerment approach recommended by Friesen, Yatchmenoff and Gordon (1997) will be used to assess family enrichment and stress as a result of taking care of a mentally challenged child.

We will also conduct a study to identify cost vs. effectiveness.  The process will involve comparing the cost of achieving an expected outcome.  The outcome of youth level of functional impairment and symptoms measured by CAFAS and CBCL will be examined and computed based on the cost/effectiveness ratios mean values and regression-adjusted values of costs and outcomes. Other mean outcomes will also be compared with regression-adjusted costs.

**D3. Data Management.** The data will be accumulated and managed through the DMH MIS. This system will support collection of demographic information as well as treatment data as required. The application can be configured to collect data points as identified by the project team.   The application is based on the latest database technology, using a Visual-Basic front end and a SQL data engine. ECURA has been certified to comply with the directives of the HIPAA legislation, and utilizes a very high level of security in order to protect privacy.

Providers will access the system through a web-enabled front end called ProviderConnect. ProviderConnect provides a "double-blind" for accessing Consumer information, in that it allows access only to the information on those Consumers on their panel. Enrollment of new Consumer or querying of their Medicaid eligibility is done in conjunction with the Care Coordination unit within DMH. If a Consumer is new to the system, the provider must work with DMH to ensure that the person is not enrolled in another Provider Agency.

The application uses the 128K-encryption technology as the mechanism for ensuring the security of the data. It also uses Secure Socket Layer (SSL) technology to track where the ProviderConnect session is occurring. In addition, the Provider Agency users are issued Digital Certificates and passwords specific to their desktop machines, and the access of the users can be limited based on their job function relative to the application.

The DMH IS data is housed at the DMH offices at 77 P Street, N.E., Washington, D.C., as is the server that authenticates the user information in order to allow the user to access ProviderConnect. The device is known as the IIS server. Plans are currently being developed to move that server, as well as a redundant SQL server to the D.C. Office of the Chief Technology Officer server farm at 441 4th Street, N.W. in order to locate it physically behind the information security firewall which allows for more intensive monitoring and screening in the event that someone should try to access the system in an unauthorized manner.

The System Administrator for the eCURA system will create a data extract routine through the report writing system of the application. This data will be "anonimized" by omitting the personal identifiers of the Consumer, and a routine will be developed that links personal identifiers back to the individual but can only be accessed by the System Administrator. The MIS/Evaluation Liaison will then be able to access this information through their own ProviderConnect download folder that will have all of the attendant security elements applied to a Provider

41

Agency. At that time, the data can be imported into SPSS, SAS, Access, or any other preferred data management tool for detailed analysis.

**Quality Control:**  Each month, a random selection of 10 percent of the records in the MIS system will be checked by the project database engineer to determine whether the form was completed properly (i.e. identifier and demographic information, skip patterns; amount of time the case manager and the client spent on each goal). In addition to these checks a research assistant will assess whether the case manager verified the item's activities in five (5) percent of the reported questions. The Research Assistant will check to see if there are any patterns of errors for the whole sample, or for a given case manager.  Systematic errors will be summarized and reported to the Project Director who will provide technical assistance to the case managers in correcting these types of errors.  Specific errors by an individual case manager will be reported to the case manager for correction.  If deemed necessary, extra training will be performed to maintain a high degree of data quality.

**Family Involvement:**  Children, families and other stakeholders will participate in every phase of the system's development, i.e., infrastructure, and service delivery. By creating a partnership between key stakeholders, community members, system implementers, policy makers and the evaluators, the system will be strengthened and benefit from their individual and collective perspectives and experiences. The outcome will be a system of care that is child and family friendly.   A family member will be hired to work with the evaluation team as an evaluation assistant.

One of the most effective ways families and youth can be incorporated into the evaluation of mental health services is through their participation in focus groups. Focus groups hold utility in the evaluation of mental health services for ethnic minorities because standardized instruments used to evaluate clinical services are typically not normed of these groups.  Furthermore, focus groups give investigators rich data related to the unique experience of families and youths that quantitative measures may miss. It gives children and families the opportunity to articulate what mental services components need improvement.

Kritek, Hargraves, Cuellar, Dallo, Gauther, Holland, Ilkiw, Swanson and Swanson (2002) have developed a modified focus group approach that shows promise with those experiencing mental health disparities. Their model utilizes the conference format to institute focus groups and capture the expertise of professionals while eliciting feedback from its participants.  The evaluators will incorporate this approach as a method for obtaining feedback from both families and other stakeholders.

The Kritek, teal. model  will target family members and youths who are directly receiving services and indirectly (family members receiving services) involved in mental health service utilization.  However, other stakeholders will also participate in similar focus groups. Family and youth focus groups will be convened around the most important issues related to family and youths' use of mental health services and the evaluation of these services. For example, possible domains of inquiry include clinical or therapy services: interactions demonstrating good communication; 2) understanding of youth's problems, that allows for demonstrating accuracy of needs assessment or diagnosis; and 3) knowledge of the youth's family environment that may

impact treatment involvement. Other domains of inquiry could include the evaluation for the quality of the treatment setting (i.e., magazines or other forms of ethnic sensitive literature in the waiting rooms, youth centered approach).

The focus group format also gives families and youth an opportunity to participate in the improvement of the mental health system. Most often, families and youths are left out of the process and we know very little about their perspective regarding the quality of service delivery. This type of evaluation does not focus solely on service outcomes, but can be used constructively to understand the on-going service delivery process by continual sharing of information regarding the improvement of services.

During the first year, the evaluation team will test the appropriateness of instruments for the D.C. population. Simultaneously, evaluators will examine the level of development and implementation of the District of Columbia system of care. Evaluators have agreed that outcome and system measures should be targeted to the level of organization and service system development (Jacob, 1988). In addition, our formative evaluation will focus on such factors as access to services, responsiveness to children/families' strengths and needs (focus groups) and adoption of the *D.C. CINGS* philosophy (cultural competence, strength-based, family/child centered). The evaluation will begin by examining the functionality of the mental health system, followed by pilot implementation, investigating the quality of improvement, i.e., and interaction among systems. Some of the previous concerns expressed by children challenged with serious emotional disturbance and their families include:

> the need for agency/provider accountability
> the attitudes exhibited by professionals
> effective and immediate response to complains
> the need for a data base that expedites intake, screening and discharge
> community base services
> family friendly training
> involving consumers, i.e., children and families throughout the system development and implementation process
> culturally competent service delivery system with holistic perspective and a no reject or eject policy

**D4. Local Evaluation Efforts.** During the first year, considerable time will be devoted to engaging various stakeholders, i.e., family members, direct staff, administrators, community leaders and policy makers, for participation in forums, panels and training. These activities will be used to collect data about the specific stakeholder concerns about District of Columbia children challenged with serious emotional disturbance who are at-risk for residential treatment or placed in residential settings in other jurisdictions. Along with collecting data, evaluators will provide information about the system of care and the evaluation process. This initial stage will set the foundation for authentic feedback and the successful implementation of a child and family friendly system. Furthermore, evaluators and trainers will strive to engage participants in a collaborative partnership to develop the District of Columbia system of care.

Nicholas Geleta, Ph.D., Project Director

First year activities will also include feedback from previous system implementers and policy makers about their efforts to develop the system of care.  Feedback from these system implementers will be used to impact the current system barriers and policy constraints.  These findings will be incorporated included with those identified from child/family focus groups.  The evaluation team will also work closely with the Department of Mental Health to ensure that evaluation procedures are developed to monitor and assess the progress of implementing the court decision requirements.

During year one, the MIS director and evaluation team will develop procedures for transferring information among agencies required to conduct interagency planning and case management.  *D.C. CINGS* will also work with the District's Institutional Review Board to ensure that protocols, data collection and management activities adhere to Federal and local jurisdiction requirements regarding the protection of human subjects and data collection.

District of Columbia GFA-SM-02-002                                    Nicholas Galeta, Ph.D., Project Director

## SECTION E.  REFERENCES TO LITERATURE CITATIONS

Achenbach, T.M. (1991). Manual for the Child Behavioral Checklist 14-18 and 1991
        Profile. Burlington, VT: University of Associates in Psychiatry.

Achenbach, T.M. (1991). Manual for the Youth Self-Report and 1991 Profile.
        Burlington, VT: University of Associates in Psychiatry.

American Academy of Adolescent Psychiatry (AACAP) and the Child Welfare League of
        America. (2001). *AACAP/CWLA Policy Statement On Mental Health And Substance
        Abuse Use Screening And Assessment Of Children In Foster Care: Final.* Washington,
        D.C.: authors.

The Annie E. Casey Foundation. (2000). *Children At Risk:  State Trends 1990-2000: A
PRB/KIDS COUNT Special Report.*  Baltimore, MD: Author.

The Annie E. Casey Foundation. (2001). *KIDS COUNT Data Book:  State Profiles Of Child
Well-Being.*  Baltimore, MD: Author.

Bazelon Center For Mental Health Law. (2001).  *Disintegrating Systems:  The State Of States'
Public Mental Health Systems.*  Washington, D.C.

Burns, B.J. And Hoagwood, K., Editors. (2002). *Community Treatment For Youth:  Evidence-
Based Interventions For Severe Emotional And Behavioral Disorders.* New York, NY:  Oxford
Press University.

Burns, B.J., Hoagwood, K. And Mzarek, P.J.  (1999).  Effective Treatment For Mental Disorders
In Children And Adolescents. *Clinical Child And Family Psychology Review,* Vol. 2, No. 4,
199-254.

Coalition For Juvenile Justice.  (2000).  *Handle With Care:  Serving The Mental Health Needs
Of Young Offenders.*

Cross And Mcdonald (1995)

Friesen, B.J., Yatchmenoff, D.K. And Gordon, L.J. (1997). Enrichment And Stress In
        Families Of Children With Serious Emotional Disorders, In C.J. Liberton, K. Kutash And
        R.M. Friedman (Eds.) A System Of Care For Children's Mental Health : Expanding The
        Research Base. 10th Annual Research Conference Proceeding. Tampa, Fl: University Of
        South Florida, 97 –102.

Hodges, K.  And Wong,  M. (1996). Psychometric Characteristics Of A Multidimensional
        Measure To Assess Impairment: The Child And Adolescent Functional Assessment
        Scale. Journal Of Child And Family Studies, 5, 445 – 467.

Hoytt, E.H., Schiraldi, V., Smith, B.V. And Ziedenberg, J. (2001). *Reducing Racial Disparities In Juvenile Detention, #8.* Baltimore, MD: Pathways To Juvenile Detention Reform Series, Annie E. Casey Foundation.

Jacob (1988).

Joseph, R., Friedman, R.M., Gutierrez-Mayka, M., Sengova, J., Uzzell, J.D., Hernandez, M. And Contreras, R. (September 2001). *Evaluation Findings And Lessons Learned From The Annie E. Casey Foundation Mental Health Initiative For Urban Children: Final Comprehensive Report.* Tampa, FL: University Of South Florida, Florida Mental Health Institute.

Koren, P.E., Dechillo, N. And Friesen, B.J. (1992). Measuring Empowerment In Families Whose Children Have Emotional Disabilities: A Brief Questionnaire. Rehabilitation Psychology, 37(40), 305-321.

Kristek, P.B., Hargraves, M., Cuellar, E.H., Dallo, F., Holland, C.A. And Swanson, J.W. (2002). Eliminating Health Disparities Among Minority Women: A Report On Conference Workshop Process And Outcome. American Journal Of Public Health, Vol. 92, No.4, 580-587.

Mccubbin, H.I., Olsen, D.H. And Larsen, A.S. (1991). F-COPES; Family Crisis Oriented Personal Evaluation Scale. In H.I. Mccubbin And A.I. Thompson (Eds.). Family Assessment Inventories For Research And Practice (2nd Ed., Pp. 210-216). Madison. WI: University Of Wisconsin-Madison.

Leventhal, T. And Brooks-Gunn, J. (2000). The Neighborhoods They Live In: The Effects Of Neighborhood Residence On Child And Adolescent Outcomes. *Psychological Bulletin, 126,* 309-337.

Morton, T.D. (December, 1999). Increasing Colorization Of America's Child Welfare System: The Overrepresentation Of African American Children. *Policy And Practice: The Journal Of The American Public Human Services Association.* 23-30.

National Institute Of Mental Health. (2001). *Blueprint For Change: Research On Child And Adolescent Mental Health: Report Of The National Advisory Mental Health Council's Workgroup On Child And Adolescent Mental Health Intervention Development And Deployment.* Washington, DC: U. S. Department Of Health And Human Services.

National Mental Health Association. (July, 2000). *Mental Health Treatment For Youth In The Juvenile Justice System: A Compendium Of Promising Practices.* Alexandria, VA: Author.

Pinderhughes, E.E., Foster, E.M. And Jones, D. (2001). Parenting In Context: Impact Of

Neighborhood Poverty, Residential Stability, Public Services, Social Networks, And Danger On Parental Behaviors. *Journal Of Marriage And Family, 63, November,* 941-953.

Poe-Yamagata, E. And Jones, M.A. (2000). *And Justice For Some: Differential Treatment Of Minority Youth In The Juvenile Justice System.* Washington, D.C.: Building Blocks For Youth.

Pottick, K.J., Warner, L.A., Manderscheid, R.W. And Lange, R. (In Draft, 2001). *A National Profile Of Youth In Mental Health Care: The 1997 Client/Patient Sample Survey (CPPS).* Newark, NJ: Rutgers, The State University, Institute For Health, Health Care Policy And Aging Research.

Roberts, D. (2001). *Shattered Bonds: The Color Of Child Welfare.* Chicago, IL: University Of Illinois Press.

Rochefort, D.A. (September, 1999). *Destination Uncertain: Mental Health Care In Massachusetts.* Boston, MA: The Massachusetts Health Policy Forum, Issue Brief.

Sampson, R.J., Raudenbush, S.W. And Earls, F. (1997). Neighborhoods And Violent Crime: A Multilevel Study Of Collective Efficacy. *Science, 277,* 918-924.

Stroul, B.A. And Friedman, R.M. (1996). The System Of Care Concept And Philosophy. In *Children's Mental Health: Creating Systems Of Care In A Changing Society.* Beth Stroul, Editor. Baltimore, MD: Paul H. Brookes Publishing Co.

Stroul, B.A., Pires, S.A., And Armstrong, M.J. (2001). *Health Care Reform Tracking Project: Tracking State Managed Care Reforms As They Affect Children And Adolescents With Behavioral Health Disorders And Their Families (2000 State Survey).* Tampa, FL: University Of South Florida, Florida Mental Health Institute.

## F.    BUDGET JUSTIFICATION/EXISTING RESOURCES/OTHER SUPPORT

**F.1    Line Item Justification**

**F.1.1    Year 1**



**Personnel.**    The salaries of Principal Investigator, Project Director, Clinical Director, Family Coordinator, Youth Coordinator Liaison to Fiscal Officer and State/Local Liaison for a total of 4.9 FTEs, will be paid by D.C. as part of its matching funds.  Staff hired with project funding will include .5 FTE Social Marketing/Communications Specialist ($60,242 annual salary) and .5 FTE MIS/Evaluation Liaison ($60,242 annual salary). These staff will be hired within two months of the grant award.  Two full-time Administrative Assistants will be hired within two months of the grant award, at an annual salary of 29, 966 each.   The Evaluation Assistant will be hired during month 2 of the grant cycle, for a half-time salary of 14,150.  The key family Contact will also be hired during this time for a half-time salary of $14,150.  All salaries are based on the 2001 General schedule of the Federal Government for Washington-Baltimore.

**Fringe Benefits.**  D.C.'s 17.0% fringe rate accounts for the following benefits:  group life insurance, health insurance, uniform allowance, unemployment insurance, disability insurance, tuition/fee reimbursement, miscellaneous fringe benefits, retirement (FICA, teachers, judicial, police/fire, civil service, and other), optical insurance, dental insurance, extra health benefits, prepaid legal services, Medicare contributions, payments to pensioners, payments to beneficiaries, refund of retirement deductions, sum death payment, funeral allowance, the D.C. manage care program, vacation and holiday (total of $40,611).

**Travel.** During the planning year local travel allowances will be made for the project staff for a total of 200 miles per week at .32 per mile, and Metro pass stipends for a total of 50 per week (5,000).  In addition, $41,000 is allotted for a team of 12 project staff including family members to attend 2 conferences at a site outside of the District. National and local training events for project staff, families, and the governance Sub Council will be coordinated through the training Office throughout the year (9,000.)

**Equipment.**  Equipment purchased during the first year of the grant award will include the following:  14 Pentium PC computers with keyboard and monitor (network and internet ready average $1000 each); 6 laptop computers with docking stations (2000); 2 network printers ($2,000 each); 3 fax machines ($400 each); 20 telephones ($2,040 installation and monthly phone charge); 6 cellular phones ($175 each); and two overhead projectors and 2 VCR & monitors or the trainer and the Family Resource Centers ($4000).

**Supplies.**  Purchase of software for use by management team and for development of databases by the Evaluators and MIS Director is expected to cost $10,000.  Office supplies for the entire process project are expected to cost $500 per month, with an initial

48

outlay per person of $100 (stapler, tape dispenser, paper, card files, filing cabinets, etc.). Training materials to assist the Training and TA Liaison are budgeted at $4,500.



**Contractual.** FASA will provide training and planning implementation at $15,000. Contracts for provider services will be paid through matching grant funds. In addition, TA will be utilized to train DC CINGS staff, family liaisons, and the Sub-Council at a cost of $15,000. Other contractual assignments will include hiring 4 full-time family liaisons through a contractual procurement with a State-wide Family Network Organization at a total cost of $124,524 during year one. Also a local university origination skilled in evaluation and research will be hired to conduct all phases of the project evaluation; $150,000 has been allotted for these services during year 1. In addition, bilingual individuals will be hired to translate and re-create the awareness materials for Spanish speakers at a cost of $10,000. Translators will be used to assist family liaisons during history taking, treatment planning, the evaluation, and the needs assessment ($15 per hour for 200 hours); sign-language interpreters will also be utilized at $20,00 per hour for 100 hours).

**Rent.** Office space will be provided in-kind by the DMH. This is estimated to cost a total $174,000 annually.

**Other.** The monthly cost for the 6 cellular lines is expected to be $40 each per month, also beginning in month 2 of the grant cycle. Printing costs for the evaluation materials and marketing/training literature are expected to be approximately $7,500 respectively. Additional costs include child care ($10 per hour for 300 hours) during meetings, training, and evaluations; snacks ($5 per person for 1,000 people over the course of the first year) for meetings and training; individual evaluation stipends at $20 per evaluation for 200 evaluations in the first year; and travel vouchers ($10 per voucher, 200 vouchers) for agency, providers, and families to attend meetings, training, and evaluation sessions. Room rental for community meetings is estimated at $3,000.

**Indirect Charges.** DC CINGS is charging a 10% fee for the project's planning year totaling $90,869. The section of this proposal containing the annual budgets also contains a letter from the CFO of the Department of Mental Health certifying that DMH will have an Indirect Rate established before the date of award.

**F.1.2. Year 2**



**Personnel.** Project personnel will have been employed by DC CINGS for a full 12 months and will receive a 4% cost of living adjustment. The Project Director, Clinical Director, Family Coordinator, Youth, State/Local Liaison, and Liaison to the Fiscal Officer will remain salaried out of D.C. matching funds. The Evaluation Assistant will receive $17,660 (yearly rate of $35,319). The MIS/Evaluation Liaison will receive $62,652. The Social/Marketing Communications Specialist and the Training and TA Liaison will each receive a half-time salary of $31,326. Each Administrative Assistant will receive $31,165. The Key Family Contact will receive a half-time salary of $17,660. The InterAgency Coordinator will receive a full-time salary of $62,652.

**Fringe Benefits.** DC CINGS' fringe rate will remain the same and will account for the benefits previously noted in Year 1. In Year 2 these benefits will total $48,553.

**Travel.** During the first year of service implementation local travel allowance will be increased for the Project staff and Family Liaisons. This will total 350 miles per week at .32 cents per mile ($7,500). Metro pass stipends will total $2,500. In addition, $40,000 is allotted for a team of 12 project staff and family members to attend two conferences at sites outside the District. Project staff, Family Liaisons, and Sub-Council members will be provided appropriate training opportunities both locally and nationally ($15,000).

**Equipment.** Additional equipment will be purchased to support the project staff and new Family Liaisons, including: 4 Pentium PC's network and Internet ready average $1,000 each; one fax machine costing $900; and two network printers at $2,000 each. The monthly service charge for 20 phones equipped with voice mail will be $700. Equipment for an additional Family Resource Center will include: 1 laptop computer with docking station, 1 fax machine, 1 cellular phone, and audiovisual equipment for a total of $4,000.

**Supplies.** Purchase of new software is expected to cost $10,000 including ECURA Licensing. Office supply costs are projected to be $500 per month. Training materials for provider professional development, Family Resource Centers and staff development are budgeted at $5,000.

**Contractual.** FASA ($12,000) will continue to provide program training for families, staff, and child-serving agencies. Contracts for Family Liaisons (8 FTE 4 Year1 and 4 Year $282,566), project evaluation team ($153,000) will continue through contractual arrangements made in Year 1. Intensive training of Family Liaisons (e.g., crisis intervention, crisis debriefing, group process, clinical interview) will continue as will training of the Sub-Council governance members, project staff, and the MultiAgency Planning Team (MAPT). Funds for this training effort total $200,000. The Social Marketing and Communications Liaison will continue to inform the community about DC CINGS and services in the system of care ($20,000). Translation of evaluation, assessment and educational materials into other languages (e.g., Spanish, Vietnamese, Amharic, Braille) will be funded at $5,000. Translators ($15 /hr for 200 hours) and sign-language interpreters ($20/hr for 100 hours) will be utilized at the Family Resource Centers and other system of care sites to facilitate diagnostic assessments, intake, project evaluation, and IPC planning.

**Rent.** Office space will be provided in-kind by the DMH. This is estimated at $177,480 and includes a 2% increase over Year 1.

**Other.** The monthly charge for 12 cellular phones will be $5,760. Printing costs for the evaluation materials will remain at $7,500. The cost of marketing/training literature will decrease to $5,000. Other direct costs include child care ($10/hr. for 300 hours) for meetings, training, and evaluations; snacks ($5/person for 1000 individuals over the course of the year); individual evaluation stipends at $20/evaluation for 250 evaluations;

travel vouchers ($10/voucher for 250 vouchers) for evaluation sessions, and room rental for community meetings ($7,500).

**Indirect Charges.** DC CINGS will continue with a 10% administrative cost ($114,552).

### F.1.3.   Year 3

**Personnel.** Project personnel for DC CINGS will again receive a 4% cost of living adjustment. The Project Director, Clinical Director, Family Coordinator, Youth, State/Local Liaison, and Liaison to the Fiscal Officer will remain salaried out of D.C. matching funds. The Evaluation Assistant will receive $18,366 (yearly rate of $36,732). The MIS/Evaluation Liaison will receive $65,158. The Social/Marketing Communications Specialist and the Training and TA Liaison will each receive a half-time salary of $32,579. Each Administrative Assistant will receive $32,411. The Key Family Contact will receive a half-time salary of $18,366. The InterAgency Coordinator will receive a full-time salary of $65, 158.

**Fringe Benefits.** DC CINGS fringe rate will remain the same and will account for the benefits previously noted in Year 1. In Year 3 these benefits will total $50,495.

**Travel.** Local travel allowance for the Project staff and Family Liaisons will be 400 miles per week at .32 cents per mile ($7,500). Metro pass stipends will total $2,500. In addition, $45,000 is allotted for a team of 12 project staff and family members to attend two conferences at sites outside the District. Project staff, Family Liaisons, and Sub-Council members will be provided appropriate training opportunities both locally and nationally ($20,000).

**Equipment.** Additional equipment will be purchased to support the project staff and new Family Liaisons, including: 15 Pentium PC's network and Internet ready average $1,000 each; one fax machine costing $900; and two network printers at $2,500 each. Equipment purchases for the Family Resource Center will include: 2 laptops with docking stations ($5,500), 4 fax machines ($3,600), 6 cellular phones ($1,050) and extensive audio visual equipment for use in training and community-based operations ($10,000). During this year the Family Resource Center will be fully furnished with furniture that will provide a home-like atmosphere this will include but not be limited to sofas, chairs, pictures, lamps, rugs ($200,000). During this project year, 5 Seven-passenger vans will be purchased for use by the Family Resource Centers, project staff, and Family Liaisons ($120,000). The monthly service charge for 20 phones equipped with voice mail will be $700.

**Supplies.** Purchase of new software is expected to cost $10,000 including eCURA Licensing. Office supply costs are projected to be $500 per month. Training materials for provider professional development, Family Resource Centers and staff development are budgeted at $5,000.

**Contractual.** FASA ($50,000) will continue to provide program training for families, staff, and child-serving agencies. FASA will also initiate efforts to gain certification by DMH as a Specialty Provider under MHRS. Contracts for Family Liaisons (8 FTE 4 Year1 and 4 Year $293,858, project evaluation team ($156,060) will continue through contractual arrangements made in Year 1. Intensive training of Family Liaisons (e.g., crisis intervention, crisis debriefing, group process, clinical interview) will continue as will training of the Sub-Council governance members, project staff, and the MultiAgency Planning Team (MAPT). Funds for this training effort total $200,000. DMH will continue to provide in-kind funds for a variety of provider services. The Social Marketing and Communications Liaison will continue to inform the community about DC CINGS and services in the system of care ($20,000). Also a TA organization will update the training materials ($10,000). Translation of evaluation, assessment and . educational materials into other languages (e.g., Spanish, Vietnamese, Amharic, Braille) will be funded at $5,000. Translators ($15 /hr for 200 hours) and sign-language interpreters ($20/hr for 100 hours) will be utilized at the Family Resource Centers and other system of care sites to facilitate diagnostic assessments, intake, project evaluation, and IPC planning.

**Rent.** Office space will be provided in-kind by the DMH. This is estimated at $181,030 and includes a 2% increase over Year 2.

**Other.** The monthly charge for 18 cellular phones will be $8,640. Printing costs for the evaluation materials will remain at $7,500. The cost of marketing/training literature will decrease to $5,000. Other direct costs include child care ($10/hr. for 300 hours) for meetings, training, and evaluations; snacks ($5/person for 1000 individuals over the course of the year); individual evaluation stipends at $20/evaluation for 250 evaluations; travel vouchers ($10/voucher for 250 vouchers) for evaluation sessions, and room rental for community meetings ($18,000).

**Indirect Charges.** DC CINGS will continue with a 10% administrative cost ($174,543).

## F.1.4. Year 4

**Personnel.** Project personnel for DC CINGS will again receive a 4% cost of living adjustment. The Project Director, Clinical Director, Family Coordinator, Youth, State/Local Liaison, and Liaison to the Fiscal Officer will remain salaried as of D.C. matching funds. The Evaluation Assistant will receive $19,101 (yearly rate of $38,202). The MIS/Evaluation Liaison will receive $67,764. The Social/Marketing Communications Specialist and the Training and TA Liaison will each receive a half-time salary of $33,882. Each Administrative Assistant will receive $33,708. The Key Family Contact will receive a half-time salary of $19,101. The InterAgency Coordinator will receive a full-time salary of $67,764.

**Fringe Benefits.** DC CINGS fringe rate will remain the same and will account for the benefits previously noted in Year 1. In Year 4 these benefits will total $52,515.

**Travel.** Local travel allowance for the Project staff and Family Liaisons will be 400 miles per week at .32 cents per mile ($7,500). Metro pass stipends will total $2,500. In addition, $45,000 is allotted for a team of 12 project staff and family members to attend two conferences at sites outside the District. Project staff, Family Liaisons, and Sub-Council members will be provided appropriate training opportunities both locally and nationally ($20,000).

**Equipment.** Additional equipment will be purchased to support the project staff and new Family Liaisons, including: 12 Pentium PC's network and Internet ready average $1,000 each; one fax machine costing $900; and two network printers at $2,500 each. Equipment purchases for the Family Resource Center will include: 2 laptops with docking stations ($5,500), fax machines ($1,800), and extensive audio visual equipment for use in training and community-based operations ($10,000). The monthly service charge for 20 phones equipped with voice mail will be $700.

**Supplies.** Purchase of new software is expected to cost $15,000 Office supply costs for the entire projected are projected increase to be $1,250 per month. Training materials for provider professional development, Family Resource Centers and staff development are budgeted at $7,500.

**Contractual.** FASA ($75,000) will continue to provide program training for families, staff, and child-serving agencies. FASA will also initiate efforts to gain certification by DMH as a Specialty Provider under MHRS. Contracts for Family Liaisons (8 FTE 4 Year1 and 4 Year $305,612, project evaluation team ($159,181) will continue through contractual arrangements made in Year 1. Intensive training of Family Liaisons (e.g., crisis intervention, crisis debriefing, group process, clinical interview) will continue as will training of the Sub-Council governance members, project staff, and the MultiAgency Planning Team (MAPT). Funds for this training effort total $200,000. DMH will continue to provide in-kind funds for a variety of provider services. The Social Marketing and Communications Liaison will continue to inform the community about DC CINGS and services in the system of care ($20,000). Also a TA organization will update the training materials ($10,000). Translation of evaluation, assessment and educational materials into other languages (e.g., Spanish, Vietnamese, Amharic, Braille) will be funded at $5,000. Translators ($15 /hr for 200 hours) and sign-language interpreters ($20/hr for 100 hours) will be utilized at the Family Resource Centers and other system of care sites to facilitate diagnostic assessments, intake, project evaluation, and IPC planning.

**Rent.** Office space will be provided in-kind by the DMH. This is estimated at $184,650 and includes a 2% increase over Year 3.

**Other.** The monthly charge for 18 cellular phones will be $8,640. Printing costs for the evaluation materials will remain at $7,500. The cost of marketing/training literature will remain at $5,000. Other direct costs include child care ($10/hr. for 300 hours) for meetings, training, and evaluations; snacks ($5/person for 1000 individuals over the course of the year); individual evaluation stipends at $20/evaluation for 250 evaluations;

travel vouchers ($10/voucher for 250 vouchers) for evaluation sessions, and room rental for community meetings ($18,000).

**Indirect Charges.** DC CINGS will continue with a 10% administrative cost ($132,236).

**F.1.5.   Year 5**

**Personnel.**  Project personnel for DC CINGS will again receive a 4% cost of living adjustment. The Project Director, Clinical Director, Family Coordinator, Youth, State/Local Liaison, and Liaison to the Fiscal Officer will remain salaried out of D.C. matching funds. The Evaluation Assistant will receive $19,865 (yearly rate of $39,730). The MIS/Evaluation Liaison will receive $70,475. The Social/Marketing Communications Specialist and the Training and TA Liaison will each receive a half-time salary of $35,237. Each Administrative Assistant will receive $35,056. The Key Family Contact will receive a half-time salary of $19,865. The InterAgency Coordinator will receive a full-time salary of $70,475.

**Fringe Benefits.**  DC CINGS fringe rate will remain the same and will account for the benefits previously noted in Year 1. In Year 4 these benefits will total $54,615.

**Travel.**  Local travel allowance for the Project staff and Family Liaisons will be 400 miles per week at .32 cents per mile ($7,500). Metro pass stipends will total $2,500. In addition, $45,000 is allotted for a team of 12 project staff and family members to attend two conferences at sites outside the District. Project staff, Family Liaisons, and Sub-Council members will be provided appropriate training opportunities both locally and nationally ($20,000).

**Equipment.**  Additional equipment will be purchased to support the project staff and new Family Liaisons and to provide a new computer lab in the Family Resource Centers, will include: 6 Pentium PC's network and Internet ready average $1,000 each, two network printers at $2,500 each. Equipment purchases for the Family Resource Center will include: 2 laptops with docking stations ($5,500), two cellular phones ($350) and extensive audio visual equipment for use in training and community-based operations ($7,500). The monthly service charge for 20 phones equipped with voice mail will be $700.

**Supplies.**  Purchase of new software is expected to cost $15,000   Office supply costs for the entire projected are projected decrease to be $10,000 per month. Training materials for provider professional development, Family Resource Centers and staff development are budgeted at $7,500.

**Contractual.**  FASA ($75,000) will continue to provide program training for families, staff, and child-serving agencies. FASA will also initiate efforts to gain certification by DMH as a Specialty Provider under MHRS.   Contracts for Family Liaisons (8 FTE 4 Year1 and 4 Year 2 $317,837, project evaluation team ($162,365) will continue through contractual arrangements made in Year 1. Intensive training of Family Liaisons (e.g.,

crisis intervention, crisis debriefing, group process, clinical interview) will continue as will training of the Sub-Council governance members, project staff, and the MultiAgency Planning Team (MAPT). Funds for this training effort total $175,000. DMH will continue to provide in-kind funds for a variety of provider services. The Social Marketing and Communications Liaison will continue to inform the community about DC CINGS and services in the system of care ($10,000). Also a TA organization will update the training materials ($20,000). Translation of evaluation, assessment and educational materials into other languages (e.g., Spanish, Vietnamese, Amharic, Braille) will be funded at $5,000. Translators ($15 /hr for 200 hours) and sign-language interpreters ($20/hr for 100 hours) will be utilized at the Family Resource Centers and other systems of care sites to facilitate diagnostic assessments, intake, project evaluation, and IPC planning.

**Rent.** Office space will be provided in-kind by the DMH. This is estimated at $188,343 and includes a 2% increase over Year 4.

**Other.** The monthly charge for 20 cellular phones will be $9,600. Printing costs for the evaluation materials will remain at $7,500. The cost of marketing/training literature will remain at $5,000. Other direct costs include child care ($10/hr. for 300 hours) for meetings, training, and evaluations; snacks ($5/person for 1000 individuals over the course of the year); individual evaluation stipends at $20/evaluation for 250 evaluations; travel vouchers ($10/voucher for 250 vouchers) for evaluation sessions, and room rental for community meetings ($23,000).

**Indirect Charges.** DC CINGS will continue with a 10% administrative cost ($131,123).

### F.1.6. Year 6

**Personnel.** Project personnel for DC CINGS will again receive a 4% cost of living adjustment. The Project Director, Clinical Director, Family Coordinator, Youth, State/Local Liaison, and Liaison to the Fiscal Officer will remain salaried as of D.C. matching funds. The Evaluation Assistant will receive $20,659 (yearly rate of $41,319). The MIS/Evaluation Liaison will receive $73,294. The Social/Marketing Communications Specialist and the Training and TA Liaison will each receive a half-time salary of $36,647. Each Administrative Assistant will receive $36,458. The Key Family Contact will receive a half-time salary of $20,659 and the InterAgency Coordinator will receive a full-time salary of $70,475. Both will be incorporated into the permanent staffing of the DMH.

**Fringe Benefits.** DC CINGS fringe rate will remain the same and will account for the benefits previously noted in Year 1. In Year 4 these benefits will total $40,828.

**Travel.** Local travel allowance for the Project staff and Family Liaisons will be 100 miles per week at .32 cents per mile ($1,875). Metro pass stipends will total $1,125. In addition, $30,000 is allotted for a team of 12 project staff and family members to attend two conferences at sites outside the District.

**Equipment.** All equipment purchases will be completed by year 6. The monthly service charge for 20 phones equipped with voice mail will be $700.

**Supplies.** Office supply costs for the entire project are projected decrease to be $10,000 per month. Training materials for provider professional development, Family Resource Centers and staff development are budgeted at $4,000.

**Contractual.** FASA ($5,000) will continue to provide program training for families, staff, and child-serving agencies. FASA will have completed its efforts to gain certification by DMH as a Specialty Provider under MHRS. Contracts for Family Liaisons (8 FTE 4 Year1 and 4 Year 2 $330,550), project evaluation team ($162,365) will continue through contractual arrangements made in Year 1. Intensive training of Family Liaisons the Sub-Council governance members, project staff, and the MultiAgency Planning Team (MAPT) will be largely completed. Funds for any additional training effort total $20,000. DMH will continue to provide in-kind funds for a variety of provider services. The Social Marketing and Communications Liaison will continue to inform the community about DC CINGS and services in the system of care ($10,000). Also a TA organization will update the training materials ($20,000). Translation of evaluation, assessment and educational materials into other languages (e.g., Spanish, Vietnamese, Amharic, Braille) will be funded at $5,000. Translators ($15 /hr for 200 hours) and sign-language interpreters ($20/hr for 100 hours) will be utilized at the Family Resource Centers and other system of care sites to facilitate diagnostic assessments, intake, project evaluation, and IPC planning.

**Rent.** Office space will be provided in-kind by the DMH. This is estimated at $192,110 and includes a 2% increase over Year 5.

**Other.** The monthly charge for 20 cellular phones will be $9,600. Printing costs for the evaluation materials will remain at $7,500. The cost of marketing/training literature will remain at $5,000. Other direct costs include child care ($10/hr. for 300 hours) for meetings, training, and evaluations; snacks ($5/person for 1000 individuals over the course of the year); individual evaluation stipends at $20/evaluation for 250 evaluations; travel vouchers ($10/voucher for 250 vouchers) for evaluation sessions, and room rental for community meetings ($3,000).

**Indirect Charges.** DC CINGS will continue with a 10% administrative cost ($90,621).

**F.2.   Existing Resources**

Existing Department of Mental Health (DMH) and D.C. resources provided to the project include:

- DMH personnel being assigned to the DC CINGS project on an in-kind basis include the Project Director, the Clinical Director, and the Liaison to

the Fiscal Officer, the Family Coordinator, the Youth Coordinator and the State/Local Liaison.

- Senior Level D.C. Government officials, families and youth will donate their time and work as participants on the governance Sub-Council.

- DMH has designated funds in the amount of $1,004,000 toward rent for office space for the project staff, family liaisons and a second Family Resource Center

- D.C. public agency participants will provide a minimum funding of $13,000,000 in provider contracts and services that will be reinvested into the system to provide more services for more children and families through community-based interventions using the Wrap Around model of service delivery.

### F.3.  Other Support

DMH receives funds for children and youth services under the federal Community Mental Health Services block grant.  These funds total $142,000 and are used to develop the system of care infrastructure and to fund service gaps, to facilitate the return of children and youth from costly out-state residential placements.  In addition, the Grant funds $100,000 to implement a Family Resource Center.  These initiatives are supported and enhanced in the DC CINGS project.

The following are agency and organization contributions and collaboration of other support.

## DISTRICT OF COLUMBIA PUBLIC AGENCIES

### Child and Family Services Agency

- Expedite placement in therapeutic foster care slots for children identified in the grant target population

- Identify and facilitate referrals for youth mentoring services

- Collaborate on monitoring and on-going quality improvement of services to be established by DC CINGS

### District of Columbia Public Schools

- Expedite placement with emphasis on those children in full-time day programs or residential placement

District of Columbia SM-02-002                Nicholas Geleta, Ph.D., Project Director

- Develop comprehensive/therapeutic public psychoeducation programs specifically tailored to meet the academic and social/emotional needs of children in the grant target population

- Collaborate on issues that will allow the inclusion of the Individual Education Plan (IEP) in the Individual Care Plan (IPC)

- Utilize recent assessments and evaluations, to avoid the need to repeatedly reassess with full diagnostic battery

- Collaborate on monitoring and on-going quality improvement of services provided through existing and future contracted or in-kind services

## Department of Health

### Addiction Prevention Recovery Administration (APRA)

- Expedite referrals for parents and youth needing substance abuse treatment services

- Provide age appropriate substance abuse education for latency and adolescent age groups

### Medical Assistance Administration

- Continue participation in Fiscal Policy Review Work Group to develop new Medicaid funding strategies and to maximize existing funding streams

- Facilitate EPSDT referral process for all District Providers including training on common EPSDT screening form and referral procedures

## Department of Human Services

Youth Services Administration (YSA) Juvenile Justice

- Engage in collaborative dialogue, training and technical assistance that ensures the appropriate mental health diagnosis of juvenile offenders

- Collaborate on monitoring and on-going quality improvement of services provided through existing and future contracted or in-kind services

Rehabilitation Services Administration (RSA) Vocational Rehabilitation

58

- Provide vocational assessments, job coaching, educational placements, vocational placements, stipends or scholarships for education and vocational placements of children and parents identified as eligible in the target population for the grant

## D.C. Superior Court and Court Social Services

- Assist with drug screening for youths identified as eligible in the grant target population

- Assist with referring and obtaining substance abuse treatment for youth in the grant target population

## Department of Recreation

- Provide space in recreation centers for after school programs

- Specify slots in summer programs and therapeutic camps for children identified as eligible in the target population

- Participate in cross-training experiences for recreation staff on special needs of children and adolescents with emotional disturbance

- Collaborate with DC CINGS staff on specialized recreational programming for children identified in the target population

## FAMILY MEMBER ORGANIZATIONS

Family Advocacy and Support Association (FASA)

- Provide training to providers, agencies on family perspective and participation in system of care planning and development

- Provide outreach and support to families on issues of advocacy and community relations

- Develop organizational infrastructure within FASA to obtain certification as specialty provider under DMH MHRS

Parent Watch

- Provide training to providers, agencies on family perspective and participation in system of care planning and development

- Provide outreach and support to families on issues of advocacy and community relations with particular emphasis on education and special education issues

## TECHNICAL ASSISTANCE ORGANZIATIONS

Annie E. Casey Foundation

- Provide technical assistance to parent organizations on developing organizational infrastructure to enhance ability to advocate and to obtain specialty provider certification under DMH MHRS.

- Provide technical assistance to the Sub-Council, Project Management staff on cultural competence strategies, maximizing funding streams, program and policy planning, and interagency System of Care development

## G. BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Project Director**
DS-670-14
Salary Range: $74,697 - $97,108

The purpose of this position is to provide overall project planning, organizing, directing, coordinating, monitoring and implementing of the D.C. CINGS Project and its component parts.

- Plans, develops, and coordinates all overall aspects of project components to assure continuity of care for children and families.

- Monitors program components' efficacy in consultation with families, consumers, providers and community residents.

- Ensures city-wide service relationships and interagency linkages with community resource to meet the needs of youth and families.

- Reviews the progress of project performance and monitors and revises strategic planning process.

- Ensures adequate quality control, utilization and staffing mix for measuring project productivity.

- Serves as a representative in the Purchasing Cooperative and Governance Body.

- Interfaces with the National Evaluator, federal and local officials and community residents to comply with all project requirements.

- Ensures fiscal accountability of all project funding sources and seeks alternative funding mechanisms.

*Knowledge and Skills Required:*

- Thorough knowledge of the functions, structure and mission of the D.C. CINGS Project as well as the policies, processes, regulations and legislative authorities which govern the activities of the project.

- Ability to communicate effectively both verbally and in writing

- Knowledge of the mental health services systems related to diagnosis and treatment of at-risk youth for residential placement.

- Knowledge of community resources available for the treatment of Seriously Emotionally Disturbed (SED) youth and their families.

- Skill in administrative and technical areas to respond to inquiries regarding the program.

- Skill in organizing and establishing administrative systems to ensure the smooth flow of communication and information.

61

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Clinical Director**
DS-180-14
Salary Range: $74,697 - $97,108

The purpose of this position is to plan, develop, deliver and evaluate comprehensive mental health services for seriously emotionally disturbed (SED) youth and their families.

- Reviews service components of program, determines the need for new program services and reallocates resources and staff.

- Initiates the development of diversionary services as determined by the needs of the community.

- Provides or arranges for a full range of mental health services for children and adolescents and their families including psychiatric evaluations; psychological assessments; family, individual, group therapy; supportive social services and consultation to public and private agencies.

- Provides mental health consultation and supervision to other professionals and para-professionals regarding treatment of children and adolescents and their families.

- Provides administrative supervision to all training and clinical staff in the program.

- Collaborates with the evaluators and MIS director.

- Prepares program reports, conducts site visits and monitors quality of services.

*Knowledge and Skills Required:*

- Satisfactory completion of an American Psychological Association (APA) accredited doctoral program (Ph.D.) in clinical or counseling psychology and an APA accredited clinical internship.

- A valid District of Columbia psychology license is required.

- Experience with children, adolescents and their families in clinical treatment services and program development.

- Ability to supervise clinical and support staff

- Knowledge of mental health services available for children and adolescents with multiple problems who are at-risk for residential placement.

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Senior State and Local Agency Liaison**
DS-670-15
Salary Range:  $87,864 - $114,224

- Provides staff assistance to the Project Director related to the implementation of the DMH mental health rehabilitation services and child/youth mental health programs, with respect to program development and interagency liaison activities involving the multi-agency planning team.

- Serves as liaison between DMH and other child-serving agencies in the District, specifically D.C. Schools, Child and Family Services Agency, Public Health and Health Care Finance, D.C. Family Court, and private agencies and community organizations to identify and develop recommendations to implement interagency agreements.

- Researches and makes recommendation regarding staffing and related programmatic needs.

- Plans, directs, coordinates and evaluates the administrative operation as it pertains to the interagency liaison management function.

- Conducts a continuing critical review and analysis of administrative requirements and activities. Identifies problem areas and recommends appropriate action. Acts as troubleshooter; investigating, analyzing and making recommendations regarding sensitive matters affecting the day-to-day operations of interagency management.

- Provides advice and assistance during the program review of the budget cycles.

- Keeps abreast of pertinent administrative rules, regulations and procedures. Assures that actions of an administrative nature originating with the Project Director's Office are in compliance with established guidelines and requirements. Reviews and evaluates existing policies and procedures by means of recurring and/or special reports.

- Prepares a large volume of correspondence for the Project Director. In Project Director's absence, ensures continued management of day-to-day operations of all phases of D.C. CINGS.

- Attends meeting and actively participates in overall administrative program planning, evaluations and coordination of operations. Confers with Project Director to keep him/her informed of status of projects; develops strategies to address problem areas. Presents recommended solutions.

District of Columbia GFA SM-02-02                              Nicholas Geleta, Ph.D. Project Director

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Interagency Coordinator**
DS-301-13
Salary Range: $55,969 - $72,758

- Provides staff assistance to the Senior State and Local Agency Liaison in coordinating the administrative operations of linking all child service providers with the D.C. CINGS Project.

- Attends meetings and actively participates in program planning and coordination activities.

- Confers with the Senior State and Local Agency Liaison to address problem areas and recommend appropriate actions in staffing the multi-agency planning team.

- Researches and prepares written recommendations regarding standards, policies and operating procedures for child/youth Programs. Researches and develops various program components within the D.C. CINGS Project.

- Acts on behalf of the Senior State and Local Agency Liaison in managing the liaison activities related to the child-serving agencies, organizations, youth and family members when designated.

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Family Coordinator**
DS-185-13
Salary Range - $63,211 – $82,180

The purpose of this position is to empower family members as partners with schools, human service agencies, community organizations for the growth and development of children with Serious Emotional Disturbance (SED) referred to the D.C. CINGS Project.

- Coordinates the expansion of parent and family support and advocacy groups.

- Serves as the liaison to the family members and youth identified for project services.

- Primary family liaison to schools, recreation, social services, and community groups.

- Develops and plans for home-based, crisis services.

- Collaborates with Training Coordinator in preparing parents and family members as advocates for youth. Prepares other staff development experiences for D.C. CINGS personnel.

- Liaison to the Receiver's Office of Consumer and Family Affairs.

- Prepares resource guides for improved consumer accessibility to city-wide services including D.C. CINGS Project.

- Collaborates with the Communication Specialist to prepare and disseminate public awareness information.

- Provides staff assistance to the Family Representatives of the D.C. CINGS governance body.

- Makes presentations to families, community members, providers, youth, business, and professional groups.

- Attends Family and Multi-Agency Planning Team.

- Serves on the Project executive management team.

- Prepares monthly reports on project activities.

*Knowledge and Skills Required:*

- Knowledge of the concepts, principles and theories of clinical social work as evidenced by completion of a Master's Degree from an accredited program in social work and hold highest level of license. Incumbent will have a minimum of 7 years experience in working with children and their families.

- Knowledge of developmental processes as well as childhood psychopathology.

- Professional knowledge of a range of evaluation approaches; therapeutic techniques, day treatment and other interventions used in treating children/youth.

- Knowledge of psychiatric, psychological and medical terminologies in the evaluation and treatment of mental illness.

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Youth Coordinator**
DS-601-12
Salary Range: $53,156 – 60,242

The incumbent in this half-time position will function as an in-kind contribution to the staffing of the D.C. CINGS system of care initiative. The Youth Coordinator will be responsible for the expansion of the Youth Council to assure that it includes representation of youth who are identified as recipients of D.C. CINGS services. The Youth Coordinator will focus on assuring that the needs, desires, and recommendations of youth with a serious and emotional disorder (SED) are included in the planning and treatment, and will act as the liaison to the project director promote feedback and participation in D.C. CINGS program evaluation activities.

*Knowledge and Skills Required*:

The Youth Coordinator will demonstrate knowledge of District of Columbia mental health programs; referral procedures, and appropriate standards of behavior, or the ability to rapidly acquire such knowledge. Must be willing to participate as needed in crisis intervention skills, behavior management, organizational procedures, and translate this knowledge into practical recommendations to achieve treatment goals. Ability to effectively relate to and communicate with students and staff and perform assigned tasks with general supervision. Excellent communications and human relations skills considered an asset, and or the ability to learn how to convey information to youth and their families to support the achievement of treatment goals and objectives. Knowledge of the needs and characteristics of low-income families, and the socio-economic stressors that impact on families day to day lives.

Ability to discuss with youth suggestions designed to promote sound judgment, and emotional stability, and confers with other professional staff regarding resources needed to support identified youth and their families in their communities. Basic understanding or the ability to learn fundamental steps utilized in conflict resolution and behavioral management techniques and the ability to act as a resource to youth and their families in the identification of community supports that will assist them in addressing situational or economic needs.

Understanding of prevention and early intervention skills and or the willingness to participate in training to become qualified to provide basic support and serve as a point of contact for youth identified as at risk for out of home placement. Ability to work with multiple social service and mental health agency staff in the development of appropriate treatment planning, and to interpret for the youth and/or family the practical impact of treatment recommendations. Ability to motivate, encourages, and applies problem-solving skills combined with leadership acumen and sensitivity to the clinical issues that present challenges that must be overcome in order to achieve stability and reunification for DC.CINGS youth and their families'. Ability to maintain confidentiality of sensitive clinical information, and maintains compliance with all applicable rules and regulations pertaining to the disclosure of treatment information.

District of Columbia GFA SM-02-02                                Nicholas Geleta, Ph.D. Project Director

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Training and Technical Assistance Liaison**
DS-1701-12
Salary Range: $53,156 - $60,242

The purpose of this position is to identify and provide for the training needs of the staff and volunteers. As such, the duties include:

- Initiates, coordinates and supervises all in-service education/training programs for professional and paraprofessional staff.

- Maintains a continuing evaluation of programs and course materials which will assure a high quality of instruction, service and training.

- Identifies educational resources to provide training and continuing education for all staff.

- Provides orientation to new staff.

- Conducts needs assessments to determine areas of training necessary to conform to professional standards and certifications.

- Maintains records of training activities and prepares statistical reports regarding status of staff development progress.

- Coordinates with the DMH Training Institute all training activities planned for D.C. CINGS.

*Knowledge and Skills Required:*

- Specialized training or experience providing training services to professionals and paraprofessionals who are delivering services to children and youth in psychiatric programs.

- Knowledge of mental illness and disability with implications for therapeutic programming for emotionally disturbed children and adolescents with multiple problems.

- Knowledge of delivery systems specifically related to diagnosis and treatment of at-risk youth for residential placement.

- Ability to analyze statistical data and interpret findings for developing additional training activities.

District of Columbia GFA SM-02-02                    Nicholas Geleta, Ph.D. Project Director

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Fiscal Liaison Officer**
DS-341-12
Salary Range: $53,156 - $60,242

The purpose of this position is to provide fiscal oversight and monitoring of expenditures according to budget allocation. As such the duties include:

· Initiates internal procedures, prepares formats for budget estimates and devises implements internal budgetary controls.

· Develops and maintains an accounting system to monitor expenditures and provide information on utilization of budget allocations.

  Conducts budget apportionments and financial reviews.

· Negotiates with procurement officials in securing essential equipment, supplies, contracts and consultants.

· Reviews all requests which obligate funds, serving as the signatory official for all requisitions involving direct purchase.

· Directs staff in the preparation of documents required for payment to vendors, contractors and providers.

· Coordinates the development of personnel management planning documents, identifying projected needs and resources for recruiting, training, career development and skills requirement.

· Oversees the distribution of personnel resources to facilitate full utilization of program needs.

· Assures that funds are expended in compliance with regulations, requirements and manager's instructions.

*Knowledge and Skills Required:*

· Extensive knowledge of management principles, concepts, practices, methods, techniques and organizational theory.

· Knowledge of the principles of governmental accounting and budgeting and of the budgetary process.

· Knowledge of procurement regulations and procedures.

· Ability to maintain records and to develop reporting mechanisms for financial accountability in accordance with policies and procedures

· Ability to analyze and to interpret data and to communicate conclusions both verbally and in writing.

· Knowledge of mental health delivery systems specifically as they relate to children and adolescents with multiple problems who are at-risk for residential placement.

68

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Evaluation Assistant** (Parent)
DS-303-07
Salary Range: $29,966 - $33,961

The purpose of this position is to obtain and compile data for entry into computer systems and for compiling studies, reports and evaluations.

- Collects data from various sources in the project using forms developed by program evaluator.

- Codes and enters data into automated data processing system assuring the accuracy of the information.

- Compiles recurring and special reports for the evaluators.

- Makes limited studies of systems within designated areas.

- Participates in reliability checks by performing periodic random sampling of information.

- Distributes, routes, identifies and files computer listings and other data.

*Knowledge and Skill Required:*

- Knowledge of a range of clerical practices and procedures to correct, review and process data, compile reports, process surveys.

- Knowledge of the procedures and techniques for the collection, compilation, computation, editing, verifying and entering data into an automatic data processing system.

- Skill in operating an electronic typewriter, word processor, microcomputer or computer terminal using a standard typewriter style keyboard.

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**MIS Evaluation Liaison**
DS-334-12
Salary Range: 53,156 - $60,242

The purpose of this position is to plan, develop, deliver and evaluate comprehensive information services for management of the system of care.

- Reviews information services provided to and needed by components of System of Care (SOC), determines the need for modifications and/or new services and reallocates information resources and staff.

- Initiates the development of new information services as determined in consultation with managers.

  Provides or arranges for a full range of information services for SOC central administration, including the Clinical Director and Program evaluators, and on-site services to component programs, including patient demographic data, tracking of care planning, service provision, aftercare follow-up, clinical quality assurance, consumer satisfaction and program evaluation.

- Collaborates as appropriate with research conducted by other health care and academic systems.

- Provides or arranges for ongoing training and consultation to SOC staff in sue of hardware and software and information system problem solving.

*Knowledge and Skills Required:*

- State of the art technical expertise in hardware, software, internal and external networking.

- Experience creating information systems for health care systems.

- Ability to consult with and train a wide range of disciplines and skill levels.

- Ability to supervise technical and support staff.

District of Columbia GFA SM-02-02                              Nicholas Geleta, Ph.D. Project Director

## BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Social Marketing/Communications Manager**
DS-1035-12
Salary Range: $53,156 - $60,242

The purpose of this position is to plan, develop and design short range and long-range programs and projects within the framework of the policies and guidelines of the D.C. CINGS Project to communicate information to the public regarding the goals and objectives of the Project.

- Serves as the lead public information spokesperson for the project.

- Surveys, plans, develops and implements programs for disseminating timely and factual information to the media and the public relating to the functions, operations, goals and services of the D.C. CINGS Project.

- Develops and directs the development of detailed communication objectives, methods and questions.

- Establishes and maintains effective working relationships with members of the news media and other specialized groups interested in the project.

- Plans, directs and executes local/national campaigns to convey complex information concerning programs and research on program responsibilities and activities.

- Provides assistance and consultation to community based organizations by initiating and maintaining positive relations with the general public and special publics such as consumer organizations and family support systems.

- Distributes project program information through Community Based Centers and evaluates and recommends modification when appropriate.

- Prepares written informational materials and makes appropriate presentations including press releases, brochures, pamphlets, fact sheets, reports, proposals, annual reports, booklets and monograms.

- Attends public hearings, official meetings and other community gatherings to record and report on proceedings through releases, special articles, reports, etc.

*Knowledge and Skills Required:*

- Skill in developing written material to convey information concerning complex programs and functions to a public having diverse levels of understanding of families, (SED) and social service issues.

- Knowledge of written and oral communication methods and techniques and skill in applying this knowledge including the D.C. CINGS Project.

71

District of Columbia GFA SM-02-02                    Nicholas Geleta, Ph.D. Project Director

# BIOGRAPHICAL SKETCHES/JOB DESCRIPTIONS

**Administrative Assistant**
DS-301-07
Salary Range: $29,966

· Serves in confidential and close working relationship providing staff assistant in support to Project Director.

· Assists Project Director in the day-to-day administrative operations of the office which requires exercise of sound judgment based on extensive experience with and knowledge of District government and its various programs and operations.

· Responsible for all typing assignments whether performed directly or distributed to assisting clerical staff. Reviews completed documents for accuracy, completeness, grammatical correctness, format, style, and appropriate copies on a wide variety of correspondence.

· Arranges for and coordinates conferences and meetings between Project Director and other District and private officials.

· Establishes, and maintains office files with a system that is orderly, reasonably arranged and easily assessed.

· Receives Project Director's calls. Knows which can be handled by other staff, and which need Director's attention. When appropriate takes clear and detailed messages in a log format.

· Receives office mail and disseminates appropriately. Monitors correspondence requiring clearance with or action by the Project Director and/or his staff. Coordinating relevant materials and assures the timely and accurate disposition of correspondence.

· Maintains appointment calendar for Project Director, coordinates schedule with those of his superiors and management staff.

· Serves as office manager for immediate clerical support staff. Manages assignments and balances workloads.

· Responsible for procuring, maintaining and ensuring availability of necessary office supplies and equipment.

# RESUME

## MARTHA B. KNISLEY

**Personal Information:**       Date of Birth: October 22, 1948
                               Social Security Number: 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

**Employment:**

<u>April, 2001 to Present:</u> Director, The Department of Mental Health for the District of Columbia

In this position I report to the Mayor of the District of Columbia as Chief Mental Health Officer and principal advisor to the Mayor on all mental health policy and programs. I have responsibility for providing executive direction and administration of all publicly funded mental health services and all private programs that are regulated by the District. This includes the development of systems of care for children and ensuring community involvement in the agency's activities and maintain contact with top officials of other District agencies and other groups and institutions to secure support and cooperation in carrying out the Department's mental health programs and the Mayor's health and human service initiatives.

<u>January, 1995 to April, 2001:</u> Senior Consultant, The Technical Assistance Collaborative, Boston, Massachusetts

The Technical Assistance Collaborative is a not-for-profit organization actively involved in providing consultation and technical assistance to national, state and local mental health, human service and special needs housing organizations. The Collaborative was created at the request and with the support of the Robert Wood Johnson Foundation.

My last assignment with TAC was as Project Manager for consultation to the Transitional Receiver in <u>Dixon v. Williams</u> in the District of Columbia. This included assisting the Receiver in development of a community care system in accordance with Court Orders. I worked in a fulltime capacity on this project supervising a consulting team that developed a mental health "authority" for the District including consultation to the Receiver on a Plan for the development of the system to be submitted to the Federal Court in 2001, legislation for a new mental health department including developing a "systems of care" approach to organizing, financing and delivering services to children with serious emotional disturbances and multiple needs.

<u>April, 1991 to January 1995:</u> Deputy Executive Director, Wake Area Mental Health Program, Raleigh, North Carolina

My primary responsibility was the direction for the Mental Health, Substance Abuse and Alcohol, Children and Youth and Mental Retardation components. During my tenure at Wake County, we developed a Medicaid Managed Care operation for children with mental health and/or substance abuse disorders and helped Wake County implement a system wide Children's Initiative.

<u>May, 1990 to March, 1991:</u> Director, The Ohio Department of Mental Health, Columbus, Ohio

I was responsible for the overall administration and direction of the Cabinet level state department of mental health. I was appointed by and reported directly to Governor Richard F. Celeste to complete the term of Pam Hyde as Director during the Celeste administration.

<u>November, 1989 to May, 1990:</u> Consultant to the Deputy Director, The Ohio Department of Mental Health, Columbus, Ohio

I was responsible for all state operated community services for the Department of Mental Health

<u>November, 1987 to November, 1989:</u> Deputy Secretary for Mental Health, Commonwealth of Pennsylvania, Department of Public Welfare, Office of Mental Health, Harrisburg, Pennsylvania

I was responsible for the public mental health system in Pennsylvania

<u>July 1983 to November, 1987:</u> Deputy Director, Ohio Department of Mental Health, Columbus, Ohio

I was responsible for the day to day operations of the Department including the development and evaluation of programs in Ohio's mental health system including the Office of Children's Services

<u>July 1974 to July, 1983:</u> Deputy Director, Director of Transitional Services and Follow-Up Care, Aftercare Coordinator and Case Management Specialist, Southwest Community Health Centers/Southwest Community Mental Health Center, Columbus, Ohio

<u>April, 1972 to July, 1974:</u> Developmental Disabilities Consultant and Case Management Specialist, Association for the Developmentally Disabled, Columbus, Ohio

<u>January, 1971 to April, 1972:</u> Vocational Counseling and Job Placement Specialist, Franklin County Program for the Mentally Retarded, ARCraft Sheltered Workshops Columbus, Ohio

**Consultation (1991-2001) (**consultation as fulltime consultant with the Technical Assistance Collaborative from 1996-2001 not included)

Chair, Review Panel on Vocational Services Demonstration Grants, Center for Mental Health Services, 1995

Expert for the U.S. Department of Justice in <u>Wyatt v. Hanan</u> (Wyatt v. Stickney), 1995

Professional Review Panel for <u>Arnold v. Sarn</u>, Behavioral Health Services, Arizona Department of Health Services, Phoenix, Arizona, 1993 -2000

The United States District Court for the Northern District of Illinois, Panel of Experts, <u>K.L. v. Edgar</u>, 1993-6

Southern Legal Counsel and The Protection and Advocacy Center, Gainesville and Tallahassee, Florida. Expert for the Plaintiffs in <u>Sanbourne v. Chiles</u>, 1991-9

CMHS, Block Grant Reviewer 1991-1995

National Institute of Mental Health, Special Review Group, Mental Health Financing and Services Research Centers, 1991

**Federal Grant/ Project Management**

Project Director, "North Carolina ACCESS: Wake County Site." Center for Mental Health Services Research Demonstration Grant, 1993-98. $4,900,100.00

Principal Investigator (4 grants) with NIMH for the development of community support for persons with serious mental illness from 1983 through 1988.

**Education**

B.A., 1970, Rehabilitation Counseling, Marshall University, Huntington, West Virginia

M.A. 1973, Counselor Education, The Ohio State University, Columbus, Ohio

# NICHOLAS GELETA

6925 Stethem Court
Manassas, Virginia 20112

Home: 703-897-884?
Office: 202-671-3157

## EDUCATION

**Ph.D. Educational Psychology and Evaluation,** The Catholic University of America, May 1986.
Areas of expertise: Learning theory, psychological evaluation and assessment (Cognitive, Projective and Educational), individual and group process, advanced research methods, and program evaluation.

**M.A. Educational Psychology with credits for Certification in School Psychology,** The Catholic University of America, May 1976.
Important courses: Evaluation of The Handicapped, Individual Intellectual Assessment, Projective Assessment, Diagnosis of Learning Disabilities, Adolescent Development, Theories of Psychological Measurement, Learning Theory, Individual and Group Counseling, Behavior Disorders in Children, and The Sociology of Urban Youth.

**B.A. Psychology,** The State University of New York at Buffalo, June 1970.

## EXPERIENCE

**PROGRAM MANAGER, THE JACKIE ROBINSON PSYCHO-EDUCATION PROGRAM FOR ADOLESCENTS),** District of Columbia, Department of Mental Health, Public Core Services Agency, September 2001 - April 2002.
**Responsibilities and Achievements:** Provides direct administrative supervision, sets and implements policy for all aspects of Psycho-education program of adolescent males and females. Responsible for the day to day operation of the program. Administers staff of 20 professionals (i.e., psychiatrist, registered nurse, psychologist, social workers, mental health specialists, school staff, case managers, art therapist, recreation therapist).

**ACTING PROGRAM MANAGER, ADOLSCENT DAY TREATAMENT PROGRAM AND THE JACKIE ROBINSON CENTER PSYCHO-EDUCATION PROGRAM FOR ADOLESCENTS),** District of Columbia, Department of Mental Health, Public Core Services Agency, June 2001 to September 2001.
**Responsibilities and Achievements:** Provides direct administrative supervision, sets and implements policy for all aspects of adolscent Day Treatment Program and Adolescent Psycho-education program. Responsible for the day to day operation of both programs. Administers staff of 35 professionals (i.e., psychiatrist, registered nurse, psychologists, social workers, mental health specialists, school staff, case managers, art therapist, recreation therapist). Worked with staff, unions and senior administrative staff to successfully merge these programs into one psychoeducation program. This merger was undertaken as part of the reorganization of the Commission on Mental Health Services into the new Department of Mental Health.

**ACTING PROGRAM MANAGER, ACUTE INPATIENT SERVICES BRANCH),** District of Columbia, Commission on Mental Health Services (CMHS), Child and Youth Services Administration (CYSA), January 2001 to June 2001.
**Responsibilities and Achievements:** Provides direct administrative supervision, sets and implements policy for all aspects of the Acute Inpatient Services Branch for Children and Adolescents. Responsible for the day today operation of a 24 bed acute inpatient psychiatric hospital program for children and adolescents. Administers staff of 45 professionals (i.e., psychiatrist, registered nurse, psychologists, social workers, mental health specialists, school staff, case managers, art therapist, recreation therapist). Worked with staff, unions and senior administrative staff to successfully transition this unit to closure as part of the reorganization of the Commission on Mental Health Services into the new Department of Mental Health.

**ACTING CHIEF RESIDENTIAL PLACEMENT UNIT (RPU),** District of Columbia, Commission on Mental Health Services (CMHS), Child and Youth Services Administration (CYSA), September 1994 to December 2000
**Responsibilities and Achievements:** Provides direct administrative supervision, sets and implements policy for all aspects of the Residential Placement Unit. Specifically, administers state level agency designated to place District Children and Adolescents in Residential Placements. Responsible for the operation of the Residential Review Committee an Interagency, Multi-disciplinary Team that operates in the RPU, determining eligibility for residential treatment. Administers staff of 16 professionals (i.e., psychiatrist,

# NICHOLAS GELETA

registered nurse, social workers, mental health specialists, placement specialists). Serves as the contract administrator representing DHS/CMHS/CYSA for 30 different facilities in 13 different states serving approximately 400 children and adolescents on an annual basis.

**ACTING DEPUTY CHIEF RESIDENTIAL PLACEMENT UNIT (RPU)**, District of Columbia, Department of Human Services (DHS), Commission on Mental Health Services (CMHS), Child and Youth Services Administration (CYSA), March 1993 to August 1994.
**Responsibilities and Achievements:** Provides direct administrative supervision of case manager/placement specialists and facility monitoring staff. Supervises the monitoring and evaluation of D.C. Medicaid facility performance and effectiveness by conducting annual site visits to facilities certified as a D.C. Medicaid provider. This responsibility includes: developing a schedule of annual site visits; evaluating facility compliance with health and safety standards and facility interpretation of D.C. and Medicaid standards and regulations; provides technical assistance to facilities in this regard when necessary or requested.

Provides direct administrative supervision of all activities related to the functioning of the Residential Review Committee (RRC) these include but are not limited to development and implementation of appropriate referral procedures, scheduling of RRC meetings, directing clinical discussion of cases, directing placement options and the rationale for placement, and discussion of aftercare plans.

**MENTAL HEALTH SYSTEMS SPECIALIST**, District of Columbia, Department of Human Services (DHS), Commission on Mental Health Services (CMHS), Child and Youth Services Administration (CYSA), August 1988 to March 1993.
**Responsibilities and Achievements:** Participated at the administrative level in the development of innovative children's mental health programs that involved the creation of crisis walk-in emergency services, mobile mental health crisis outreach, outreach prevention services, intensive case management services, home-based crisis intervention services and wrap-around services. Developed, wrote and implemented program policy and procedures, position descriptions, and participated in the staffing and hiring of positions for these programs. Developed, wrote and implemented contracts for specialized Home-Based Crisis Intervention Services, "Wrap-Around Services," and Educational Support and Advocacy Services. Developed and implemented monitoring and evaluation plans for the Bureau, three Divisions and Bureau contracted services using CMHS policy and JCAHO Consolidated Standards, emphasizing the Continuing Quality Improvement (CQI) model.

**SCHOOL PSYCHOLOGIST**, Public Schools of The District of Columbia, February 1977 to August 1988.

## PUBLICATIONS & PRESENTATIONS

Kerst, S., Vorwerk, K., & Geleta, N. (1978). The Role of Phonetic Processing in Silent Reading. Journal of Reading Behavior, 9(4), 339-352.

Geleta, N., & Yekovich, F.R. (1986, August). The interactive effects of micro- and macrostructural processing during text comprehension. Paper presented at the 94* meeting of the American Psychological Association, Washington, D.C.

Symposium on the Development of Training Curriculum to increase the clinical knowledge and skill level of the parents and families of SED children receiving residential treatment. September 18-20, 1996, funded through Mental Health Block Grant; Gallaudet University, Washington, D.C.

Symposium on Creative Approaches for Connecting Families and Clinical Staff in Managing the Behavioral Health Care Needs of Children and Adolescents with Serious Emotional Disturbance. September 25-27, 1997, funded through Mental Health Block Grant; Gallaudet University, Washington, D.C.

# ANDREA WEISMAN
3920 Livingston Street, NW
Washington, DC 20015
Phone (202) 686-2720 FAX (202) 244-1642
Email: aweisman@aol.com

## Brief Professional History

### Senior Analyst, Department of Mental Health, Washington, DC

Special projects and child/youth and adult systems analysis for the Director of the Department of Mental Health.

### Senior Program Manager, Juvenile Justice, Department of Mental Health, Washington, DC

Administrative and clinical oversight, program development and implementation of all mental health services for youth who come into contact with the juvenile justice system in Washington, DC. Oversight includes: Youth Forensic Services, Oak Hill Youth Detention Center and all community-based services. As per the _Jerry M._ consent decree, DMH is responsible for all mental health service provision to youth under the supervision of the Youth Services Administration of the District's Department of Human Services. February 2001 – present

### Director, Mental Health Services, Central Detention Facility (DC Jail), Washington, DC

I served as Director of Mental Health Services for the federal Court-appointed Receiver of Medical and Mental Health Services for the DC Jail. I left at the end of the Receivership and upon the privatization of the Jail's medical and mental health services. As Director, I had overall responsibility the development, implementation and evaluation of a comprehensive mental health program for 1,700 inmates detained in the jail on any given day and over 1,000 monthly admissions. December 1995 – July 2000

### Director, DC Women's Jail Project, Central Detention Facility (DC Jail), Washington, DC

I developed and raised funds for to provide advocacy and direct service to mentally ill women in the DC Jail through a clinical externship for Howard University doctoral students. The project was supported by funds from the U.S. District Court for the District of Columbia, the Public Welfare Foundation, the Eugene and Agnes E, Meyer Foundation, and the Center for Mental Health Services/Substance Abuse and Mental Health Services Administration/HHS. January 1995 – August 1996.

## In Brief

## Consultation

### Physicians for Human Rights, Washington, DC.

Mental health expert and trainer for PHS. This project trains medical students to inspect juvenile justice facilities and prepares them to provide medical educational to incarcerated juveniles. March 2000 – present.

### Institute on Crime, Justice and Corrections, George Washington University, Washington, DC.

Mental health expert for the Institute which serves as monitor of a Memorandum of Understanding between the U.S. Department of Justice and the Georgia Department of Juvenile Justice regarding health care and conditions of confinement in the State's juvenile detention and correctional facilities. [Previous to 1999, DOJ's contract was with the National Council on Crime and Delinquency.] January 1998 – June. 2001.

- **Human Rights Watch,** Baltimore City Jail, Baltimore, Md. (11/99)
- **Amnesty International,** Norway (2/99)
- **National Coalition for Mental and Substance Abuse Health Care in the Justice System,** Washington, DC (4/94 – 12/94)
- **Death Penalty Focus,** San Francisco, Ca. (8/92 – 9/94)
- **Pelican Bay Information Project,** San Francisco, Ca. (9/93)

## Clinical Practice

- **Director, Psychological Services Center, Clark University,** Worcester, Ma. (1/91–6/91)
- **Partner, Private Practice, Clinical Associates of Shrewsbury,** Shrewsbury, Ma. (9/90–6/93)
- **Treatment Team Coordinator, Westborough State Hospital,** Westborough, Ma. (9/87–12/90)
- **Sexual Abuse Specialist, Westborough State Hospital,** Westborough, Ma. (9/88-12/90)

## Education

1987  Ph.D., Clinical Psychology, Clark University, Worcester, Ma.
1977  M.A., Psychology, Clark University, Worcester, Ma.
1972  B.A., Psychology, Clark University, Worcester, Ma.

## Honors and Awards

Research Scholar Appointment, Clark University, 9/77-6/79
Phi Beta Kappa, Clark University, 6/72
B.A. Cum Laude and with High Honors in Psychology, Clark University, 6/7d2

## Recent Publications, Reports and Presentations

(2000) "Mental Illness Behind Bars." In J. May and K. Pitts (Eds.) *Building Violence: How America's Rush to Incarcerate Creates More Violence.* Sage Publications, Ca.

(1999) Central Detention Safety Net Program." An interactive journaling series for use in a jail-based substance abuse program. Developed with Corrective Action Publication, a subsidiary of Serenity Support Services.

(1999) "Manufacture of Mental Illness in U.S. Prisons: Can Psychologists Respond?" With Craig Haney. Panel presented at the American Psychological Association meeting in Boston, Ma. The panel was part of a session entitled *Crisis in U.S. Prisons: Implications for a Culture of Peace.*

(1998) Invited faculty: First National Conference on Death and Dying in Prisons and Jails: Caring for prisoners, families and caregivers. Panel: Delivering Palliative Care at the End of Life.  Paper: *Barriers to the provision of palliative care at the end of life.*  Co-sponsored by the Center on Crime, Communities and Culture and the Project on Death in America, projects of the Open Society Institute.

(1998) "Mental Health Outpatient Services in Correctional Settings." In M. Puisis, R. Shansky, and J. May (Eds.) *Clinical Practice in Correctional Medicine.*  Mosby, Chicago, Ill.

**Velva R. Taylor Spriggs**
3649 New Hampshire Avenue, NW
Washington, DC 20010-1559
(301) 443-0139
(202) 291-4979

| | |
|---|---|
| **Objective:** | To support/guide/manage/create/improve services provided by local, national or international human services organizations for the purpose of improving the quality of human life. |

**Summary:**
*Licensed social worker in the District of Columbia*
*32 years of combined experience in social work, training, teaching, and international program development*
*Peace Corps Volunteer in Central America*
*Congressional Intern*
*Recipient of numerous academic scholarships and awards*
*Moderate fluency in Spanish*
*Experienced in training, teaching, counseling, supervision, writing, program administration, and organizational problem-solving*
*Owner/manager of management consultant firm, imported arts and crafts shop, and restaurant*
*Experienced in public/private mental health, social services and educational institutions*
*Advocate in both local and national children's mental health movements*

**Education:**
Masters of Social Work, University of Pennsylvania
School of Social Work (1969)
BA (cum laude), Morgan State College (1964)

**Employment Experience:**

*Present*
Director, Child and Youth Services
DC Department of Mental Health

**1999–2002**
Acting Director, Office on Early Childhood
Center for Substance Abuse Prevention
Substance Abuse Mental Health Services Administration

**1997–1999**
Project Officer, Mental Health Block Grant Office
Center for Mental Health Services
Substance Abuse Mental Health Services Administration

**1994–1997**
Director/Project Officer, System Planning & Development Program
(a.k.a. Child Adolescent & Service System Program or CASSP)
Child Adolescent and Family Branch,
Center on Mental Health Services
Substance Abuse and Mental Health Services Administration
US Department of Health & Human Services, Rockville, MD
Carries oversight responsibility for Family Network, Infrastructure and research grants related to children's mental health; assists in the design and development of the Branch's Native American and Underserved Initiatives;

Resume of Velva R. Taylor Spriggs
Page 2

coordinates the development of concept papers, contracts, and various consultations; assists with the development of the Federal interagency collaborative; Project Director for the National Technical Assistance Center at Georgetown University; provides on-sight technical assistance to grantees; represents the Branch at various meetings, and assists in the development of monographs on child mental health topics.

1988-1994    Management Analyst, US Department of Housing and Urban Development
Washington, DC
Identify management systems' problems and recommend solutions; write policies and procedures affecting national housing programs.

**Additional Experience:**

| | |
|---|---|
| 1970-72 | *Project Director, Family Service of Prince Georges County, MD |
| 1969-70 | *Family Service Consultant, Atlanta Housing Authority, Atlanta, GA |
| 1966-67 | *Peace Corps Trainer, Texas Technological College, Lubbock, TX |
| 1964-66 | *Community Development Worker/Teacher, US Peace Corps, Costa Rica |
| 1978-86 | *Teacher/Private Consultant (part-time) |
| | *Morgan State University at Patuxent Institution |
| |    and Maryland State Penitentiary, Baltimore, MD |
| | *Community College of Baltimore, Baltimore, MD |
| | *Mayor's Office of Baltimore, Baltimore, MD |
| | *Various private consultant firms |

**Other Activities:**

Past President and co-founder, Family Advocacy and Support Association (FASA)
Proprietor, First World Arts 'N' Crafts Gallery
Past Board Member, Northwest Family Center
Past Board Member, DC State Mental Health Advisory Council
Past Board Member, Federation of Families for Children's Mental Health
Recipient, US Department of the Treasury Award
Recipient, Certificate, Excellent in Performance, US Department of Housing and Urban Development (1988, 1992)
Recipient, National Claiming Children Award, Federation of Families for Children's Mental Health
Member, National Association of Black Social Workers
Past Secretary, Blacks in Government, HUD Chapter
Past President/Founder, Park Plaza Tenants Association
Public speaker on mental health issues related to children
Past Member:  Prince Georges County Hotline Board of Directors
Professional Advisory Council of the Mental Health Association of Prince Georges County, Inc.
Committees of the National Association of Mental Health

# BIOGRAPHICAL SKETCH

Provide the following information for the key personnel in the order listed for Form Page 2.
Follow the sample format for each person. DO NOT EXCEED FOUR PAGES.

| NAME | POSITION TITLE |
|---|---|
| Gary, Lawrence | Professor |

EDUCATION/TRAINING  *(Begin with baccalaureate or other initial professional education, such as nursing, and include postdoctoral training.)*

| INSTITUTION AND LOCATION | DEGREE (if applicable) | YEAR(s) | FIELD OF STUDY |
|---|---|---|---|
| Tuskegee Institute, Tuskegee, AL | B.S. | 1963 | Secondary Education |
| University of Michigan, Ann Arbor | M.P.A. | 1964 | Public Administration |
| University of Michigan, Ann Arbor | M.S.W. | 1967 | Social Work |
| University of Michigan, Ann Arbor | Ph.D | 1970 | Social Work /Sociology |

## A. Positions and Honors
## POSITIONS
## SELECTED HONORS

| | |
|---|---|
| 1985 –Present | Professor, SCHOOL OF SOCIAL WORK, HOWARD UNIVERSITY |
| 1990 – 1992 | **The Samuel D. Wurtzel Professor**, School of Social Work, Virginia Commonwealth University, Richmond, VA |
| 1985 – 1990 | Professor, The Graduate School of Arts and Sciences, Howard University, DC |
| 1972 - 1990 | Director, Institute for Urban Affairs and Research, Howard University, DC |
| 1986 – 1987 | Henry and Lucy Moses Distinguished-Visiting Professor, School of Social Work, Hunter College, New York, New York. |
| 1974 – 1984 | Director, Mental Health Research and Development Center, Howard University, DC |
| 1971 – 1984 | Associate Professor, The Graduate School of Arts and Sciences, Howard University, DC |
| 1971 – 1972 | Assistant to Vice President for Academic Affairs, Howard University, DC |
| 1968 – 1971 | Lecturer and Assistant Professor, School of Social Work, Howard University, DC |

**Editorial Consultation**
Consulting Editor, Journal of Social Work, 1985-1990
Editorial Board, Journal of Social Work, 1977-1981
Editorial Board, Journal of Multicultural Social Work, 1989- Present
Editorial Board, Journal of Teaching in Social Work, 1987 – 1997
Editorial Board, journal of Progressive Human services, 1989-1996
Editorial Board, Journal of Social Work Education, 1982 –1987

**Selected External Research Support**
NIMH Mental Health Research and Development 1974 –1977 ($2,177,082)
NIMH Mental Health Research of Children 1975-1977 ($252,745)
NIMH Pathways to Help: Informal Support Systems 1980-1982 ($295,999)
NIMH Predictors of Depressive /symptoms, 1984-1988 ($817,705)
HUD: Short term Studies and Research on High Priority Problems in Support of HUD Mission 1983-1998 ($2 million)

## B. Selected Peer Review and Other Publications (in Chronological Order).

Gary, L.E. (1998). Family etiology of youth problems. In R.S. Ashery, E.B. Robertson, and E.B. Kumpfer (Eds). Abuse Prevention through Family Intervention (pp. 42-77). Rockville, MD: National Institute on Drug Abuse.

Gary, L. E. (1998). The protective factor model: Strengths-oriented prevention for African American families. In F.L. Brisbane (Eds). Cultural Competence for Health Care Professionals Working with African American Communities: Theory and Practice (pp. 81-105). Rockville, MD: Substance Abuse and Mental Health Service Administration.

Gary, L.E. (1996). Correlates of Health-Related Behaviors in Older African American Adults: Implications for Health Promotion. Family and Community Health, 19, no. 2, 43-57.

Gary, L. E (1995). African American Men's Perceptions of Racial Discrimination: A Sociocultural Analysis. Social Work Research, 19, no. 4, 207-17.

Gary, L. E (1995). History of Historically Black Colleges and Universities Training Programs. Proceedings of the African American Behavioral Health Workforce Development Conference, (pp. 32-73). Columbia, S.C.: Southern Human Resource Development. Consortium for Mental Health

Selected Colloquia: lectures at numerous universities

Atlanta University
Hunter College
Meharry Medical College
Medical College of Virginia
Ohio State University
University of Michigan
University of Pennsylvania
University of North Carolina
Syracuse University
Yale University

**Selected Consultancies:**
Center for Disease Control
Lilly Endowment, Inc
National Institute of Drug Abuse
U.S. Department of Health and Human Services
National Council of Mental Health Centers
Educational Testing Services
Black Mental Health Alliance
Child Trend Inc.
Morehouse School of Medicine

+ PHS 398/2590 (Rev. 05/01)      Page __8____      Biographical Sketch Format Page

Number pages consecutively at the bottom throughout the applicatio 82   not use suffixes such as 3a, 3b.

Principal Investigator/Program Director (Last, first, middle): Nicholas Gaea, Ph.D., Project Director

# BIOGRAPHICAL SKETCH

Provide the following information for the key personnel in the order listed for Form Page 2.
Follow the sample format for each person. DO NOT EXCEED FOUR PAGES.

| NAME | POSITION TITLE |
|---|---|
| Manning, Maxwell C. | Assistant Professor |

EDUCATION/TRAINING *(Begin with baccalaureate or other initial professional education, such as nursing, and include postdoctoral training.)*

| INSTITUTION AND LOCATION | DEGREE (if applicable) | YEAR(s) | FIELD OF STUDY |
|---|---|---|---|
| Glassboro State College | B.A. | 1971 | Secondary Education |
| SUNY at Stony Brook | MSW | 1979 | Social Work |
| New York University | Ph.D. | 1997 | Social Work |

## A. Positions and Honors
## POSITIONS
## SELECTED HONORS

| | |
|---|---|
| 1997 –Present | Assistant Professor, SCHOOL OF SOCIAL WORK, HOWARD UNIVERSITY |
| 1996 -1997 | Lecturer, NATIONAL CATHOLIC SCHOOL OF SOCIAL SERVICES, CATHOLIC UNIVERSITY |
| 1996 – 1998 | Adjunct Faculty, SCHOOL OF SOCIAL WORK, UNIVERSITY OF MARYLAND at BALTIMORE |
| 1995 - 1996 | Consultant/Project Coordinator, LAUREL CONSULTING GROUP |
| 1992 - 1996 | Director, BEVERLY MACK HARRY PSYCHOTHERAPY TRAINING INSTITUTE |
| 1993 - 1995 | Trainer/Consultant, *WOUNDED HEALERS*, ST. PAUL COMMUNITY BAPTIST CHURCH |
| 1994 - 1995 | Director of Human Services, THE DOOR |
| 1991 - 1994 | Director of Mental Health and Therapeutic Foster Care, MIRACLE MAKERS |
| 1986 – 1991 | Project Manager, BROOKLYN (CASSP) CHILDREN AND ADOLESCENT SYSTEM SERVICE PROGRAM |
| 1984 – 1986 | Clinical Director, BEDFORD STUYVESANT COMMUNITY MENTAL HEALTH CENTER |
| 1983 - 1984 | Supervisor, FAMILY DYNAMICS, INC. |
| 1981 –1983 | Coordinator, GUIDANCE CENTER, THE FAMILY CENTER |
| 1980 -1981 | Coordinator, Children's Partial Hospital JERSEY MEDICAL CENTER |
| 1985 –1993 | Adjunct Faculty, NEW YORK UNIVERSITY, COLLEGE OF NEW ROCHELLE, EMPIRE STATE COLLEGE |

| | |
|---|---|
| 1985 - Present | Program Evaluation and Consultant Experience |
| | FAMILY MEDICAL AND COUNSELING SERVICES, |
| | SASHA BRUCE YOUTHWORK, INC |
| | DISTRICT OF COLUMBIA DEPARTMENT OF MENTAL HEALTH |
| | PENNSYLVANIA DEPARTMENT OF MENTAL HEALTH |
| | NYC CHILD WELFARE ADMINISTRATION |
| | GEORGETOWN CHILD DEVELOPMENTAL CENTER, NATIONAL MINORITY INTIATIVE COMMITTEE |
| | CASEY FAMILY SERVICES |
| | BALTIMORE HIV PLANNING COUNCIL. |

| | |
|---|---|
| 1999 – present | Board of Directors - DISTRICT OF COLUMBIA MENTAL HEALTH ASSOCIATION |
| 2001 - present | Board member – MARYLAND BOARD OF SOCIAL WORK EXAMINERS |
| 1991 – 1992 | 23RD Edition of Who's Who of the East |
| 1990-1991 | Board of Directors/Chairperson - BUSHWICK GEOGRAPHIC TARGETING TASK FORCE |
| (1986-1991) | Co-Chairperson – BLACK TASK FORCE ON CHILD ABUSE |
| (1986-1991) | Member - NATIONAL MINORITY INITIATIVE RESOURCE COMMITTEE Georgetown University Child Development Center |
| (1984 - 1986) | Member - NEW YORK STATE ADVISORY COMMITTEE ON CHILDREN AND FAMILIES |
| 1983 - 1984) | Member - NEW YORK STATE COMMISSION ON CHILD SUPPORT |
| (1983-1985) | Director - FATHERHOOD COLLECTIVE |
| 1981-1983 | COUNCIL ON SOCIAL WORK EDUCATION MINORITY FELLOW. |

## PROFESSIONAL LICENSES AND TRAINING

Maryland State License/LCSW - C
Diploma in Clinical Social Work

**Certificate in Adolescent Sexuality and Pregnancy Prevention** (1983)
Children's Aid Society

**Clinical Practicum, Family Therapy Training Center** (1982)
Philadelphia Child Guidance Center

**Advanced Clinical Social Work Program** (Sept, 1980 to May, 1981)
Hunter College, School of Social Work
**B. Peer Review and Other Publications (in Chronological Order).**

Okundaye, J., Llewellyn J. Cornelius, L.J., and Manning, M.C. (2001). Drug Trafficking among African American Youth:
Risk factors for future incarceration. Journal of African American Men. Vol. 5

Manning, M. (2000). Organization and Community Assessment Skills with African Americans. In S. Furuto and R. Fong (Eds.). Cultural Competent Social work practice: Practice skills, intervention and evaluation. Longman Press.

Cornelius, L.J., Okundaye, J.N., and Manning, M.C. (2000). HIV related risk behavior among African American females
and the changing face of HIV/AIDS in the third decade of the pandemic. Journal of the National Medical Association, 92: 183-195.

Manning, M. (1999). Review of Educating Black Males: Critical Lessons in Schooling, Community and Power, by Ronnie Hopkins, Journal of NegroEducation, Vol. 67(1).

Benjamin, M and Manning, M, (1999). Cultural Competent Behavioral Managed Care with Children, In Jackson, V. and Lopez, L. (Eds.). Cultural competence in managed behavioral health care. Rhode Island: Manisses

# Curriculum Vitae

## *Harriet D. Crawley*
### *1307 Canyon Road*
### *Silver Spring, Maryland 20904-1407*
### *(H) (301) 384-3148; (W) (202) 576-5151; (Email) Whsax@aol.com*

---

**PERSONAL**

My twenty-five year career as a Clinical Social Worker has been spent advocating on behalf of children and adolescents with serious emotional disturbances (SED) and their families in both a paid and volunteer capacity. I am married and the proud mother of two adult sons.

---

**EDUCATION**

B.A. Sociology, Hampton Institute, Hampton, Virginia, 1971
M.S.W. Social Work, University of Pittsburgh, Pittsburgh, Pennsylvania, 1974

---

**EMPLOYMENT**

1994-Present  *Program Manager, District of Columbia Government, Department of Mental Health Community Services, Paul Robeson School for Growth and Development, 3700-10th Street, NW, Washington, DC 20010*
Is responsible for coordinating and integrating psychoeducational program services essential to the prevention, treatment, or aftercare of latency-aged children diagnosed with SED and/or learning disabilities; provides supervision, direction and guidance to special education specialists, special education teachers, child psychiatrists, clinical psychologists, clinical social workers, art therapist, recreational therapist, psychiatric nurse and other educational and clinical staff.

1998-2000  *Child and Youth Compliance Monitor, Department of Health and Human Services, Center for Mental Health Services, Rockville, MD.*
Monitored various United States territories and states for compliance with State Mental Health Block Grant regulations as they pertained to services provided to/for, children and adolescents with SED and their families.

1982-1994  *Clinical Social Worker, District of Columbia Government, Commission on Mental Health Services, Child and Youth Services Administration, Paul Robeson School for Growth and Development, 3700-10th Street, NW, Washington, D.C 20010*
Planned, developed and implemented a social work program to ensure that program goals were responsive to the needs of Paul Robeson School clientele and families; formulated policies, procedures and directives necessary to augment, establish or maintain the provision of a full range of social work services to clients requiring foster care or residential treatment placement; maintained a caseload and provided individual, group and family therapy to clientele and their families.

1979-1982  *Clinical Social Worker, District of Columbia Government, Department of Human Resources, Mental Health Services Administration, Children's Residential Treatment Center, 3700-10th Street, N.W, Washington; D.C 20010*
Coordinated and supervised work to be accomplished by a subordinate staff of

Curriculum Vitae, Crawley, Harriet D., Page 2

clinical social workers and social work interns; assigned cases, prepared written reports, gave advice and counsel on administrative as well as technical program matters; assisted in interviewing candidates for job vacancies; assisted in planning, evaluating and coordinating the work of the clinical component; provided individual, group and family therapy to clientele and their families.

1977-1979  *Social Worker, District of Columbia Government, Department of Human Resources; Mental Health Services Administration; Area B Community Mental Health Center, Juvenile Justice Outreach Program, 1125 Spring Road, NW, Washington, D.C 20010*
Provided clinical and advocacy services to adolescents who were or had been involved in the Juvenile Justice System.

## INTERESTS & ACTIVITIES

- Active and founding member of a parent/professional Washington, DC based support group for the families of children and youth with SED (The Family Advocacy and Support Association, Inc. (FASA)). The group was started in 1987.
- Member of the National Association of Social Workers.
- Member of EWE Investment Club, is an avid reader and enjoys traveling.

## CERTIFICATION

Licensed Independent Clinical Social Worker (LICSW) – DC

## AWARDS AND CERTIFICATES

Was the first recipient of FASA's service provider award for outstanding contributions on behalf of children, youth and families in the field of mental health.

Received a Certificate of Appreciation from the Department of Health and Human Services (DHHS), Substance Abuse and Mental Health Services Administration (SAMHSA), Center for Mental Health Services (CMHS), for recognition of outstanding contributions to the production of the video, "Voices of Strength: An Inside Look at Children's Mental Health".

## CONSULTANTSHIPS AND TRAINING

Assisted in the development of FASA's previous and current successful proposal for a Statewide Family Support Network Grant from the CMHS.

Worked on the citywide DCPS parent/professional planning and steering committee that implemented "The Bridge Model Workshop" in the DC Public Schools. The workshop sought to improve communications between parents and professionals who served students with handicapping conditions.

Co-facilitated a workshop on "Parent/Professional Collaboration" for the American Healthcare Institute in Silver Spring, Maryland.

## REFERENCES

Available upon request

**Curriculum Vitae of**
**Jendayo K. Grady**

3179 Chester Grove Road
Upper Marlboro, MD 20774
(301) 568-2029
E-mail: jendayo_grady@hotmail.com

## EDUCATION

**Howard University (APA accredited)**                                    8/95-present
Washington, D.C.
Program: Clinical Psychology
Degree: Master of Science, May 1998
Status: Doctoral Candidate (ABD)

**Morehouse College**                                                    8/91-5/95
Atlanta, GA
Degree: Bachelor of Arts, May 1995
Major: Psychology

## CLINICAL EXPERIENCE

**Doctoral Internship**                                                  6/00-6/01
Howard University Hospital
Department of Psychiatry
Washington, D.C.
Worked on three rotations: Outpatient Clinic, Inpatient psychiatric
ward, and Consultation/Liaison. Conducted interviews, individual & group
therapy, psychological testing and consulted as a therapist on cancer unit
as well as on general medical wards. Functioned as integral part of treatment
team. Completed research project, and presented it at Grand Rounds.

**Clinical Extern/Clinical Therapist**                                   9/96-6/00
Progressive Life Center, Inc.
Substance Abuse Program
Washington, D.C.
Conducted individual, group, and family therapy with adjudicated adolescents
referred for substance abuse problems. Participated in case review and
treatment planning meetings. Conducted home-based treatment.

**Child Trainer**                                                        5/99-12/99
Marshall Heights Community Development Organization
Strengthening Families Program
Washington, D.C.
Taught children skills and techniques which will allow them to better
interact with family members in order to strengthen the family unit.

87

**Youth Counselor**                                                            8/96–1/99
Sasha Bruce Youthwork (R.E.A.C.H.)
Washington, D.C.
Group training, counseling, report writing, recreation, crisis
intervention, behavior management in residential group home.

**Clinical Practicum Student**                                                 9/95–5/96
Clifton T. Perkins Hospital
Jessup, MD
Administered cognitive and projective psychological assessments within a
maximum security adult forensic population to ascertain whether clients were
legally competent to stand trial. Psychological test reports were utilized to make
specific treatment planning recommendations..
planning recommendations.

## RESEARCH
**Doctoral dissertation** on resilience in urban African American          5/98–present
women: coping and worldview as predictors of well-being.
**Masters Thesis** on stressful life events, community violence,           8/95–5/98
and domestic violence as predictors of depression.
**Internship Research Project** on efficacy of group therapy on            6/00–6/01
female victims of childhood sexual abuse.
**Research Assistant**                                                     9/95–5/98
Safe Start Project
Administered, scored, and coded measures in a violence prevention
project.

## VOLUNTEER WORK
Round Oak Missionary Baptist Church                                        1/99–present
Silver Spring, MD
Youth Minister
Teach Sunday School, spiritually counsel children and adolescents,
facilitate groups, tutor, develop and supervise youth church programs.

Hamilton Alternative School                                                1/96–5/96
Washington, D.C.
Mentor
Mentored and tutored an adolescent who attended the school.

Cultural Awareness Network                                                 10/94–5/95
Atlanta, GA
Group Leader
Facilitated groups in which various aspects of African American
culture were discussed with adolescents, assisted in raising money to
fund different programs, and assisted in the organization of the curriculum.

# SECTION H: CONFIDENTIALITY AND SAMHSA PARTICIPANT PROTECTION

**H1. Protection for Potential Risks.** Children and youth with SED and their families are at high risk for a great many problems. Management and clinical staff involved in this project are sensitive to these issues and will be available on a 24-hour basis to deal with crises that may arise. *D.C. CINGS* staff has considerable experience conducting research with this population and have found that, with proper training and support services, the risk of participation in evaluations is minimal. Procedures for obtaining clinical backup when circumstances indicate the child or a family member is in danger will be developed by the case manager.

## H2. Data Collection

The Evaluation team will collect intake data from participating children and youth with SED, as well as their family members once eligibility has been determined and consent has been obtained. Further data collection will occur with the assistance of the CSA care manager responsible for coordinating care. Evaluators will collect additional data from project interviews with participating children, youth, parents, staff and *D.C. CINGS* collaborating agencies as necessary. Standardized assessments, follow-up evaluations, client satisfaction survey, data from instruments designed to assess local definitions of family and appropriate care and measurements required by the national evaluation will be collected. A schedule of specific data collection procedures is included in Table 1, Appendix 3.

The *D.C. CINGS* project intends to provide services earlier in the treatment cycle that will include those who are "at risk" as previously defined, with particular outreach to children with SED who are not currently represented within the current service system, but who require services such as Latinos, homeless and other underrepresented groups. All children and families who fit these criteria will be eligible to participate in the project and evaluation.
The highest standard will be employed for ensuring confidentiality of data used in D.C. CINGS. We have a responsibility to protect the confidentiality of information about children and their family members. Parents and guardians must be advised of their rights and consent must always be obtained  (except where otherwise allowed by law) prior to any interagency sharing of information that identifies the child or youth. This consent will apply only to interagency sharing; participating agencies may not disclose information unless a separate consent is obtained.

All interviews with families who choose to participate will be conducted in a private setting most amenable and convenient to the child and family's schedule (an office, home, or other setting suggested by the respondent). The project evaluators will conduct face-to-face interviews and focus groups in the language of preference by the participant. They will also gather information during theses activities on questionnaire forms.

In the community, staff will ensure, to the extent possible, that questions are asked under situations of privacy. Because of the sensitive nature of some data to be collected, efforts will be taken to minimize the likelihood that participants will find the process uncomfortable. Participants may choose to skip those questions they feel uncomfortable answering. In order to

minimize the risk of unwarranted disclosure of project data and consequent social harm (E.G., breaches of confidentiality), staff will take precautions with computerized data including information captured in automated tracking systems.

The DMH IS data is housed at the DMH offices at 77 P Street, N.E., Washington, D.C., as is the server that authenticates the user information in order to allow them to access ProviderConnect. The device is known as the IIS server. Plans are currently being developed to move that server, as well as a redundant SQL server to the D.C. Office of the Chief Technology Officer server farm at 441 4th Street, N.W. in order to locate it physically behind the information security firewall which allows for more intensive monitoring and screening in the event that someone tried to access the system in an unauthorized manner. The data base engineer will maintain the confidential nature of the data by removing all forms with personal identifiers (i.e., locator and consent forms) from all other information. These forms are kept in key-locked filing cabinets separated from the data files at DMH.

The System Administrator for the eCURA system will create a data extract routine through the report writing system of the application. This data will be "anonimized" by omitting the personal identifiers of the Consumer, and a routine will be developed that links personal identifiers back to the individual but can only be accessed by the System Administrator. The MIS/Evaluation Liaison will then be able to access this information through their own ProviderConnect download folder that will have all of the attendant security elements applied to a Provider Agency. At that time, the data can be imported into SPSS, SAS, Access, or any other preferred data management tool for detailed analysis.

Other precautions we will employ include:

- Maintaining unique identifiers (hard copies) in a locked filing cabinet in the project director's office.
- Holding computer double-key codes in a separate file.
- Ensuring that only specifically identified professional project staff have access to any identifiers or to other means of identifying participants, further minimizing the likelihood inadvertent, inappropriate disclosure.
- Developing a security system limiting access to all or portions of available information for read-only or change purposes.

**Absence of Coercion.** Participation in the project will be voluntary with parents and/or guardians consenting to the family's participation. *D.C. CINGS*, in consultation with the SOC Team and Sub-Council, will review procedures established for the protection of human subject and consent forms for obtaining written consent. The case manager and key family contact will discuss these forms with the family.

## H3. Privacy and Confidentially

The highest standard will be employed for ensuring confidentiality of data used in *D.C. CINGS*. We have a responsibility to protect the confidentiality of information about children and their family members. Parents and guardians must be advised of their rights and consent must always

District of Columbia GFA SM-02-002                                      Nicholas Geleta, Ph.D., Project Director

be obtained) except where otherwise allowed by law) prior to any interagency sharing of information that identifies the child or youth. This consent will apply only to interagency sharing; participating agencies may not disclose information unless a separate consent is obtained. Professional staff will hold to the highest standards of respect for the confidentiality of participant and related data. All interviews with families who choose to participate will be conducted in a private setting most amenable and convenient to the child and family's schedule (an office, home, or other setting suggested by the respondent). The project evaluators will conduct face-to-face interviews in the language of preference by the participant. They will also gather information during the interview on questionnaire forms. Families who choose not to participate will not be penalized in any way.

In the community, staff will ensure, to the extent possible, that questions are asked under situations of privacy. Because of the sensitive nature of some data to be collected, efforts will be taken to minimize the likelihood that participants will find the process uncomfortable. Participants may choose to skip those questions they feel uncomfortable answering.

## H4. Adequate Consent Procedures

Only children and youth whose parents and/or guardians give written consent will participate in the evaluation. Participation in the project and evaluation is voluntary. Individuals receiving services from *D.C. CINGS* will be informed of the national evaluation at the time of eligibility determination and asked to provide consent. The consent form, in English and Spanish, will contain information about the evaluation. Translators will be made available when necessary. Individuals participating in the program will indicate whether they agree to be interviewed as part of the evaluation. Participation in *D.C. CINGS* will not be contingent upon agreeing to participate in the evaluation. It is the staff's experience, however, (and that of other organizations currently implementing similar programs) that refuse to participate in an evaluation of this type is rare. *Families who choose not to participate will not be penalized in any way.*

The Key Family Contact will assist family members with reading and understanding the consent form and provide a contact information for the project director and case manager if the family member wishes to speak to a manager or has questions that cannot be answered by the Key Family Contact. Interviewers will countersign forms indicating that they have witnessed the singing of consent. Adolescents over age 13 will also provide written consent at the time of interviews; children 13 or under will be asked to provide consent.

# 6.  APPENDICES 1 THROUGH 6

District of Columbia GFA SM-02-002                                    Nicholas Geleta, Ph.D., Project Director

# Appendix 1:

# Memoranda of Understanding for Services Coordination and Evaluation

## The District of Columbia 'CINGS' Project
'Children Inspired Now Gain Strength'

### THE SYSTEM OF CARE SUB–COUNCIL of
**The Mayor's Intragovernmental Youth Investment Collaborative**
enters into
an
**INTERAGENCY/FAMILY
COOPERATIVE AGREEMENT**
establishing

*A COMPREHENSIVE COMMUNITY-BASED SYSTEM OF CARE FOR
CHILDREN WITH SERIOUS EMOTIONAL DISTURBANCE
AND THEIR FAMILIES*

## INTRODUCTION

'D.C.CINGS'(Children Inspired Now Gain Strength) is a citywide initiative designed to implement a comprehensive System of Care for children with serious emotional disturbance and their families.  The System of Care is defined by its focus on being family-centered, and highly individualized in its interventions to assist families, that are grounded in the identified strengths of the child and family.  The System will be community-based and deliver services in a culturally competent manner.  Its hallmark will be accessibility and coordination of services.

## STATEMENT OF PURPOSE

The purpose of this agreement is to document the commitment of all participating government agencies and the representatives of families and consumers who are members of the System of Mental Health Care Sub-Council (Sub-Council) of the District's Intragovernmental Youth Investment Collaborative, mandated under Section 111 of the "Mental Health Service Delivery Reform Act of 2001," who have come together to establish and implement a seamless and highly coordinated Comprehensive System of Care for Children and their families in the District of Columbia.  This system will be grounded in the principles of cultural competency, utilization of child and family strengths and resiliency, the development of highly individualized interventions utilizing the Wrap Around model, that include non-traditional interventions and delivery systems that accentuate rapid accessibility to services, flexible funding strategies, and coordination of resources across all agencies.

## GENERAL PROVISIONS

The members of the Sub-Council will constitute the overall governance body for the purpose of maintaining administrative oversight of the grant.  This governance body

includes representation[1] by families and consumers, the Superintendent of Public Schools, the Director of the Department of Mental Health, the Director of the Child and Family Services Agency, Director of the Department of Human Services, Director of the Department of Health, Administrator of Youth Services Administration, Administrator of the Addiction Prevention and Recovery Administration, Administrator of the Medical Assistance Administration, the Administrator of the Mental Retardation and Developmental Disabilities Administration, the presiding Judge of the Family Division of the Superior Court of the District of Columbia (became the Family Court of the Superior Court on January 8, 2002), the Director of University Legal Services (the designated protection and advocacy agency for the District) and the Chair of the District of Columbia Mental Health Planning Council. This Sub-Council shall have oversight for policy issues, the financial plan for expenditure of grant funds and for monitoring all outcomes related to system processes, services, consumer satisfaction and clinical and functional outcomes for children and families receiving services under the grant.

**Families and Consumers will:**

Participate with full and sufficient membership on the System of Care Sub-Council governing body described in this agreement. Participate directly in the planning, management and evaluation of the System of Care. Serve in the position of Key Family Contact, providing advocacy and outreach to children and families. Serve in the positions of Credentialed Family Providers as developed through the grant process.

**Child Serving Agencies[2] will:**

Commit to identify and directly contribute to the staffing, funding, and direct services including all appropriate Transition Services as defined under IDEA to children and families that are part of the target population served by the project.

Commit to sustain and integrate into the existing system, the coordinated system of care developed through the project beyond the 6-year time frame of the grant.

Develop and implement a strategy that allows for the reinvestment of all fiscal savings realized through all cost efficiencies and the reduced utilization of more expensive services (i.e., residential placement, acute psychiatric hospitalizations, out of District non-residential private school placements, and other out of home placements such as therapeutic foster care), back into the new system of care to provide more community-based services to greater numbers of children and families.

---

[1] District agencies comprising the governance body are:  the Public Schools of the District of Columbia, the Department of Mental Health, the Child and Family Services Agency, the Department of Human Services, the Department of Health, the Youth Services Administration, the Medical Assistance Administration, the Mental Retardation/Developmental Disabilities Administration, and the Superior Court of the District of Columbia.

[2] Child serving agencies include all agencies providing direct services or education for children. This excludes the Superior Court and the Protection and Advocacy Agency (University Legal Services).

Commit to providing all necessary service provision, census, demographic, and financial data needed to meet grant reporting and evaluation requirements as well as long-term planning and implementation of ongoing system development goals.

Facilitate the hiring, contracting and other administrative processes involved in the implementation of the grant.

Develop and implement a plan for on-going across agency education and training that will provide for the periodic orientation of all new and existing system of care staff to the general principles of the system of care and the specific components of this agreement as key to ensuring the sustainability of the project goals.

## PROJECT EVALUATION

All members of the Sub-Council agree to participate in and cooperate with all local and federal evaluations of this grant project, including federal site visits.

Except as precluded under the section on Confidentiality and Sharing of Information, each member agency of the Sub-Council shall make available for inspection all information and documents necessary for successful evaluation of this grant project.

## CONFIDENTIALITY AND SHARING OF INFORMATION

Each member agency of the Sub-Council agrees to share with other members all legally disclosable information under the D.C. Mental Health Information Act necessary to make clinical determinations regarding the eligibility of the child and family for services under this project and for diagnostic and treatment planning purposes subsequent to acceptance into the project for services.

Each member agency agrees that sharing of information shall be timely and expeditious.

All information records and data collected and maintained by the project shall be protected from unauthorized disclosure.

Except as otherwise provided by federal and District law or regulation, the use of disclosed information shall be restricted to purposes directly related to the provision of services and administration of the project.

Any exchange of information shall conform to applicable federal and District laws, agency regulations, and policies pertaining to confidentiality, and where applicable, be accompanied by written consent of the consumer or where appropriate by the consumer's parent or legal guardian.

## TERM OF AGREEMENT

This agreement shall be reviewed annually and may be modified as necessary to further the goals of the project.

This agreement will become effective April 26, 2002 and shall continue subject to the will of the majority of the Sub-Council.

The following senior executive government staff, and representatives of family and consumer advocacy groups have executed this agreement. Their signatures follow.

The Honorable Anthony A. Williams
Mayor
District of Columbia

The Honorable Carolyn N. Graham
Deputy Mayor for Children and Families
District of Columbia

Phyllis P. Morgan
President
Family Advocacy and Support Association

Jane Brown, Esq.
Director
University Legal Services

Paul Vance
Superintendent
District of Columbia Public Schools

Olivia Golden
Director
Child and Family Services Agency

Martha B. Knisley
Director
Department of Mental Health

Carolyn W. Colvin
Director
Department of Human Services

Ivan Walks, M.D.
Director
Department of Health

The Honorable Lee F. Satterfield
Presiding Judge
Family Division, D.C. Superior Court

Dale Brown
Acting Administrator
Mental Retardation Developmental/
Disabilities Administration

Herbert H. Weldon, Jr.
Senior Deputy Director for
HealthCare Finance

Larry Siegel, M.D.
Administrator
Addiction, Prevention, Recovery
Administration

Richard Budson, M.D.
Chair Person
D.C. Mental Health Planning Council

Gayle Turner
Administrator
Youth Services Administration

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

OFFICE OF THE MAYOR
GOVERNMENT OF THE DISTRICT OF COLUMBIA


_____    4/22/02
The Honorable Anthony A. Williams          Date
Mayor


_____    4/19/02
The Honorable Carolyn N. Graham            Date
Deputy Mayor for Children and Families

IN WITNESS WHEREOF, the parties by their signatures hereto execute this INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated above:

FAMILY ADVOCACY AND SUPPORT ASSOCIATION (FASA)


_____          _____
Phyllis P. Morgan                                      Date
President

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

UNIVERSITY LEGAL SERVICES

_Jane Brown/KB_      _4/22/02_

Jane Brown, Esq.            Date
Director

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

DISTRICT OF COLUMBIA PUBLIC SCHOOLS


_____        4/22/02
Paul Vance                             Date
Superintendent

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

DEPARTMENT OF MENTAL HEALTH

_____          April 22, 2002
Martha B. Knisley                         Date
Director

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

CHILD AND FAMILY SERVICES AGENCY

_____     _____
Olivia Golden                       Date
Director

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

DEPARTMENT OF HUMAN SERVICES

_____          _____
Carolyn W. Colvin                                Date
Director

4/22/02

IN WITNESS WHEREOF, the parties by their signatures hereto execute this INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated above:

DEPARTMENT OF HEALTH

4/19/02

_____                    _____
Ivan Walks, M.D.                                    Date
Director

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

D.C. SUPERIOR COURT, FAMILY DIVISION


_____          April 23, 2002
The Honorable Lee F. Satterfield                  Date
Presiding Judge

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

MENTAL RETARDATION DEVELOPMENTAL DISABILITIES
ADMINISTRATION

_____        __4/22/02_____

Dale Brown                                              Date
Acting Administrator

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

MEDICAL ASSISTANCE ADMINISTRATION

_____        22 Apr 02
Herbert H. Weldon, Jr.                    Date
Senior Deputy Director for
Health Care Finance

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

ADDICTION PREVENTION AND RECOVERY ADMINISTRATION

_____          4/22/02_____
Larry Siegel, M.D.                         Date
Administrator

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

D.C. MENTAL HEALTH PLANNING COUNCIL

4/18/02

Richard Budson, M.D.                              Date
Chair Person

IN WITNESS WHEREOF, the parties by their signatures hereto execute this
INTERAGENCY/FAMILY COOPERATIVE AGREEMENT and show their full support
for goals and purpose of the 'D.C. CINGS' Project and the commitments stipulated
above:

YOUTH SERVICES ADMINISTRATION

Valerie P. Boyh ——— (pow) _____ 4/19/02
Gayle Turner                              Date
Administrator

# Appendix 2:

# Health Coverage Modification Plans/ Governor's Assurance

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### DEPARTMENT OF MENTAL HEALTH

Office of the Director



Bernard S. Arons, M.D.
Director, Center for Mental Health Services,
Substance Abuse and Mental Health Services Administration
5600 Fishers Lane
Rockville, MD  20857

Dear Dr. Arons:

This is to certify that the system of care proposed under the Cooperative Agreements for the Comprehensive Community Mental Health Services for Children and Their  Families Program, GFA No. SM-02-002, reflects the specific goals of the 2002 State Mental Health Plan for the District of Columbia.

The 2003 State Mental Health Plan will include specific milestones that will monitor implementation of the system.

Sincerely,

Martha B. Knisley
Director, Department of Mental Health

# Appendix 3:

# Data Collection Procedures

Nicholas Geleta, Ph.D., Project Director

**APPENDIX 3**

### Appendix No. 3 "Data Collection Procedures"

After the end of the first year, the evaluation will focus on an analysis of the program operation and ensuring the findings from the national evaluation are incorporated in system change. This analysis will draw data from multiple sources to ensure input from all stakeholders to guard against potential biases or limited perspectives. Children, families, case managers, providers and agency staff will be queried using focus groups. Responses will be coupled with the examination of program documentation routinely submitted to the central database and a review of the assortment of interagency and intra-agency agreements in an effort to determine their effectiveness toward the development of a system of care. All findings will be reported back to the key stakeholders through a conference at the end of the year. Specific data collection procedures are included in Table 1.

### Table 1.
### Measurements and Data Collection for Families, Services and Outcomes

| Data | Target Population | Instruments/ measurements | Intervals/months | | | | Responsible for collection |
|---|---|---|---|---|---|---|---|
| | | | Baseline | 6 | 12/24 | 24/30 | |
| **I. Child/family system** | | | | | | | |
| 1. Child data | Child | Intake form | X | | | | Program |
| 2. Family data | Family | Intake form | X | | | | Program |
| 3. Diagnosis | Child | Intake form | X | | | | Program |
| 4. Presenting problem | Child | Intake form | X | X | X | X | Program |
| 5. Psychosocial data | Child | Intake form | X | | | | Program |
| 6. Health Status | Child | Intake form | X | X | X | X | Program |
| 7. Treatment Plan | Family | Intake form | | X | X | X | Program |
| 8. Service Level | Child | Intake form | X | X | X | X | Program |
| 9. Service Cost | | | | | | | |
| **II. Intervention Outcomes** | | | | | | | |
| 1. Child symptoms | Child | CBCL | X | X | X | X | Program |
| 2. Child Functioning | Child | CAFAS | X | X | X | X | Evaluation |
| 3. Focus Groups | Child | DISC | | X | X | X | Evaluation |
| 4. Family engagement | Family | To be developed | X | X | X | X | Program |

| Data | Target Population | Instruments/ measurements | Intervals/months | | | | Responsible for collection |
|---|---|---|---|---|---|---|---|
| | | | Baseline | 6 | 12/24 | 24/30 | |
| **III. Family Factors** | | | | | | | |
| 1. Social supports | Family | F-COPES | X | X | X | X | Evaluation |
| 2. Extended family support | Family | F-COPES | X | X | X | X | Evaluation |
| 3. Spirituality | Family | F-COPES | X | X | X | X | Evaluation |
| 4. Empowerment | Family | FES | X | X | X | X | Evaluation |
| **IV. System of Care** | | | | | | | |
| 1. Estimate of Unmet Need | Program | Interviews | X | X | X | X | Evaluation |
| 2. Service Types | Program | Interviews | X | X | X | X | Evaluation |
| 3. Funding Sources | Program | Interviews | X | | | | Evaluation |
| 4. Interagency interaction | Program | Interviews | X | X | X | X | Evaluation |
| 5. Service coordination | Program | Interviews | X | X | X | X | Evaluation |
| 6. Project Impact | Program | Interviews | X | X | X | X | Evaluation |
| 7. Family Involvement | Program | Interviews | X | X | X | X | Program |
| 8. # of children served | Program | Interviews | X | X | X | X | Program |
| 9. # of agency visits | Program | Interviews | X | X | X | X | Program |
| 10. Cultural competence | Program | | X | X | X | X | Evaluation |

# Appendix 4:

# Sample Consent Forms

# CONSENT FOR TREATMENT

**Name of Consumer:**

**Legal Guardian, if any:**

**Attorney-in-fact, if any:**


I/We hereby give consent for mental health treatment (which may include services, supports, and/or medication) for the above named Consumer.  Services may include one or more of the following:  1) medication and somatic services, (2) individual, family and/or group counseling-psychotherapy services, and, 3) diagnostic assessment services.  *[ANY OTHER SERVICES THAT SHOULD BE SPECIFIED?]*

**The purpose** of the proposed treatment is:  _____.

**The potential risks involved without treatment** may be that the Consumer continues his/her current level of functioning and makes no progress.  If issues are not resolved, situations may become worse causing increased stress and decreased levels of functioning.

**The potential risks involved in treatment** may include discomfort discussing and facing issues with service providers and others.  Certain medications may have unpleasant side effects which will be explained in detail by the physician if he or she prescribes a medication for this patient.  Other **side effects** for this treatment may include _____.

Specific medications proposed for this Consumer include the following: _____ *[MUST INCLUDE INFORMATION REGARDING THE PURPOSE FOR THE ADMINISTRATION OF THE MEDICATION, POSSIBLE SIDE EFFECTS, AND ITS POTENTIAL RISKS AND BENEFITS.]*

**The potential benefits involved in receiving treatment** may include an improved functioning level; an improved sense of self-confidence and self-esteem; attainment of new skills to improve coping mechanisms, relate with others and understand self and others; enhanced sense of well-being; and greater self-reliance and independence.

**Feasible alternative treatment methods** will be explored with the Consumer as appropriate.  At every opportunity, the Consumer will be encouraged to choose specific activities which may include one or more of the following: *[ meditation, relaxation techniques, expressive arts, pet therapy, music therapy, recreational activities, volunteer service projects, sports, and others to enhance their treatment.]*

I/We understand that at any time I/we may revoke consent for treatment.


Revised 2/00                                   118                                   UMCH-600

# JOINT CONSENT
## FOR THE USE AND DISCLOSURE OF
## PROTECTED HEALTH INFORMATION

This Consent has been prepared for use by the District of Columbia Department of Mental Health and Its Network of Mental Health Providers of Services and Support.

NAME:_____

    I understand and agree that _____ may share my health information with others in order to treat me, to obtain payment for my treatment, and to perform other healthcare operations. The information may relate to my past, present, or future mental or physical health. I understand that, if I don't agree to allow _____ to share my information, _____ will not be able to provide treatment to me.

    Disclosures may be made by _____ [describe persons who are authorized to disclose the information]. The entities to whom disclosures may be may include _____ [describe entities to whom information might be disclosed].

    I understand that I have the option of requesting restrictions regarding how my health information may be used or disclosed by _____. I also understand that _____ does not have to accept these restrictions.

    I acknowledge that a Notice of Information Practices has been made available to me. The Notice of Information practices provides a more complete description of the potential uses and disclosures of my information. I understand that I have the right to review the Notice prior to signing this consent. I also understand that _____ reserves the right to change the Notice and related practices, and that if any such changes in the Notice are going to be made, a copy of the Notice will be mailed to me at the address I've provided. I can also obtain a copy of the notice by contacting the eCura Hotline @ _____.

    I understand that I may revoke this consent in writing. If I revoke my consent, _____ must stop sharing my information from that time forward. However, as long as this consent is in effect, _____ is free to share my information.


_____       _____

Signature of patient or of legal guardian or attorney-in-fact       Date

I/We understand the risks and benefits of treatment (including alternative or no treatment) and give consent for treatment.

Signed:_____    Date:_____
          Consumer

Signed:_____    Date:_____
          Guardian

Signed:_____    Date:_____
          Attorney in-Fact
Signed:_____    Date:_____

# Appendix 5:

# Non-Federal Match Certification

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF MENTAL HEALTH

Office of the Director



Bernard S. Arons, M.D.
Director, Center for Mental Health Services,
Substance Abuse and Mental Health Services Administration
5600 Fishers Lane
Rockville, MD  20857

Dear Dr. Arons:

This is to certify that sufficient non-Federal funds will be available to match Federal grant
funds, in the ratios specified in GFA No. SM-02-002, for the duration of the grant.

                                        Sincerely,

Martha B. Knisley                                Susan F. Provyn
Director                                         Chief Financial Officer

# Appendix 6:

# Organizational Chart
# Staffing Pattern
# Timeline
# Management Chart



http://dc.gov/mayor/organization.htm

District of Columbia
Department Mental Health
Office of the of Director
Table of Organization Chart

## D. C. CINGS
## STAFFING PATTERN

| Staff Position | Name | % Time on Project | Race | Gender |
|---|---|---|---|---|
| Principal Investigator | Martha B. Knisley, Director | 100% | Caucasian | Female |
| Senior State-Local Liaison | Velva Spriggs | 30% | African American | Female |
| Projector Director | Nicholas Geleta, Ph.D. | 100% | Caucasian | Male |
| Clinical Director | Andrea Weisman, Ph.D. | 100% | Caucasian | |
| Family Coordinator | Harriett Crawley, MSW | 100% | African American | Female |
| Key Family Contact | To be named | 50% | | |
| Youth Coordinator | Jendayo Grady | 50% | African American | Male |
| Interagency Coordinator | To be named | 100% | | |
| MIS Evaluation Liaison | To be named | 50% | | |
| Fiscal Liaison Officer | To be named | 50% | | |
| Training & T.A. Liaison | To be named | 50% | | |
| Social Marketing/Communications Manager | To be named | 50% | | |

126

D.C. CINGS TIMELINE

| Action | Staff Person | Year 1 | | | | | | | | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 |
| **Infrastructure Development** | | | | | | | | | | | | | | | | | | | | |
| Reassign DMH designated staff: Project Director, Clinical Director, Family Coordinator, Fiscal Officer, and Youth Coordinator | Principal Investigator, Receiver, Youth Director | X | | | | | | | | | | | | | | | | | | |
| Establish D.C. CINGS SOC Team (Adm. Group) | Principal Investigator | X | | | | | | | | | | | | | | | | | | |
| Hire other D.C. CINGS operational staff: Interagency Coordinator, Key Family Contact, MIS/Evaluation Liaison, Training & TA Coordinator, Marketing/Communications Manger and Admin. Costs | Project Director D.C. CINGS SOC Team | | X | X | | | | | | | | | | | | | | | | |
| Contract with Howard University for evaluation team | Project Director D.C. CINGS SOC Team | | X | | | | | | | | | | | | | | | | | |
| Contract for Family Liaisons | Project Director D.C. CINGS SOC Team | | X | X | X | | | | | | | | | | | | | | | |
| **Strategic Plan Development** | | | | | | | | | | | | | | | | | | | | |
| Establish Strategic Planning Group | MH Sub-Council | | X | | | | | | | | | | | | | | | | | |
| Hire Strategic Planning Consultant (Logic Model Cons) | Principal Investigator, Project Director | | X | | | | | | | | | | | | | | | | | |
| Work with Medicaid Management Comm. To develop reinvestment strategies | Senior State-Local Liaison Fiscal Office liaison Project Director | | X | X | X | X | X | | | | | | | | | | | | | |
| Contract for special studies: • Out-of-state Placements | Project Director Clinical Director | | X | X | X | X | | | | | | | | | | | | | | |
| • Access for Latino Children | Project Director, Family Coordinator, and SOC Team | | X | X | X | X | | | | | | | | | | | | | | |

| Action | Staff Person | Year 1 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9-12 | Year 2 1-6 | 7-12 | Year 3 1-6 | 7-12 | Year 4 1-6 | 7-12 | Year 5 1-6 | 7-12 | Year 6 1-6 | 7-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Review current policies/practices to assess needed changes | MH Sub-Council SOC Team | | X | X | X | X | X | X | X | X | | | | | | | | | | |
| Develop Draft Plan | Consultant Strategic Planning Group | | X | X | X | X | X | | | | | | | | | | | | | |
| Finalize Strategic Imp. Plan | Consultant Strategic Planning Group | | | | | | | | | X | | | | | | | | | | |
| Review and refine Strategic Imp. Plan | SOC Team Sub-Council | | | | | | | | | | X | X | X | X | X | X | X | X | | |
| **Interagency Coordination** | | | | | | | | | | | | | | | | | | | | |
| Operationalize specific MOUs for each agency | Project Director Interagency Coordinator | | | X | X | | | | | | | | | | | | | | | |
| Identify agency liaisons for D.C CINGS implementation | Interagency Coordinator | | | | | X | X | X | | | | | | | | | | | | |
| Set up centralized grievance resolution process | SOC Team Interagency Task Force | | | | | X | X | X | | | | | | | | | | | | |
| Develop resource and information guide on current initiatives | Interagency Coordinator | | | | | | | | | X | | | | | | | | | | |
| Review, amend and add interagency agreements, as needed | Interagency Coordinator | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Act as liaison to other child initiatives in the District | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Assess models used to capture "re-investment" dollars for youth returning from RTCs in other states /jurisdictions | Fiscal Office Liaison Expert Consultants | | | | | | | | | X | X | | | | | | | | | |
| Develop strategies for capturing "re-investment" dollars in the District | Fiscal Office Liaison Expert Consultants SOC Team | | | | | | | | | | X | | | | | | | | | |
| Implement "re-investment" strategies and other funding strategies | MH Sub-Council Fiscal Office Liaison SOC Team | | | | | | | | | | | | X | X | X | X | X | X | 6 | X |
| Develop periodic reports on costs of services, payment sources, etc. | Fiscal Office Liaison | | | | | | | | | | | X | X | X | X | X | X | X | X | X |

Nicholas Geleta, Ph.D., Project Director

| Action | Staff Person | Y1 M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 | M9-12 | Y2 1-6 | Y2 7-12 | Y3 1-6 | Y3 7-12 | Y4 1-6 | Y4 7-12 | Y5 1-6 | Y5 7-12 | Y6 1-6 | Y6 7-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Identify and seek other sources of funds for sustainability | Fiscal Office Liaison / Expert Consultants | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| Provide fiscal analysis support to strategic planning group | Fiscal Office Liaison / Expert Consultants | | | | X | X | X | X | X | | | | | | | | | | | |
| Development and implement reimbursement systems | Expert Consultants / Fiscal Office Liaison | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | |
| Develop accounting reporting systems | Fiscal Office Liaison | | | | X | X | X | | | | | | | | | | | | | |
| Conduct budget development mid-year process | Project Director / SOC Team / Fiscal Office Liaison | | | | | | | | | X | X | X | X | X | X | X | X | X | X | |
| **Family Involvement** | | | | | | | | | | | | | | | | | | | | |
| Identify family members to be involved in Strategic Planning Comm. | MH Sub-council / Project Director | X | X | | | | | | | | | | | | | | | | | |
| Hire key family contact | Subcontractor | X | X | X | | | | | | | | | | | | | | | | |
| Assist Evaluation Team in identifying potential Evaluation Liaison | Family Coordinator | | | X | X | | | | | | | | | | | | | | | |
| Develop agreements with Neighborhood Collaboratives about their roles in D.C. CINGS | Family Coordinator / Interagency Coordinator | X | | X | X | X | X | | | | | | | | | | | | | |
| Review and amend agreements with Neighborhood Collaboratives annually | Family Coordinator / Interagency Coordinator | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Subcontract to identify strategies to build capacity of FASA | Family Coordinator / Annie E. Casey | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | |
| Subcontract to hire and credential four Family Liaisons | Project Director / Family Coordinator | | | | | | X | X | | | | | | | | | | | | |
| Hire and credential four additional Family Liaisons | Subcontractor | | | | | | | | | X | | X | | | | | | | | |
| **Youth Involvement** | | | | | | | | | | | | | | | | | | | | |
| Identify and implement strategy for involvement of Youth in strategic planning implementation of Project | Project Director / Youth Coordinator | X | X | X | | | | | | | | | | | | | | | | |

| Action | Staff Person | Year 1 | | | | | | | | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 |
| Develop MH subcommittee of the Youth council | Youth Coordinator | | | | | X | X | | | | | | | | | | | | | | |
| Create feedback mechanisms for ongoing youth; Review of implementation | Youth Coordinator; Youth Council | | | | | | | X | X | | | X | | X | | X | | X | | X |
| Conduct activities to educate and increase awareness of MH among District youth. | Youth Coordinator; Youth Council | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| **Service Development Enhancement** | | | | | | | | | | | | | | | | | | | | |
| Provide baseline data on service utilization of youth with SED across agencies | Clinical Director; MIS/Evaluation Liaison | | X | X | | | | | | | | | | | | | | | | |
| Access availability of community support services | Clinical Director; Neighborhood Collaboratives | | X | X | X | | | | | | | | | | | | | | | |
| Identify major gaps in current service system | Clinical Director; MIS/Evaluation Liaison | | X | X | X | X | | | | | | | | | | | | | | |
| Assess and develop CSAs capacity to provide child services | Principal Investigator; Project Director; Clinical director | | | X | X | X | | | | | X | X | X | X | X | X | X | X | X | X |
| Identify evidence-based practice models to be implemented | Project Director; Clinical Director | | | | | | | X | X | | | | | | | | | | | |
| Develop and implement plan for service development/enhancement | Clinical Director | | | | | | | | | X | X | X | X | X | X | X | | X | | |
| Create and pilot test universal risk and resiliency tool | Clinical Director; Interagency Task Force | | | | | | | | | | X | X | | | | | | | | |
| Fully implement universal risk and resiliency tool | Clinical Director; Project Director | | | | | | | | | | | | X | X | X | X | X | X | X | X |
| Identify and contract with specialty providers | Clinical Director | | | | | | | | | X | | X | X | X | X | X | X | X | X | X |
| **MIS Activities** | | | | | | | | | | | | | | | | | | | | |
| Assess current computer hardware/software and project restructuring needs | MIS/Evaluator Liaison | | | X | X | | | | | | | | | | | | | | | |
| Purchase computers/software | Evaluation Team | | | | X | | | | | | | | | | | | | | | |
| Develop and install MIS at D.C. CRNGS offices and sites | MIS/Evaluator Liaison | | | | X | X | X | | | | | X | | | | | | | | |
| Link agencies through computer network | MIS/Evaluator Liaison | | | | X | X | X | | | | | X | | | | | | | | |

30

Nicholas Geleta, Ph.D., Project Director

| Action | Staff Person | Year 1 | | | | | | | | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 |
| Download available appropriate data | MIS/Evaluator Liaison | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| Create MIS forms for data collection and program for analysis | MIS/Evaluator Liaison | | | | | | X | X | X | X | | | | | | | | | | |
| Coordinate data information with local and national evaluation requirements | MIS/Evaluator Liaison | | | | | | | | | X | X | X | X | X | X | X | X | X | X | |
| **Evaluation Activities** | | | | | | | | | | | | | | | | | | | | |
| Designate Evaluation Team, including parent Evaluation Assistant | Project Director / Evaluation Team | | | X | X | | | | | | | | | | | | | | | | |
| Orientation for Evaluation Team | Project Director / SOC Team | | | | | X | X | | | | | | | | | | | | | | |
| Adapt national evaluation | Evaluation Team / MIS/Evaluation Liaison | | | | | | | X | X | | | | | | | | | | | | |
| Design local formative evaluation | Evaluation Team / MIS/Evaluation Liaison | | | | | | | X | X | | | | | | | | | | | | |
| Conduct needed training and evaluation process [131] | Evaluation Team | | | | | | | | X | X | | | | | | | | | | |
| Collect data (Semi-annually) | Evaluation Team | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Analyze data (Semi-annually) | Evaluation Team | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Supply data to national evaluation managers | Evaluation Team / MIS/Evaluation Liaison | X | X | X | X | X | | | | | X | X | X | X | X | X | X | X | X | X |
| Write and produce interim evaluation reports | Evaluation Team | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Write and produce yearly evaluation reports | Evaluation Team | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Analyze program operations | Project Director / Evaluation Team / MIS/Evaluation Liaison | | | | | | | | | | X | X | X | X | X | X | X | X | X | D |
| Review implementation of strategic plan | Project Director / Evaluation Team | | | | | | | | | | X | X | X | X | X | X | X | Z | X | |
| **Training and Technical Assistance** | | | | | | | | | | | | | | | | | | | | |
| Assess available training staff, materials and resources | Training & TA Coordinator / Interagency Coordinator | | | | | | | | X | | | | | | | | | | | |
| Identify major gaps in training | Training & TA Coordinator / Interagency Coordinator | | | | | | | | X | | | | | | | | | | | |

| Action | Staff Person | Y1-1 | Y1-2 | Y1-3 | Y1-4 | Y1-5 | Y1-6 | Y1-7 | Y1-8 | Y1-9-12 | Y2 1-6 | Y2 7-12 | Y3 1-6 | Y3 7-12 | Y4 1-6 | Y4 7-12 | Y5 1-6 | Y5 7-12 | Y6 1-6 | Y6 7-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Training & TA Plan for Strategic Implementation | Strategic Planning Group Training & TA Coordinator | | | | | | | | | | X | | | | | | | | | |
| Train D.C. CINGS staff and agency stakeholders | Training & TA Coordinators Training Consultants | | | | | | | | | | X | X | X | X | X | | X | | | |
| Train DCA staff and providers | Training & TA Coordinator Interagency Coordinator | | | | | | | | | | X | X | X | X | X | | X | | X | |
| Train core coordination and wrap-around staff | Training & TA Coordinator Interagency Coordinator | | | | | | | | | | X | X | X | X | X | | X | | | |
| Train neighborhood collaboratives, community leaders, families, religious leaders, youth, etc. | Training & TA Coordinator Training Consultants | | | | | | | | | | X | X | X | X | X | | X | | | |
| Assist in efforts to train for selected evidence-based practice | Training & TA Coordinator Evidence-Based Practice Providers | | | | | | | | | | | | | | | | | | | |
| Evaluate training and technical assistance effectiveness | Training & TA Coordinator Evaluation Team | | | | | | | | | | X | X | X | X | X | | X | | X | X |
| **Social Marketing Committee** | | | | | | | | | | | | | | | | | | | | |
| Identify other social materials/communication strategies for District kids and family and seek to share information/efforts when possible | Social Marketing Communications Manager Project Director | | | X | X | X | | | | | X | X | X | X | X | | X | X | X | X |
| Coordinate activities with national social marketing/communication partnership | Social Marketing Communications Manager | | | | | | X | X | X | | | | | | | | | | | |
| Develop a social marketing/ communications plan for project | Social Marketing Communications Manager Project Director SOC Team | | | | | | | | | X | | | | | | | | | | |
| Develop materials/resources for social marketing/communications effort | Social Marketing Communications Manager SOC Team | | | | | | | | | | X | X | | | | | | | | |

Nicholas Geleta, Ph.D., Project Director

| Action | Staff Person | Year 1 | | | | | | | | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 |
| Implement social marketing/communications activities | Social Marketing/ Communications Manager, SOC Team | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Evaluate impact/effectiveness of activities | Social Marketing/ Communications Manager, Evaluation Team | | | | | | X | X | | | | X | | X | | X | | X | X | |
| Review/revise Social Marketing/ Communications Activities based on feedback | Social Marketing/ Communications Manager | | | | | | | | | | | X | | X | | | | X | X | |
| **Fiscal Development** | | | | | | | | | | | | | | | | | | | | |
| Work with Medicaid Workgroup to develop strategies for reinvestment | Principal Investigator, Fiscal Office Liaison | | X | X | X | X | X | X | | | | X | | X | | X | | X | | |
| Identify all funding sources (public and private) available for children with SED and ...ir services | Fiscal Office Liaison, Interagency Coordinator, Senior State-Local Liaison | | X | X | X | | | | | | | | | | | | | | | |
| Review current costs associated with all existing service types, primary sources of payment, etc. | Fiscal Office Liaison, SOC Team | | X | X | | | | | | | | | | | | | | | | |
| Collect data and develop a report on all funding reimbursement for mental health services for child populations in the District | Fiscal Office Liaison | | | | X | X | X | | | | | | | | | | | | | |
| **Ongoing Project** | | | | | | | | | | | | | | | | | | | | |
| Evaluate children with SED in out-of-state placements and determine eligibility to move to community-based setting | Clinical Director, Consultant Group, Project Director, SOC Team | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Develop protocols to assess those at risk of SED | Clinical Director, SOC Team | | | | | | | | X | | | | | | | | | | | |
| Work with CSAs to enhance access and appropriateness of ... services | Clinical Director, Interagency Coordinator | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |

| Action | Staff Person | Year 1 | | | | | | | | | Year 2 | | Year 3 | | Year 4 | | Year 5 | | Year 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 | 1-6 | 7-12 |
| Identify and establish client referral protocols, assessment protocols, and flow of clients through the system | Clinical Director; SOC Team | | | | | | | | | X | | | | | | | | | | |
| Create and implement QI process | Clinical Director | | | | | | | | | | | X | X | X | X | X | X | X | X | X |
| Identify potentially eligible children | SOC Team | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| Enroll all eligible D.C. children | SOC Team | | | | | | | | | | X | X | X | X | X | X | X | X | X | X |
| Review at least five randomly selected cases for treatment plan compliance | Clinical Director; SOC Team | | | | | | | | | | X (S-MOS) | X* | X | X | X | X | X | X | X | X |

*Note:  Begin here every other month.

134

# D.C. CINGS Management Structure





# D.C. CINGS:
## System of Care

# ASSURANCES - NON-CONSTRUCTION PROGRAMS

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0040), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE OFFICE OF MANAGEMENT AND BUDGET. SEND IT TO THE ADDRESS PROVIDED BY THE SPONSORING AGENCY.**

**Note:** Certain of these assurances may not be applicable to your project or program. If you have questions, please contact the awarding agency. Further, certain Federal awarding agencies may require applicants to certify to additional assurances. If such is the case, you will be notified.

As the duly authorized representative of the applicant I certify that the applicant:

1. Has the legal authority to apply for Federal assistance, and the institutional, managerial and financial capability (including funds sufficient to pay the non-Federal share of project costs) to ensure proper planning, management and completion of the project described in this application.

2. Will give the awarding agency, the Comptroller General of the United States, and if appropriate, the State, through any authorized representative, access to and the right to examine all records, books, papers, or documents related to the award; and will establish a proper accounting system in accordance with generally accepted accounting standard or agency directives.

3. Will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, o personal gain.

4. Will initiate and complete the work within the applicable time frame after receipt of approval of the awarding agency.

5. Will comply with the Intergovernmental Personnel Act of 1970 (42 U.S.C. §§4728-4763) relating to prescribed standards for merit systems fo programs funded under one of the nineteen statutes or regulations specified in Appendix A of OPM's Standard for a Merit System of Personnel Administration (5 C.F.R. 900, Subpart F).

6. Will comply with all Federal statutes relating to nondiscrimination. These include but are not limited to: (a) Title VI of the Civil Rights Act of 1964 (P.L. 88-352) which prohibits discrimination on the basis of race, color or national origin; (b Title IX of the Education Amendments of 1972, as amended (20 U.S.C. §§1681-1683, and 1685 1686), which prohibits discrimination on the basis of sex; (c) Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. §§794), which prohibits discrimination on the basis of handicaps; (d) the Age Discrimination Act of 1975, as amended (42 U.S.C. §§6101-6107), which prohibits discrimination on the basis of age;

(e) the Drug Abuse Office and Treatment Act of 1972 (P.L. 92-255), as amended, relating to nondiscrimination on the basis of drug abuse; (f) the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970 (P.L. 91-616), as amended, relating to nondiscrimination on the basis of alcohol abuse or alcoholism; (g) §§523 and 527 of the Public Health Service Act of 1912 (42 U.S.C. §§290 dd-3 and 290 ee-3), as amended, relating to confidentiality of alcohol and drug abuse patient records; (h) Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§3601 et seq.), as amended, relating to nondiscrimination in the sale, rental or financing of housing; (i) any other nondiscrimination provisions in the specific statute(s) under which application for Federal assistance is being made; and (j) the requirements of any other nondiscrimination statute(s) which may apply to the application.

7. Will comply, or has already complied, with the requirements of Title II and III of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (P.L. 91-646) which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal or federally assisted programs. These requirements apply to all interests in real propert acquired for project purposes regardless of Federal participation in purchases.

8. Will comply with the provisions of the Hatch Act (5 U.S.C. §§1501-1508 and 7324-7328) which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

9. Will comply, as applicable, with the provisions of the Davis-Bacon Act (40 U.S.C. §§276a to 276a-7), the Copeland Act (40 U.S.C. §276c and 18 U.S.C. §874), and the Contract Work Hours and Safety Standards Act (40 U.S.C. §§327- 333), regarding labor standards for federally assisted construction subagreements.

137

Standard Form 424B (Rev.7-97)
Prescribed by OMB Circular A-102

Created by: PSC Media Arts (301) 443-2454    XFT

10. Will comply, if applicable, with flood insurance purchase requirements of Section 102(a) of the Flood Disaster Protection Act of 1973 (P.L. 93-234) which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

11. Will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Polic Act of 1969 (P.L. 91-190) and Executive Order (EO) 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetland pursuant to EO 11990; (d) evaluation of flood hazards in floodplains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Costal Zone Management Act of 1972 (16 U.S.C. §§1451 et seq.); (f) conformit of Federal actions to State (Clear Air) Implementation Plans under Section 176(c) of the Clear Air Act of 1955, as amended (42 U.S.C. §§7401 et seq.); (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended, (P.L. 93-523); and (h) protection of endangered species under the Endangered Species Act of 1973, as amended, (P.L. 93-205).

12. Will comply with the Wild and Scenic Rivers Act of 1968 (16 U.S.C. §§1271 et seq.) related to protecting components or potential components of the national wild and scenic rivers system.

13. Will assist the awarding agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended (16 U.S.C. §470), EO 11593 (identification and protection of historic properties), and the Archaeological and Historic Preservation Act of 1974 (16 U.S.C. §§ 469a-1 et seq.).

14. Will comply with P.L. 93-348 regarding the protection of human subjects involved in research, development, and related activities supported b this award of assistance.

15. Will comply with the Laboratory Animal Welfare Act of 1966 (P.L. 89-544, as amended, 7 U.S.C. §§2131 et seq.) pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported b this award of assistance.

16. Will comply with the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. §§4801 et seq.) which prohibits the use of lead based paint in construction or rehabilitation of residence structures.

17. Will cause to be performed the required financial and compliance audits in accordance with the Single Audit Act of 1984.

18. Will comply with all applicable requirements of all other Federal laws, executive orders, regulations and policies governing this program.

| SIGNATURE OF AUTHORIZED CERTIFYING OFFICIAL | TITLE |
|---|---|
| *[signature]* | Director Department of Mental Health |
| APPLICANT ORGANIZATION | DATE SUBMITTED |
| Department of Mental Health | April 26, 2002 |

SF-424B (Rev. 7-97) Back

OMB Approval No. 0920-042

# CERTIFICATIONS

## 1. CERTIFICATION REGARDING DEBARMENT AND SUSPENSION

The undersigned (authorized official signing for the applicant organization) certifies to the best of his o her knowledge and belief, that the applicant, defined as the primary participant in accordance with 45 CFR Part 76, and its principals:

(a) are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal Department or agency;

(b) have not within a 3-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(c) are not presently indicted or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with com- mission of any of the offenses enumerated in paragraph (b) of this certification; and

(d) have not within a 3-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

Should the applicant not be able to provide this certification, an explanation as to why should be placed after the assurances page in the application package.

The applicant agrees by submitting this proposal tha it will include, without modification, the clause titled "Certification Regarding Debarment, Suspension, In eligibility, and Voluntary Exclusion—Lower Tie Covered Transactions" in all lower tier covered transactions (i.e., transactions with sub- grantees and/or contractors) and in all solicitations for lowe tier covered transactions in accordance with 45 CFR

## 2. CERTIFICATION REGARDING DRUG-FREE WORKPLACE REQUIREMENTS

The undersigned (authorized official signing for the applicant organization) certifies that the applican will, or will continue to, provide a drug-free work place in accordance with 45 CFR Part 76 by:

(a) Publishing a statement notifying employees that the unlawful manufacture, distribution, dis- pensing, possession or use of a controlled substance is prohibited in the grantee's work- place and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an ongoing drug-free awareness program to inform employees about—

(1) The dangers of drug abuse in the workplace
(2) The grantee's policy of maintaining a drug-free workplace;
(3) Any available drug counseling, rehabil itation, and employee assistance programs; and
(4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(c) Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a) above;

(d) Notifying the employee in the statement re- quired by paragraph (a), above, that, as a condition of employment under the grant, the employee will—
(1) Abide by the terms of the statement; and
(2) Notify the employer in writing of his or he conviction for a violation of a criminal drug statute occurring in the workplace no late than five calendar days after such conviction;

(e) Notifying the agency in writing within ten calendar days after receiving notice under paragraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to every grant officer or other designee on whose grant activity the convicted employee was working, unless the Federal agency has designated a central point

139

for the receipt of such notices. Notice shall include the identification number(s) of each

(f) affected grant;

Taking one of the following actions, within 30 calendar days of receiving notice under paragraph (d) (2), with respect to any employee who is so convicted–

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

For purposes of paragraph (e) regarding agency notification of criminal drug convictions, the DHHS has designated the following central point for receipt of such notices:

Office of Grants and Acquisition Management
Office of Grants Management
Office of the Assistant Secretary for Management and
    Budget
Department of Health and Human Services
200 Independence Avenue, S.W., Room 517-D
Washington, D.C. 20201

## 3. CERTIFICATION REGARDING LOBBYING

Title 31, United States Code, Section 1352, entitled "Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions," generally prohibits recipients of Federal grants and cooperative agreements from using Federal (appropriated) funds for lobbying the Executive or Legislative Branches of the Federal Government in connection with a SPECIFIC grant or cooperative agreement. Section 1352 also requires that each person who requests or receives a Federal grant or cooperative agreement must disclose lobbying undertaken with non-Federal (non-appropriated) funds. These requirements apply to grants and cooperative agreements EXCEEDING $100,000 in total costs (45 CFR Part 93).

The undersigned (authorized official signing for the applicant organization) certifies, to the best of his or her knowledge and belief, that:

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federally appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure of Lobbying Activities," in accordance with its instructions. (If needed, Standard Form-LLL, "Disclosure of Lobbying Activities," its instructions, and continuation sheet are included at the end of this application form.)

(3)

The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

## 4. CERTIFICATION REGARDING PROGRAM FRAUD CIVIL REMEDIES ACT (PFCRA)

The undersigned (authorized official signing for the applicant organization) certifies that the statements herein are true, complete, and accurate to the best of his or her knowledge, and that he or she is aware that any false, fictitious, or fraudulent statements or claims may subject him or her to criminal, civil, or administrative penalties. The undersigned agrees that the applicant organization will comply with the Public Health Service terms and conditions of award if a grant is awarded as a result of this application.

## 5. CERTIFICATION REGARDING ENVIRONMENTAL TOBACCO SMOKE

Public Law 103-227, also known as the Pro-Children Act of 1994 (Act), requires that smoking not be permitted in any portion of any indoor facility owned or leased or contracted for by an entity and used routinely or regularly for the provision of health, da care, early childhood development services, education or library services to children under the age of 18, if the services are funded by Federal programs either directly or through State or local governments, b Federal grant, contract, loan, or loan guarantee. The law also applies to children's services that are provided in indoor facilities that are constructed, operated, or maintained with such Federal funds. The law does not apply to children's services provided in private residence, portions of facilities used fo inpatient drug or alcohol treatment, service providers whose sole source of applicable Federal funds is Medicare or Medicaid, or facilities where WIC coupons are redeemed.

Failure to comply with the provisions of the law ma result in the imposition of a civil monetary penalt of up to $1,000 for each violation and/or th imposition of an administrative compliance order on the responsible entity.

By signing the certification, the undersigned certifies that the applicant organization will compl with the requirements of the Act and will not allow smoking within any portion of any indoor facility used for the provision of services for children as defined by the Act.

The applicant organization agrees that it will require that the language of this certification be included in any subawards which contain provisions fo children's services and that all subrecipients shal certify accordingly.

The Public Health Services strongly encourages al grant recipients to provide a smoke-free workplace and promote the non-use of tobacco products. This is consistent with the PHS mission to protect and advance the physical an mental health of the American people.

| SIGNATURE OF AUTHORIZED CERTIFYING OFFICIAL | TITLE |
| --- | --- |
| *Martha B. M...y* (signature) | Director<br>Department of Mental Health |

| APPLICANT ORGANIZATION | |
| --- | --- |
| Department of Mental Health | DATE SUBMITTED<br>April 26, 2002 |

9.    DISCLOSURE OF LOBBYING ACTIVITIES

NOT APPLICABLE

# CHECKLIST

OMB Approval No. 0920-0428

**Public Burden Statement:** Public reporting burden for this collection of information is estimated to average 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to CDC, Project

Clearance Officer, 1600 Clifton Road, MS D-24, Atlanta, GA 30333, ATTN: PRA (0920-0428). Do not send the completed form to this address.

**NOTE TO APPLICANT:** This form must be completed and submitted with the original of your application. Be sure to complete both sides of this form. Check the appropriate boxes and provide the information requested. This form should be attached as the last page of the signed original of the application. This page is reserved for PHS staff use only.

---

**Type of Application:** ☒ NEW ☐ Noncompeting Continuation ☐ Competing Continuation ☐ Supplemental

**PART A:** The following checklist is provided to assure that proper signatures, assurances, and certifications have been submitted.

|  |  | Included | NOT Applicable |
|---|---|---|---|
| 1. | Proper Signature and Date for Item 18 on SF 424 (FACE PAGE) | ☒ | |
| 2. | Proper Signature and Date on PHS-5161-1 "Certifications" page. | ☒ | |
| 3. | Proper Signature and Date on appropriate "Assurances" page, i.e., SF-424B (Non-Construction Programs) or SF-424D (Construction Programs) | ☒ | |
| 4. | If your organization currently has on file with DHHS the following assurances, please identify which have been filed by indicating the date of such filing on the line provided. (All four have been consolidated into a single form, HHS Form 690) | | |

☒ Civil Rights Assurance (45 CFR 80) ......... **March 17, 1998**
☒ Assurance Concerning the Handicapped (45 CFR 84) ......... **March 17, 1998**
☒ Assurance Concerning Sex Discrimination (45 CFR 86) ......... **March 17, 1998**
☒ Assurance Concerning Age Discrimination (45 CFR 90 & 45 CFR 91) ......... **March 17, 1998**

| 5. | Human Subjects Certification, when applicable (45 CFR 46) | ☐ | ☒ |

---

**PART B:** This part is provided to assure that pertinent information has been addressed and included in the application.

|  |  | YES | NOT Applicable |
|---|---|---|---|
| 1. | Has a Public Health System Impact Statement for the proposed program/project been completed and distributed as required? | ☐ | ☒ |
| 2. | Has the appropriate box been checked for item # 16 on the SF-424 (FACE PAGE) regarding intergovernmental review under E.O. 12372 ? (45 CFR Part 100) | ☒ | |
| 3. | Has the entire proposed project period been identified in item # 13 of the FACE PAGE? | ☒ | |
| 4. | Have biographical sketch(es) with job description(s) been attached, when required? | ☒ | |
| 5. | Has the "Budget Information" page, SF-424A (Non-Construction Programs) or SF-424C (Construction Programs), been completed and included? | ☒ | ☐ |
| 6. | Has the 12 month detailed budget been provided? | ☒ | ☐ |
| 7. | Has the budget for the entire proposed project period with sufficient detail been provided? | ☒ | ☐ |
| 8. | For a Supplemental application, does the detailed budget address only the additional funds requested? | ☐ | ☒ |
| 9. | For Competing Continuation and Supplemental applications, has a progress report been included? | ☐ | ☒ |

---

**PART C:** In the spaces provided below, please provide the requested information.

Business Official to be notified if an award is to be made.

**Name** Martha B. Knisley

**Title** Director

**Organization** DC Dept of Mental Health

**Address** 77 P St, NE, Suite 400 Washington, DC 20002

**E-mail Address** martha.knisley@dc.gov

**Telephone Number** 202-673-2200

**Fax Number** 202-673-1933

Program Director/Project Director/Principal Investigator designated to direct the proposed project or program.

**Name** Nicholas Geleta, Ph.D.

**Title** Project Director

**Organization** DC Dept of Mental Health

**Address** 77 P St, NE Suite 400 Washington, DC 2002

**E-mail Address** nicholas.geleta@dc.gov

**Telephone Number** 202-671-3157

**Fax Number** 202-673-1933

**APPLICANT ORGANIZATION'S 12-DIGIT DHHS EIN (if already assigned)**

| 1 | 5 | 3 | 6 | 0 | 0 | 1 | 1 | 3 | 1 | A | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|

43

**SOCIAL SECURITY NUMBER**

| 0 | 5 | 4 | - | 4 | 2 | - | 1 | 7 | 4 | 5 |
|---|---|---|---|---|---|---|---|---|---|---|

**HIGHEST DEGREE EARNED** Ph.D

*(OVER)*

**PART D:  A private, nonprofit organization must include evidence of its nonprofit status with the application. An of the following is acceptable evidence. Check the appropriate box or complete the "Previously Filed section, whichever is applicable.**

☐ (a)  A reference to the organization's listing in the Internal Revenue Service's (IRS) most recent list of tax-exempt organizations described in section 501(c)(3) of the IRS Code.

☐ (b)  A copy of a currently valid Internal Revenue Service Tax exemption certificate.

☐ (c)  A statement from a State taxing body, State Attorney General, or other appropriate State official certifying that the applicant organization has a nonprofit status and that none of the net earnings accrue to any private shareholders or individuals.

☐ (d)  A certified copy of the organization's certificate of incorporation or similar document if it clearly establishes the nonprofit status of the organization.

☐ (e)  Any of the above proof for a State or national parent organization, and a statement signed by the parent organization that the applicant organization is a local nonprofit affiliate.

If an applicant has evidence of current nonprofit status on file with an agency of PHS, it will not be necessary to file similar papers again, but the place and date of filing must be indicated.

Previously Filed with: (Agency)                                                                      on (Date)

| *N/A* | *N/A* |

---

## INVENTIONS

If this is an application for continued support, include: (1) the report of inventions conceived or reduced to practice required by the terms and conditions of the grant; or (2) a list of inventions already reported, or (3) a negative certification.

---

## EXECUTIVE ORDER 12372

...fective September 30, 1983, Executive Order 12372 (Inter-governmental Review of Federal Programs) directed OMB to abolish OMB Circular A-95 and establish a new process for consulting with State and local elected officials on proposed Federal financial assistance. The Department of Health and Human Services implemented the Executive Order through regulations at 45 CFR Part 100 (Inter- governmental Review of Department of Health and Human Services Programs and Activities). The objectives of the Executive Order are to (1) increase State flexibility to design a consultation process and select the programs it wishes to review, (2) increase the ability of State and local elected officials to influence Federal decisions and (3) compel Federal officials to be responsive to State concerns, or explain the reasons.

The regulations at 45 CFR Part 100 were published in the *Federal Register* on June 24, 1983, along with a notice identifying the

Department's programs that are subject to the provisions of Executive Order 12372. Information regarding PHS programs subject to Executive Order 12372 is also available from the appropriate awarding office.

States participating in this program establish State Single Points of Contact (SPOCs) to coordinate and manage the review and comment on proposed Federal financial assistance. Applicants should contact the Governor's office for information regarding the SPOC, programs selected for review, and the consultation (review) process designed b their State.

Applicants are to certify on the face page of the SF-424 (attached) whether the request is for a program covered under Executive Order 12372 and, where appropriate, whether the State has been given an opportunity to comment.

144

DEPARTMENT OF HUMAN SERVICES

COMMISSION ON MENTAL HEALTH SERVICES

WASHINGTON, D. C. 20032

March 25, 1998

Mr. Paul Cushing
Department of Health and Human Services
Office of Civil Rights
Region 3
PO Box 13716
Philadelphia, PA  19101

Dear Mr. Cushing:

Thank you for our phone conversation this morning.  As per
instruction, please find enclosed HHS 690, signed by the
Receiver, Commission on Mental Health Services, District of
Columbia Government.

The District is applying for the HHS grant with the short title,
Child Mental Mental Health Initiative, GFA No. SM-98-006 and the
Catalog of Federal Domestic Assistance No. 93.104.

Mr. Johnny Nelson, in the HHS Civil Rights Office in Washington,
DC, advised us to file HHS 690 for this grant, even though the
District of Columbia has certainly filed the composite assurances
at some time in the past.

Thank you for your attention to this matter.

Sincerely,

Juan Carlos Lovelace, Ed.D.
Grant Project Director

1914

## ASSURANCE OF COMPLIANCE

ASSURANCE OF COMPLIANCE WITH TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, SECTION 504 OF THE REHABILITATION ACT OF 1973, TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AND THE AGE DISCRIMINATION ACT OF 1975

The Applicant provides this assurance in consideration of and for the purpose of obtaining Federal grants, loans, contracts, property, discounts or other Federal financial assistance from the Department of Health and Human Services.

THE APPLICANT HEREBY AGREES THAT IT WILL COMPLY WITH:

1.  Title VI of the Civil Rights Act of 1964 (P. L. 88-352), as amended, and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 80), to the end that, in accordance with Title VI of that Act and the Regulation, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the Applicant receives Federal financial assistance from the Department.

2.  Section 504 of the Rehabilitation Act of 1973 (P. L. 93-112), as amended, and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 84), to the end that, in accordance with Section 504 of that Act and the Regulation, no otherwise qualified handicapped individual in the United States shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity for which the Applicant receives Federal financial assistance from the Department.

3.  Title IX of the Educational Amendments of 1972 (P. L. 92-318), as amended, and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 86), to the end that, in accordance with Title IX and the Regulation, no person in the United States shall, on the basis of sex, be excluded

146

from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any education program or activity for which the Applicant receives Federal financial assistance from the Department.

4. The Age Discrimination Act of 1975 (P. L. 94-135), as amended, and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 91), to the end that, in accordance with the Act and the Regulation, no person in the United States shall, on the basis of age, be denied the benefits of, be excluded from participation in, or be subjected to discrimination under any program or activity for which the Applicant receives Federal financial assistance from the Department.

The Applicant agrees that compliance with this assurance constitutes a condition of continued receipt of Federal financial assistance, and that it is binding upon the Applicant, its successors, transferees and assignees for the period during which such assistance is provided. If any real property or structure thereon is provided or improved with the aid of Federal financial assistance extended to the Applicant by the Department, this assurance shall obligate the Applicant, or in the case of any transfer of such property, any transferee, for the period during which the real property or structure is used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. If any personal property is so provided, this assurance shall obligate the Applicant for the period during which it retains ownership or possession of the property. The Applicant further recognizes and agrees that the United States shall have the right to seek judicial enforcement of this assurance.

The person or persons whose signature(s) appear(s) below is/are authorized to sign this assurance, and commit the Applicant to the above provisions.

3/17/98
Date

Scott H. Nelson, M.D., Receiver
Commission on Mental Health Services
Signature and Title of Authorized
Official

Scott H. Nelson, M.D., Receiver
Commission on Mental Health Services
Name of Applicant or Recipient

147